Anthony **BARTEE**, Petitioner,

v.

Nathaniel **QUARTERMAN**, Director, Texas Department of Criminal Justice, Correctional Institutions Division, Respondent.

Civil No. SA–06–CA–263–FB.

United States District Court,
W.D. Texas,
San Antonio Division.

Aug. 6, 2008.

---

Jay Robert Brandon, Law Office of Jay Brandon, Richard Emil Langlois, Langlois & Snyder, San Antonio, TX, Jani J. Maselli, Attorney at Law, Houston, TX, for Petitioner.

### MEMORANDUM OPINION AND ORDER DENYING RELIEF

FRED BIERY, District Judge.

Petitioner Anthony Bartee filed this federal habeas corpus action pursuant to Title 28 U.S.C. Section 2254 collaterally attacking his May, 1998, Bexar County conviction for capital murder and sentence of death. For the reasons set forth below, petitioner is entitled to neither federal habeas corpus relief nor a Certificate of Appealability from this Court.

### I. Statement of the Case

A. *Factual Background*

1. *Petitioner Attempts to Solicit Assistance*

On August 15, 1996, petitioner telephoned his acquaintance Heidi Munoz and informed her he planned to "ace some white dude out." [1] Munoz interpreted this remark as indicating petitioner planned to rob and "get rid of" the person in question, whom petitioner indicated was named "David." [2] When Ms. Munoz refused petitioner's request to assist in this endeavor, petitioner asked for the phone number of Ms. Munoz's ex-boyfriend, Joey Banks, and indicated he planned to seek Mr. Banks' help. [3] During the same telephone conversation, petitioner also unsuccessfully solicited the assistance of Ms. Munoz's friends Nadine Berlanga and Stella Suarez. [4]

At some point during the summer of 1996, petitioner telephoned Joey Banks and requested Mr. Banks' help in robbing and killing someone who lived in the same neighborhood where petitioner stayed and who, petitioner informed Mr. Banks, had "some gold cards and a motorcycle" petitioner wanted. [5] When Mr. Banks indicated he would not help, petitioner told Joey Banks he would do it himself. [6]

2. *Petitioner's Arrival at Heidi Munoz's Apartment*

Later on that same date, petitioner arrived at Ms. Munoz's apartment riding a motorcycle which petitioner said he had acquired through a lawsuit. [7] Petitioner gave Ms. Suarez a ride on his motorcycle but Ms. Munoz declined petitioner's invitation for a ride. [8] Although petitioner said he was carrying a gun, Ms. Munoz never saw one. [9]

3. *Petitioner's Claims at the Bowling Alley*

The following morning, on August 16, 1996, petitioner approached two employees of a bowling alley located near petitioner's parents' residence and informed them he owned the Harley Davidson motorcycle they had found parked behind the bowling alley. [10]

---

1. Statement of Facts from Petitioner's Trial (henceforth "S.F. Trial"), Volume XX, testimony of Heidi Garza Munoz, at pp. 87–88, 90–92, 114.

2. *Id.*

3. *Id.,* at pp. 92–93.

4. *Id.,* at p. 93.

5. S.F. Trial, Volume XXI, testimony of Joey Cortez Banks, at pp. 41–44.

6. *Id.,* at pp. 44, 49.

7. S.F. Trial, Volume XX, testimony of Heidi Garza Munoz, at pp. 95–97.

8. *Id.*

9. *Id.,* at p. 101.

10. S.F. Trial, Volume XX, testimony of Johnny Romero, at pp. 131–40; testimony of Steve Ruiz, at pp. 155–63.

#### 4. *Petitioner's Trip to Corpus Christi*

Later that same date, petitioner drove the Harley motorcycle to Corpus Christi, Texas, where he met up with his acquaintance Macedonio Gonzalez.[11] Petitioner informed Mr. Gonzalez that he had traded in two motorcycles to acquire the new Harley.[12] Petitioner also informed Mr. Gonzalez petitioner had seen a friend of his shot in the head by two members of the "Ace of Spades" gang.[13] Petitioner never informed Mr. Gonzalez that the motorcycle belonged to petitioner's murdered friend.[14] A few days later, petitioner returned to San Antonio but left the new Harley in Macedonio Gonzalez's custody, telling Mr. Gonzalez he would return to pick it up.[15] When petitioner did not return after several weeks, Mr. Gonzalez contacted local law enforcement authorities in Corpus Christi, who took custody of the Harley.[16] A Corpus Christi homicide detective testified at petitioner's trial that, on August 26, 1996, he took possession of a motorcycle from Macedonio Gonzalez which he identified as the same motorcycle reported stolen in connection with the murder of David Cook in San Antonio.[17]

#### 5. *Discovery of the Decedent's Body*

On the morning of August 17, 1996, police and David Cook's family members discovered the body of David Cook inside Mr. Cook's locked residence in San Antonio, Texas.[18] An autopsy revealed Mr. Cook had been fatally shot twice in the head and stabbed once in the shoulder.[19] At the crime scene, police discovered: (1) a slug which fell from the face of David Cook as his body was rolled over by personnel from the medical examiner's office,[20] (2) a sec-

11. S.F. Trial, Volume XX, testimony of Macedonio Gonzalez, at pp. 173–75.

12. *Id.*, p. 175.

13. *Id.*, at pp. 177–80, 185, 189, 192–93, 195–98.

14. *Id.*, at pp. 196–97.

15. *Id.*, at p. 182.

16. *Id.*, at p. 183.

17. S.F. Trial, Volume XXI, testimony of Richard L. Garcia, at pp. 5–9.

18. S.F. Trial, Volume XVIII, testimony of Phyllis Cook, at pp. 33–39; testimony of Cheryl Budington, at pp. 49–61; testimony of Robert Garcia, at pp. 73–93; testimony of Debra Wichlip, at pp. 139–71; testimony of Jesse C. Garcia, IV, at pp. 182–249; testimony of Theresa Velasquez, at pp. 257–71.

S.F. Trial, Volume XIX, testimony of Ralph Looney, at pp. 12–23, 37; testimony of Harold Ray Bellamy, at pp. 45–70.

19. S.F. Trial, Volume XIX, testimony of Vincent DiMaio, at pp. 78–119. More specifically, the Bexar County Chief Medical Examiner testified: (1) David Cook suffered a close-range gunshot wound (i.e., 1–3 inches from the skin) to the right side of the head which entered about two and a half inches above the ear canal, traversed the brain ganglia, and exited the temporal region toward the front of the head on about the same level as that of entry, (2) this wound was immediately lethal and instantaneously rendered David Cook unconscious, (3) the bullet from this gunshot wound exited the body and was not recovered during the autopsy, (4) David Cook suffered a second gunshot wound, this one to the right side of the back of the neck which had been fired slightly further from the skin than the other gunshot wound, (5) this second bullet transected the spinal cord at the first cervical vertebrae, caused immediate paralysis, and would have been sufficient by itself to cause death by asphyxia within ninety seconds to two minutes, (6) either of the gunshot wounds would have been immediately incapacitating and fatal, (7) David Cook also suffered a nonfatal, superficial, stab wound to the right shoulder about three inches below the top of the shoulder which, because of minimal bleeding, was probably inflicted post-mortem, (8) toxicology results on David Cook's blood were negative for alcohol, narcotics, cocaine, or other drugs, and (9) both of David Cook's fatal wounds were caused by a deadly weapon, i.e., a firearm. *Id.*

20. S.F. Trial, Volume XVIII, testimony of Debra Wichlip, at pp. 149, 170–71; testimony of

ond slug which had passed through a wall, penetrated the rear of Mr. Cook's refrigerator, and come to rest therein,[21] and (3) a pair of spent shell casings and several live 9 mm rounds.[22] A firearms expert testified at petitioner's trial that the spent round, shell casings, and bullet fragment recovered from the crime scene were all consistent with 9 mm bullets that had been fired from the type of handgun Mr. Cook owned but which was missing from the crime scene following Mr. Cook's murder.[23] Both David Cook's 9 mm pistol and Harley Davidson motorcycle were missing from his residence.[24]

### 6. The Missing Harley

Several members of David Cook's family described and identified a photograph of a red Harley Davidson motorcycle owned by David Cook which was missing from Mr. Cook's residence following the discovery of David Cook's body.[25] Heidi Munoz identified a photograph of David Cook's Harley Davidson motorcycle as similar to the one driven by petitioner when he visited Ms. Munoz's apartment late on the night of August 15, 1996.[26] Each of the two bowling alley employees who encountered peti-

tioner the following morning identified the same photograph of Mr. Cook's motorcycle as the one petitioner claimed as his own.[27] A friend of petitioner's who resided in Corpus Christi identified the same photograph of David Cook's motorcycle as the one petitioner drove to Corpus Christi in August, 1996 and claimed as his own.[28]

### 7. Petitioner's First Statement to Police

On August 20, 1996, shortly after his return to San Antonio, petitioner gave San Antonio police a written statement in which he claimed to have no knowledge whatsoever of David Cook's murder.[29]

### 8. Petitioner's Second Statement to Police

On August 30, 1996, while in custody on an unrelated charge, and after having been informed that police had recovered David Cook's missing motorcycle, petitioner gave San Antonio Police a second written statement in which he claimed: (1) he had been present at David Cook's home at the time of Mr. Cook's fatal shooting, (2) he had witnessed two local gang members he

Jesse C. Garcia, IV, at pp. 218, 230; testimony of Theresa Velasquez, at p. 262; Volume XIX, testimony of Harold Ray Ballamy, at pp. 48–50.

21. S.F. Trial, Volume XVIII, testimony of Debra Wichlip, at pp. 152–53, 168–69; testimony of Jesse C. Garcia, IV, at p. 228; testimony of Theresa Velasquez, at pp. 265–67.

22. S.F. Trial, Volume XVIII, testimony of Debra Wichlip, at pp. 144–46, 149, 152, 167–68; testimony of Jesse C. Garcia, IV, at pp. 213–18, 222, 228–29, 234–35; testimony of Theresa Velasquez, at pp. 257–58, 262.

23. S.F. Trial, Volume XIX, testimony of Edward William Love, Jr., at pp. 122–30, 137–39, 255–57.

24. S.F. Trial, Volume XIX, testimony of Harold Ray Ballamy, at pp. 51–52.

25. S.F. Trial, Volume XVIII, testimony of Phyllis Cook, at pp. 29, 44; testimony of Cheryl Budington, at pp. 52–53; Volume XXI, testimony of Marvin K. Cook, at pp. 55–56.

26. S.F. Trial, Volume XX, testimony of Heidi Munoz, at pp. 95–96.

27. S.F. Trial, Volume XX, testimony of Johnny Romero, at pp. 132–33; testimony of Steve Ruiz, at pp. 155–57.

28. S.F. Trial, Volume XX, testimony of Victoria Sommerfield, at p. 215.

29. S.F. Trial, Volume XX, testimony of George Saidler, at pp. 49–54, 57–61, 66–71.

Petitioner's first statement to police was admitted into evidence as State Exhibit 111A and read in open court. Id., at pp. 57–61, 66–71. A copy of State Exhibit 111A appears in S.F. Trial, Volume XXV, at pp. 83–86.

knew only as "Snake" and "Throw down" enter Mr. Cook's residence and escort Mr. Cook to the back bedroom, (3) he then went to the garage and sat down on Mr. Cook's motorcycle, (4) suspecting foul play was about to occur, he started Mr. Cook's motorcycle, and (5) when he then heard gunshots, he fled the scene on Mr. Cook's motorcycle out of fear for his own safety.[30]

### 9. Petitioner's Call to His Friends

In following weeks, petitioner telephoned Heidi Munoz and one of Ms. Munoz's friends, claimed to have had no involvement in David Cook's murder, and urged them both to claim they had no knowledge of anything relating to David Cook's murder or of the motorcycle petitioner was riding the night he visited Ms. Munoz's apartment.[31]

## B. Indictment

On April 2, 1997, a Bexar County grand jury indicted petitioner in cause no. 97–CR–1659 on a single count of capital murder, to wit having intentionally and knowingly caused the death of David Cook by shooting Mr. Cook with a firearm while in the course of committing and attempting to commit the predicate offenses of robbery and burglary on Mr. Cook.[32]

## C. Trial

### 1. Jury Selection

Jury selection began in petitioner's capital murder trial on March 9, 1998, and concluded on April 8, 1998.

### 2. Replacement of Petitioner's Co-Counsel

On April 13, 1998, the day the guilt-innocence phase of petitioner's trial was to begin, petitioner's co-counsel, attorney Michael Sawyer, advised the trial court he had only that morning become aware of the fact he knew Susan Cook, one of David Cook's sisters, and the entire Cook family.[33] Mr. Sawyer requested to withdraw as petitioner's co-counsel.[34] The trial court granted Mr. Sawyer's request, appointed attorney Joel Perez to replace Michael Sawyer, granted a four-week continuance, but denied petitioner's motion for mistrial.[35]

### 3. Guilt–Innocence Phase of Trial

The guilt-innocence phase of petitioner's capital murder trial commenced on May 11, 1998.

After presenting the evidence outlined above, the prosecution rested on May 14, 1998.

The defense then called a neighbor of David Cook who testified: (1) he heard what he believed was a loud motorcycle take off around ten p.m. on August 15, 1996, and (2) very shortly thereafter, he heard automotive tires squealing.[36] The

---

**30.** S.F. Trial, Volume XX, testimony of Guillermo Mendoza, at pp. 255–69.

Petitioner's second statement was admitted into evidence during petitioner's trial as State Exhibit no. 126 and read in open court. *Id.,* at pp. 264–71. A copy of State Exhibit no. 126 appears in S.F. Trial, Volume XXV, at pp. 89–91.

**31.** S.F. Trial, Volume XX, testimony of Heidi Garza Munoz, at pp. 98–101, 115–16, 123; Volume XXI, testimony of Josephine Nadine Berlanga, at pp. 26–28, 31–33.

**32.** Transcript of pleadings, motions, and other documents filed in petitioner's state trial

court proceedings (henceforth "Trial Transcript"), Volume I of III, at p. 4.

**33.** S.F. Trial, Volume XVII, at pp. 2–3.

**34.** *Id.*

**35.** *Id.,* at pp. 3–8.

**36.** S.F. Trial, Volume XXI, testimony of Manual Chavarria, at pp. 68–70. On cross-examination by the prosecution, however, the same witness testified he had bad hearing, he could not be certain the first sound he had heard was made by David Cook's motorcycle, while he heard dogs barking that night, he heard no

defense also presented a second neighbor of David Cook who testified she witnessed a white vehicle with two black stripes squealing its tires as it left David Cook's driveway around 10:45 p.m. the evening of the murder.[37] The defense then rested.

The prosecution then called in rebuttal a third neighbor of David Cook who testified, on the evening of David Cook's murder: (1) sometime after 11 p.m., he was visited by a drunken friend who parked his car directly across the street from David Cook's home, (2) he argued with his inebriated friend, who was driving a big white car with dark blue stripes, and (3) his friend later left the area, first by backing his vehicle into David Cook's driveway and then squealing his tires as he left the area at a high rate of speed.[38]

In its guilt-innocence phase jury instructions, the trial court charged the jury on the lesser-included offense of non-capital murder, as well as capital murder.[39]

On May 15, 1998, after deliberating less than five hours, the jury returned its verdict, finding petitioner guilty of capital murder, as charged in the indictment.[40]

### 4. Punishment Phase of Trial

The punishment phase of petitioner's capital murder trial commenced on May 18, 1998.

The prosecution presented a pair of witnesses, each of whom testified to the details of separate aggravated sexual assaults the petitioner perpetrated upon them at knife-point in July 1982 when they were teenagers.[41] A fingerprint examiner testified the petitioner's fingerprints matched those on a pair of penitentiary packets indicating the petitioner had been: (1) convicted of aggravated rape in Texas in separate criminal cases arising from the two incidents about which the two women had testified, (2) sentenced to serve terms of thirty-three and ten years, respectively, as a result of those convictions, and (3) convicted on a pair of theft charges in California in 1980.[42]

The defense then called petitioner's father, who testified the petitioner: (1) was an above-average student who had been honorably discharged from the United States military, (2) was a "giving" person, not aggressive, and "always willing to help," (3) had always been respectful to his parents when growing up, (4) had never

---

gunshots, and he was unsure the second sound he heard was that of a vehicle taking off. *Id.*, at pp. 78–82.

37. S.F. Trial, Volume XXI, testimony of Diane Denise Miller, at pp. 92, 98, 101, 103–04. This witness testified on cross-examination she could not see how many persons were inside the white vehicle as it left the area. *Id.*, at p. 104.

38. S.F. Trial, Volume XXI, testimony of Bernardo Hurtado, at pp. 107–113.

39. Trial Transcript, Volume III of III, at pp. 290–302.

40. S.F. Trial, Volume XXII, at pp. 59–62; Trial transcript, at pp. 305–06.

The time stamps on petitioner's guilt-innocence phase jury charge and verdict form indicate the trial court submitted its charge at approximately 9:48 a.m. on May 15, 1998, and the jury returned its guilty verdict at approximately 2:45 p.m. the same date.

41. S.F. Trial, Volume XXIII, testimony of Yvette Brown Summers, at pp. 4–16; testimony of Kanna Lynn Vanvelser, at pp. 23–42.

42. S.F. Trial, Volume XXIII, testimony of Ralph Looney, at pp. 49–64.

Petitioner's penitentiary packets, admitted into evidence as State Exhibit nos. 141 & 142, appear at S.F. Trial, Volume XXV, at pp. 95–116.

been deprived of visitation privileges during pretrial detention, (5) had served twelve years incarceration in California and Texas prisons, and (6) deserved mercy.[43] The defense also called a public school risk counselor who testified petitioner: (1) while serving a prison sentence, had been a "model prisoner" who participated in a program to discourage gang-involved school students from continuing their gang-related affiliation, (2) had been sexually abused as an adolescent and showed symptoms of sexual abuse, (3) had difficulty adjusting once he was released from prison, and (4) had impressed her with the way he handled himself when addressing her students.[44]

On May 19, 1998, the jury returned its verdict at the punishment phase of petitioner's trial, finding: (1) beyond a reasonable doubt there was a probability petitioner "would commit criminal acts of violence that would constitute a continuing threat to society," and (2) there were insufficient mitigating circumstances to warrant a sentence of life imprisonment rather than a death sentence be imposed.[45]

### 5. Direct Appeal

Petitioner filed his appellant's brief on July 1, 1999, asserting twelve points of error.[46] In an unpublished opinion issued May 3, 2000, the Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence.[47] *Bartee v. State*, No. 73,126

---

**43.** S.F. Trial, Volume XXIII, testimony of James Bartee, at pp. 67–84. Petitioner's father admitted on cross-examination petitioner had always professed his innocence in connection with one of the aggravated sexual assault charges made against petitioner in 1982, he had not been aware of petitioner's guilty plea to a second charge of aggravated sexual assault until he learned of that fact during the punishment phase of petitioner's capital murder trial, and he was unaware petitioner had, at one time, used an alias. *Id.*, at pp. 76–81.

**44.** S.F. Trial, Volume XXIII, testimony of Mary Karen Sedung, at pp. 93–119. On cross-examination, this witness admitted: (1) she briefly engaged in a sexual relationship with petitioner shortly after he was released from prison, (2) she had sent petitioner money on several occasions, (3) petitioner denied responsibility for his rape conviction and told her his prior conviction was the product of consensual sex, (4) she worked as a volunteer for an organization opposed to the death penalty, (5) no one other than petitioner had informed her petitioner had been sexually abused as a child, (6) petitioner had used drugs while on parole, (7) the day David Cook was murdered, she wired petitioner money, (8) petitioner acknowledged using marijuana and alcohol, and (9) petitioner's work life showed a lack of structure. *Id.*, at pp. 119–51.

**45.** S.F. Trial, Volume XXIV, at pp. 47–50; Trial Transcript, Volume III of III, at pp. 312–13.

**46.** As points of error on direct appeal, petitioner presented arguments focusing on: (1) the trial court's rulings on both parties' challenges for cause during voir dire, (2) the trial court's denial of petitioner's challenge to the prosecution's peremptory strike of a black venire member, (3) the trial court's refusal to grant a mistrial after sustaining a defense objection to, and instructing the jury to disregard, the prosecution's evidence of David Cook's good character presented during the guilt innocence phase of trial, (4) the trial court's refusal to instruct the jury on the lesser-included offenses of robbery and aggravated robbery, and (5) the prosecutor's alleged comments on petitioner's failure to testify made during closing argument at both phases of trial.

**47.** In its opinion affirming petitioner's conviction and sentence, the Texas Court of Criminal Appeals concluded, in part: (1) the trial court had not abused its discretion in its rulings on challenges for cause during voir dire, (2) any error in the jury instructions was harmless, (3) there was no rational basis for additional lesser-included offense instructions, (4) most of the prosecutorial comments about which petitioner complained were not directed at petitioner's failure to testify, and (5) the trial court had directed the jury to disregard the prosecutor's one ambiguous comment.

(Tex.Crim.App. May 3, 2000). Petitioner did not thereafter seek certiorari review of his conviction by the United States Supreme Court.

### 6. State Habeas Proceeding

On January 3, 2000, petitioner filed an application for state habeas corpus relief in which he asserted thirty-seven claims for relief, including a multi-faceted claim of ineffective assistance by his trial counsel.[48]

The state habeas trial court held evidentiary hearings on petitioner's claims on September 8–9 and 28, 2004. Petitioner called four witnesses to testify during those hearings: (1) attorney Vincent D. Callahan, petitioner's former lead trial counsel; (2) petitioner's father; (3) the lead prosecutor from petitioner's trial; and (4) the private investigator who assisted petitioner's court-appointed defense investigator in interviewing potential witnesses prior to petitioner's trial. Petitioner did not question his own lead trial counsel regarding the subjective thought processes and strategic reasoning underlying counsel's decision-making in connection with petitioner's trial, particularly with regard to counsel's decisions not to investigate certain potentially advantageous factual matters more thoroughly, i.e., the very crux of petitioner's own ineffective assistance claims. Petitioner likewise, never called his co-counsel at trial, attorney Joel Perez, to testify. Petitioner also introduced no testimony from any witness suggesting that any additional, admissible, exculpatory, mitigating, or favorable impeachment evidence existed at the time of petitioner's trial which could have been discovered or developed through more thorough investigation by petitioner's trial counsel and investigators.

In an Order issued October 17, 2005, the state trial court found petitioner had failed to present any evidence supporting the vast majority of his claims, concluded none of petitioner's state habeas claims possessed any merit, and recommended denial of petitioner's state habeas application.[49] In an unpublished Order issued March 8, 2006, the Texas Court of Criminal Appeals adopted the state habeas trial court's findings of fact and conclusions of law, and denied state habeas relief. *Ex parte Anthony Bartee*, WR–63,381–01, 2006 WL 560692 (Tex.Crim.App. March 8, 2006).

### B. Proceedings in Federal Court

On February 21, 2007, petitioner filed his federal habeas corpus petition in this cause, asserting thirty-one claims for relief. *Docket entry no. 11.*

On September 28, 2007, respondent filed his answer and motion for summary judgment, arguing the state courts reasonably rejected each of petitioner's claims herein on the merits in the course of petitioner's

---

**48.** Transcript of pleadings, motions, and other documents filed during petitioner's state habeas proceeding (henceforth "State Habeas Transcript"), Volume 1 of 4, at pp. 1–191.

In addition to reiterating the same twelve claims he had previously presented in his direct appeal, petitioner's state habeas application: (1) asserted numerous instances of allegedly ineffective assistance by his trial counsel, (2) argued petitioner was actually innocent and had effectively been denied all meaningful assistance of counsel, (3) challenged the trial court's punishment-phase jury instructions regarding the jury's duty to disre-

gard the impact of state parole laws when answering the capital sentencing special issues, (4) asserted *Brady* and *Giglio–Napue* claims, (5) employed a wide variety of state and federal constitutional theories to attack the facial validity of the Texas capital sentencing special issues, and (6) challenged the admission of evidence regarding unidentified "extraneous offenses" during the punishment phase of petitioner's capital murder trial.

**49.** State Habeas Transcript, Volume 1 of 4, at pp. 771–803.

direct appeal and state habeas corpus proceedings. *Docket entry no. 17.*

On February 1, 2008, petitioner filed his reply brief. *Docket entry no. 23.*

## II. *AEDPA Standard of Review*

Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson,* 532 U.S. 782, 792, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001). Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton,* 544 U.S. 133, 141, 125 S.Ct. 1432, 161 L.Ed.2d 334 (2005); *Williams v. Taylor,* 529 U.S. 362, 404–05, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if: (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton,* 544 U.S. at 141, 125 S.Ct. 1432; *Mitchell v. Esparza,* 540 U.S. 12, 15–16, 124 S.Ct. 7, 157

L.Ed.2d 263 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite governing Supreme Court authority does not, *per se,* establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell v. Esparza,* 540 U.S. at 16, 124 S.Ct. 7.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown v. Payton,* 544 U.S. at 141, 125 S.Ct. 1432; *Wiggins v. Smith,* 539 U.S. 510, 520, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Wiggins v. Smith,* 539 U.S. at 520–21, 123 S.Ct. 2527. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan,* —— U.S. ——, 127 S.Ct. 1933, 1939, 167 L.Ed.2d 836 (2007) ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Wiggins v. Smith,* 539 U.S. at 520, 123 S.Ct. 2527; *Price v. Vincent,* 538 U.S. 634, 641, 123 S.Ct. 1848, 155

L.Ed.2d 877 (2003) ("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner").

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado,* 541 U.S. 652, 660–61, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade,* 538 U.S. 63, 71–72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. A petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan,* 127 S.Ct. at 1939–40 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice v. Collins,* 546 U.S. 333, 338–39, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006) ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller–El v. Dretke,* 545 U.S. 231, 240, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) ("we presume the Texas court's factual findings to be sound unless Miller–El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. § 2254(e)(1).

However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller–El v. Dretke,* 545 U.S. at 240, 125 S.Ct. 2317 (the standard is "de-manding but not insatiable"); *Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See St. Aubin v. Quarterman,* 470 F.3d 1096, 1100 (5th Cir.2006) (holding Section 2254(d) permits a federal habeas court to review only a state court's decision and not the written opinion explaining that decision), *cert. denied,* —— U.S. ——, 127 S.Ct. 2133, 167 L.Ed.2d 869 (2007); *Amador v. Quarterman,* 458 F.3d 397, 410 (5th Cir. 2006) (holding the same), *cert. denied,* —— U.S. ——, 127 S.Ct. 2129, 167 L.Ed.2d 866 (2007); *Pondexter v. Dretke,* 346 F.3d 142, 148 (5th Cir.2003) (holding the precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether the state court's ultimate conclusion was objectively reasonable), *cert. denied,* 541 U.S. 1045, 124 S.Ct. 2160, 158 L.Ed.2d 736 (2004); *Anderson v. Johnson,* 338 F.3d 382, 390 (5th Cir.2003) (holding a federal habeas court reviews only a state court's decision and not the opinion explaining that decision); *Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir.2002) (en banc) (holding a federal court is authorized by § 2254(d) to review only a state court's decision and not the written opinion explaining that decision), *cert. denied,* 537 U.S. 1104, 123 S.Ct. 963, 154 L.Ed.2d 772 (2003).

## III. Actual Innocence Claim

### A. The Claim

In his first claim, petitioner argues he is "factually innocent" of David Cook's murder because law enforcement authorities did an inadequate job investigating whether others might have been involved in the murder.[50] More specifically, petitioner complains that potentially exculpatory DNA evidence (in the form of hair fibers allegedly found in David Cook's hand) was never properly examined, fingerprints found at the crime scene were never compared to those of other suspects, and police failed to identify either "Snake" or "Throw down," the two men petitioner claimed to have seen inside Mr. Cook's residence on the night of the murder. In his state habeas proceeding, petitioner also pointed to the potentially exculpatory testimony of a Robert Keith Adams to support his assertion of actual innocence.

### B. State Court Disposition

As the state habeas trial court pointed out in its findings of fact and conclusions of law, later adopted by the Texas Court of Criminal Appeals, petitioner offered the state habeas court no evidence showing: (1) "Snake" or "Throw down" were anything more than figments of petitioner's imagination, (2) any exculpatory fingerprint or DNA evidence had ever existed, or (3) Robert Keith Adams had any personal knowledge regarding David Cook's murder.[51] The Texas Court of Criminal Appeals rejected this claim on the merits when it adopted the state habeas trial court's findings and conclusions.[52]

---

**50.** Petitioner's Petition for Writ of habeas Corpus, filed February 21, 2007, docket entry no. 11 (henceforth "Petition"), at pp. 5–19; Petitioner's Reply to Respondent's Answer and Motion for Summary Judgment, filed February 1, 2008, docket entry no. 23 (henceforth "Reply"), at pp. 3–5.

**51.** State Habeas Transcript, Volume 4 of 4, at pp. 772–73.

This Court's independent review of the record from petitioner's state habeas corpus proceeding disclosed that petitioner never offered the state habeas court any new evidence establishing his actual innocence. Petitioner presented no DNA or fingerprint evidence, never called Mr. Adams to testify, and never offered any evidence showing that "Snake" or "Throw down" had ever existed. On the contrary, petitioner's former lead trial counsel testified during petitioner's state habeas hearing: (1) his court-appointed investigator was never able to identify or contact anyone with the street names "Snake" or "Throw down" who matched petitioner's detailed physical descriptions of those two persons, (2) neither petitioner nor petitioner's parents knew the true identities of either "Snake" or "Throw down," and (3) the defense was unable to locate either of those two persons. S.F. State Habeas Hearing September 8, 2004, testimony of Vincent D. Callahan, found in State Habeas Transcript, Volume 3 of 4, at pp. 583, 589–90, 617, 636, 638–39, 643.

The private investigator who assisted petitioner's court appointed investigator testified that he and the chief investigator tried without success to locate "Snake" and "Throw down." S.F. State Habeas Hearing September 9, 2004, testimony of Thomas Orsen Caldwell, found in State Habeas Transcript, Volume 4 of 4, at pp. 711, 718–19, 725, 727.

The only testimony regarding Mr. Adams' knowledge of the murder came from petitioner's prosecutor William Pennington, who testified: (1) he interviewed Robert Keith Adams, (2) Mr. Adams and petitioner knew each other, (3) the only information Mr. Adams had regarding David Cook's murder was that which petitioner had given to Mr. Adams during conversations when they were both incarcerated, and (4) he personally informed petitioner's trial counsel Joel Perez of the foregoing information. S.F. State Habeas Hearing September 8, 2004, testimony of William Penington, found in State Habeas Transcript, Volume 3 of 4, at pp. 681–83, 687. Petitioner never called attorney Perez to testify during petitioner's state habeas proceeding.

**52.** Ex parte Anthony . Bartee, WR–63,381–01, 2006 WL 560692 (Tex.Crim.App. March 8, 2006); State Habeas Transcript, Volume 4 of 4, at pp. 772–73.

## C. AEDPA Analysis

■ In *Herrera v. Collins,* 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), the United States Supreme Court declared that claims of "actual innocence" based on newly discovered evidence do not constitute an independent ground for granting federal habeas corpus relief. *Herrera v. Collins,* 506 U.S. at 400–01, 113 S.Ct. 853. However, in *Herrera,* the Supreme Court also reaffirmed that a state prisoner who supplements his federal habeas claims with "a colorable showing of actual innocence" can thereby circumvent procedural barriers to obtaining federal habeas review on the merits for his constitutional claims. *Herrera v. Collins,* 506 U.S. at 404, 113 S.Ct. 853.

The Supreme Court's holding in *Herrera* precludes petitioner's argument suggesting his belated attacks on the quality of the police investigation into David Cook's murder independently warrant federal habeas corpus relief. Under *Herrera,* even new evidence establishing a state prisoner's actual innocence beyond any doubt does not independently authorize federal habeas corpus relief, *Herrera v. Collins,* 506 U.S. at 400–02, 113 S.Ct. 853; *Parr v. Quarterman,* 472 F.3d 245, 252 (5th Cir.2006), *cert. denied,* ─── U.S. ───, 127 S.Ct. 2974, 168 L.Ed.2d 707 (2007); *Foster v. Quarterman,* 466 F.3d 359, 367 (5th Cir.2006), *cert. denied,* ─── U.S. ───, 127 S.Ct. 2099, 167 L.Ed.2d 817 (2007); *Dowthitt v. Johnson,* 230 F.3d 733, 741 (5th Cir.2000), *cert. denied,* 532 U.S. 915, 121 S.Ct. 1250, 149 L.Ed.2d 156 (2001).

However, the foreclosure of petitioner's contention does not end this Court's examination of petitioner's actual innocence claim. The Supreme Court has held that a showing of "actual innocence" opens the door to federal habeas review of procedurally defaulted claims and claims that would otherwise be barred by abuse-of-the-writ principles. *Schlup v. Delo,* 513 U.S. 298, 326–27, 115 S.Ct. 851, 130 L.Ed.2d 808, (1995); *Herrera v. Collins,* 506 U.S. at 404, 113 S.Ct. 853; *Parr v. Quarterman,* 472 F.3d at 252.

In *Schlup v. Delo,* the Supreme Court explained a petitioner seeking to surmount a procedural default through a showing of "actual innocence" must establish it is more likely than not that, in light of the new evidence, no juror, acting reasonably, would have voted to find the petitioner guilty beyond a reasonable doubt. *Schlup v. Delo,* 513 U.S. at 327, 115 S.Ct. 851; *Wright v. Quarterman,* 470 F.3d 581, 590 (5th Cir.2006), *cert. denied,* ─── U.S. ───, 127 S.Ct. 2996, 168 L.Ed.2d 707 (2007); *Foster v. Quarterman,* 466 F.3d at 367. The Supreme Court has more recently reaffirmed the vitality of this standard of review. *See House v. Bell,* 547 U.S. 518, 538, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006) ("A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.").

Thus, even though petitioner may not seek federal habeas corpus relief premised exclusively on a showing that new evidence establishes his "actual innocence," he may assert such an argument as a means of circumventing his procedural default on any other constitutional claim he presents to this Court. *House v. Bell,* 547 U.S. at 536–38, 126 S.Ct. 2064; *Parr v. Quarterman,* 472 F.3d at 252; *Wright v. Quarterman,* 470 F.3d at 590–92.

Petitioner's arguments about allegedly undiscovered exculpatory evidence and the poor quality of the police investigation into David Cook's murder do not satisfy the constitutional "actual innocence" standard discussed in *House v. Bell.* As the Supreme Court emphasized, the threshold for

a showing of "actual innocence" is "extraordinarily high." *House v. Bell,* 547 U.S. at 553–55, 126 S.Ct. 2064. Petitioner's speculative allegations about allegedly undiscovered or unexamined exculpatory evidence are insufficient to satisfy this standard.

More than a decade has passed since David Cook's murder. Despite that fact, and the availability since 2001 of procedures under Article 64 of the Texas Code of Criminal Procedure permitting post-conviction scientific examination of potentially exculpatory evidence, petitioner identifies no "newly discovered" exculpatory evidence. In order to satisfy the evidentiary standard set forth in *House v. Bell,* it was incumbent upon petitioner to present the state habeas court (or this Court) with some actual newly discovered evidence establishing "more likely than not any reasonable juror would have reasonable doubt." Petitioner presented neither the state habeas court nor this Court with any such evidence. Petitioner's arguments about potentially exculpatory evidence, premised on forensic testing never actually performed on any physical evidence, do not satisfy the standard set forth in *Schlup v. Delo* and *House v. Bell.*

Likewise, petitioner's attacks on the sufficiency of the evidence supporting his conviction do not satisfy the "actual innocence" standard. As another Judge of this Court has recently noted, *Moore v. Quarterman,* 526 F.Supp.2d 654, 681–82 (W.D.Tex.2007), the Supreme Court's explanation of what it meant by the term "actual innocence" is perhaps more helpful to understanding how a federal habeas court must evaluate such a claim than the standard itself:

> The meaning of actual innocence as formulated by *Sawyer,* and *Carrier* does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no

reasonable juror would have found the defendant guilty. It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.

> We note finally that the *Carrier* standard requires a petitioner to show that it is more likely than not that "no reasonable juror" would have convicted him. The word "reasonable" in that formulation is not without meaning. It must be presumed that a reasonable juror would consider fairly all of the evidence presented. It must also be presumed that such a juror would conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt.

*Moore v. Quarterman,* 526 F.Supp.2d at 681–92 (*quoting Schlup v. Delo,* 513 U.S. at 329, 115 S.Ct. at 868 (footnote omitted)).

As Judge Ferguson also noted:

> The Supreme Court took great care in *Schlup* to distinguish the standard it applied in that case from the evidentiary sufficiency test it announced in *Jackson v. Virginia:*

> > Though the *Carrier* standard requires a substantial showing, it is by no means equivalent to the standard of *Jackson v. Virginia.* The *Jackson* standard, which focuses on whether any rational juror could have convicted, looks to whether there is sufficient evidence which, if credited, could support conviction. The *Jackson* standard thus differs in at least two important ways from the *Carrier* standard. First, under *Jackson,* the

assessment of the credibility of witnesses is generally beyond the scope of review. In contrast, under the gateway standard we describe today, the newly presented evidence may indeed call into question the credibility of the witnesses presented at trial. In such a case, the habeas court may have to make some credibility assessments. Second, and more fundamentally, the focus of the inquiry is different under *Jackson* than under *Carrier*. Under *Jackson*, the use of the word "could" focuses the inquiry on the power of the trier of fact to reach its conclusion. Under *Carrier*, the use of the word "would" focuses the inquiry on the likely behavior of the trier of fact.

Indeed, our adoption of the phrase "more likely than not" reflects this distinction. Under *Jackson*, the question whether the trier of fact has the power to make a finding of guilt requires a binary response: Either the trier of fact has power as a matter of law or it does not. Under *Carrier*, in contrast, the habeas court must consider what reasonable triers of fact are likely to do. Under this probabilistic inquiry, it makes sense to have a probabilistic standard such as "more likely than not." Thus, though under

*Jackson* the mere existence of sufficient evidence to convict would be determinative of petitioner's claim, that is not true under *Carrier*.

*Moore v. Quarterman* 526 F.Supp.2d at 682 (*quoting Schlup v. Delo*, 513 U.S. at 330, 115 S.Ct. at 868–69 (citations and footnote omitted)).

### D. Conclusion

The Texas Court of Criminal Appeals' rejection on the merits of petitioner's actual innocence claim during the course of petitioner's state habeas corpus proceeding was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

## IV. Denial of Counsel— Conflict of Interest

### A. The Claim

In his second claim, petitioner argues he was denied the assistance of counsel when one of his original trial counsel, attorney Michael Sawyer, withdrew following the completion of jury selection but prior to the start of the guilt-innocence phase of petitioner's capital murder trial.[53] Peti-

---

**53.** Petition, at pp. 20–32; *Reply*, at pp. 5–6.

Petitioner relies upon an affidavit petitioner presented to the state habeas court to support this claim. *Petition*, at p. 22, However, at the start of the evidentiary hearing in petitioner's state habeas corpus proceeding, the state habeas trial court sustained the state's objection to all affidavits proffered by petitioner, including petitioner's own affidavit. S.F. State Habeas Hearing September 8, 2004, found at State Habeas Transcript, Volume 3 of 4, at pp. 578–80. Thereafter, petitioner neither re-offered his own affidavit nor testified himself. As explained above, the AEDPA limits this Court's federal habeas review of the propriety of the state habeas court's denial of relief on

the merits of this claim to examining the reasonableness of the state habeas court's factual findings and legal conclusions in light of the evidence actually before the state habeas court. Thus, insofar as petitioner attempts to rely upon his own affidavit to support his conflict of interest claim before this Court, petitioner's argument fails because his affidavit is not properly before this Court.

Petitioner did not present the state habeas court with any other evidence in the form of testimony from Michael Sawyer or any other witness identifying either the precise nature of the relationship between Mr. Sawyer and the Cook family, any specific deficiency in Mr. Sawyer's performance during the jury selec-

tioner argues Mr. Sawyer's conflict of interest justifies granting petitioner a presumption of prejudice.

### B. *State Court Disposition*

The state habeas trial court found petitioner had presented no evidence showing either Mr. Sawyer had an actual conflict of interest in connection with petitioner's case or any such conflict had an adverse effect on petitioner's trial and concluded petitioner's conflict of interest claim lacked merit.[54] The Texas Court of Criminal Appeals adopted these findings and conclusions.

### C. *AEDPA Review*

#### 1. *The General Rule*

Ordinarily, complaints about the performance of a criminal defendant's trial counsel are evaluated under the familiar dual prongs of the test announced in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

█ In his second claim, petitioner seeks to have this Court evaluate the performance of his former trial counsel Mi-

chael Sawyer under the far more exacting tests applicable when an actual conflict of interest impedes counsel's performance. The Sixth Amendment right to counsel includes the right to representation that is free from any conflict of interest. *United States v. Garcia–Jasso*, 472 F.3d 239, 243 (5th Cir.2006); *United States v. Vasquez*, 298 F.3d 354, 360 (5th Cir.), *cert. denied*, 537 U.S. 1024, 123 S.Ct. 546, 154 L.Ed.2d 436 (2002); *United States v. Vaquero*, 997 F.2d 78, 89 (5th Cir.), *cert. denied*, 510 U.S. 1016, 114 S.Ct. 614, 126 L.Ed.2d 578 (1993).

#### 2. *Inapplicability of Cuyler v. Sullivan Exception*

█ A conflict of interest exists when defense counsel places himself in a position conducive to divided loyalties. *United States v. Vasquez*, 298 F.3d at 360; *United States v. Vaquero*, 997 F.2d at 89. "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *United States v. Infante*, 404 F.3d 376, 390–91 (5th Cir. 2005); *Ramirez v. Dretke*, 396 F.3d 646, 649 (5th Cir.2005); *United States v. Salado*, 339 F.3d 285, 291 (5th Cir.2003). The *Cuyler* standard differs substantially from the *Strickland* test in that *Cuyler* requires no showing of "prejudice." *See Strickland v. Washington*, 466 U.S. at 692, 104 S.Ct. 2052 (recognizing prejudice is presumed under the *Cuyler* test only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affect-

---

tion phase of petitioner's trial, or any adverse effect Mr. Sawyer's performance during jury selection might have had on the outcome of petitioner's trial.

**54.** State Habeas Transcript, Volume 4 of 4, at pp. 774–76

ed his lawyer's performance."); *United States v. Newell,* 315 F.3d 510, 516 (5th Cir.2002) ("When a defendant has been able to show that his counsel 'actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance,' constitutional error has occurred and prejudice is inherent in the conflict."); *Perillo v. Johnson,* 205 F.3d 775, 781 (5th Cir.2000) (discussing the distinction between the *Cuyler* and *Strickland* tests).

■ Under the *Cuyler* test, an "actual conflict" exists when defense counsel is compelled to compromise his duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client. *Perillo v. Johnson,* 205 F.3d at 781. A defendant must show more than a speculative or potential conflict. *United States v. Garcia–Jasso,* 472 F.3d at 243; *United States v. Infante,* 404 F.3d at 391. The defendant must demonstrate his counsel made a choice between possible alternative courses of action; if he did not make such a choice, the conflict remained hypothetical. *United States v. Garcia–Jasso,* 472 F.3d at 243. The mere possibility of a conflict, absent a showing that the attorney actively represented conflicting interests, is not sufficient. *Cuyler v. Sullivan,* 446 U.S. at 350, 100 S.Ct. 1708 ("But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance."); *United States v. Villarreal,* 324 F.3d 319, 327 (5th Cir.2003).

■ "An adverse effect on counsel's performance may be shown with evidence that counsel's judgment was actually fettered by concern over the effect of certain trial decisions on other clients." *United States v. Infante,* 404 F.3d at 393; *Perillo v. Johnson,* 205 F.3d at 807. The defendant must establish adverse effect by demonstrating there was some plausible alternative defense strategy that could have been pursued, but was not, because of the actual conflict. *United States v. Infante,* 404 F.3d at 393; *Perillo v. Johnson,* 205 F.3d at 781; *Beathard v. Johnson,* 177 F.3d 340, 345 (5th Cir.), *cert. denied,* 528 U.S. 954, 120 S.Ct. 380, 145 L.Ed.2d 296 (1999). "To prevail, a defendant must identify 'some plausible defense strategy or tactic that might have been pursued but was not, because of the conflict of interest.'" *United States v. Villarreal,* 324 F.3d at 327; *Hernandez v. Johnson,* 108 F.3d 554, 560 (5th Cir.), *cert. denied,* 522 U.S. 984, 118 S.Ct. 447, 139 L.Ed.2d 383 (1997); *Perillo v. Johnson,* 79 F.3d 441, 449 (5th Cir.1996). "A conflict of interest is present 'whenever one defendant stands to *gain significantly* by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a co-defendant whom counsel is also representing.'" *Ramirez v. Dretke,* 396 F.3d at 650. "An actual conflict of interest exists if counsel's introduction of probative evidence or plausible arguments that would significantly benefit one defendant would damage the defense of another defendant whom the same counsel is representing." *United States v. Salado,* 339 F.3d at 291; *United States v. Rico,* 51 F.3d 495, 509 (5th Cir.), *cert. denied,* 516 U.S. 883, 116 S.Ct. 220, 133 L.Ed.2d 150 (1995).

In *Beets v. Scott,* 65 F.3d 1258 (5th Cir.1995) (*en banc*), *cert. denied,* 517 U.S. 1157, 116 S.Ct. 1547, 134 L.Ed.2d 650 (1996), the Fifth Circuit rejected a broad-ranging application of the *Cuyler* standard to complaints of ineffective assistance arising from alleged conflicts of interest by defense counsel. *See Beets v. Scott,* 65 F.3d at 1268 (holding that not every potential conflict, even in multiple client representation cases, is an "actual conflict" for Sixth Amendment purposes). Subsequent-

ly, the Fifth Circuit has consistently refused to apply the *Cuyler* test outside the context of multiple representation situations. *See, e.g., United States v. Garza,* 429 F.3d 165, 172 (5th Cir.2005) ("*Cuyler* only applies where an attorney was effectively, if not technically, representing multiple clients in the same proceeding."), *cert. denied,* 546 U.S. 1220, 126 S.Ct. 1444, 164 L.Ed.2d 143 (2006); *United States v. Newell,* 315 F.3d at 516 (holding *Strickland* "more appropriately gauges an attorney's alleged conflict of interest arising not from multiple client representation but from a conflict between the attorney's personal interest and that of his client"); *Perillo v. Johnson,* 205 F.3d at 781 ("An 'actual conflict' exists when defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client."); *Moreland v. Scott,* 175 F.3d 347, 349 (5th Cir.) ("cases in which it is alleged that the attorney's representation was affected by his own self-interest are evaluated under the more relaxed *Strickland* standard."), *cert. denied,* 528 U.S. 937, 120 S.Ct. 342, 145 L.Ed.2d 267 (1999); *Hernandez v. Johnson,* 108 F.3d at 559 ("This circuit has limited *Cuyler* to actual conflicts resulting from a lawyer's representation of multiple criminal defendants."). Petitioner's complaints of "conflict of interest" by his trial counsel fall outside the situations in which the Fifth Circuit applies the *Cuyler* test. *United States v. Garza,* 429 F.3d at 172; *Perillo v. Johnson,* 205 F.3d at 781; *Hernandez v. Johnson,* 108 F.3d at 559; *Beets v. Scott,* 65 F.3d at 1268.

Petitioner's complaints about the performance of Michael Sawyer during jury selection do not satisfy either the "actual conflict" or "adverse effect" requirements of the narrow *Cuyler* exception to the *Strickland* standard. Petitioner's affidavit, purporting to detail events on the morning Mr. Sawyer withdrew from petitioner's representation, was never properly before the state habeas court and petitioner proffered no other evidence, either through his own testimony or Mr. Sawyer's exploring the reasons for Michael Sawyer's withdrawal. The fact Mr. Sawyer was familiar with one or more members of David Cook's family does not, standing alone, establish an "actual conflict" within the meaning of *Cuyler*; nor does it satisfy the "adverse effect" prong. Any adverse impact that relationship might have had on Mr. Sawyer's performance during voir dire was negated by the fact Michael Sawyer did not realize he personally knew the David Cook family until he saw David Cook's sister in the courtroom.

Petitioner presented the state habeas court with no evidence either showing Michael Sawyer had ever represented any member of the Cook family or establishing Mr. Sawyer's relationship with the Cook family was anything more than social in nature. Thus, petitioner failed to present any evidence to the state habeas court showing Mr. Sawyer suffered from an "actual conflict" sufficient to make the *Cuyler* standard applicable to petitioner's trial. Moreover, petitioner failed to present the state habeas court with any evidence showing Michael Sawyer's performance during voir dire was "adversely effected" by virtue of his relationship with the Cook family.

### 3. Inapplicability of Cronic v. United States

Petitioner also seeks to invoke a second exception to the *Strickland* standard of review.

In *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), decided the same day as *Strickland,* the Supreme Court held that a presumption of

prejudice similar to that recognized in *Cuyler* arises in three narrow circumstances: first, when a criminal defendant is completely denied the assistance of counsel; second, when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; and finally, where the circumstances are such that even competent counsel very likely could not render effective assistance. *United States v. Cronic,* 466 U.S. at 659, 104 S.Ct. 2039. As examples of the latter two situations, respectively, the Supreme Court cited the denial of effective cross-examination in *Davis v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (defendant was denied the opportunity to cross-examine the prosecution's key witness for bias), and the circumstances surrounding the trial of the so-called "Scottsboro Boys" addressed in *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932) (no individual attorney was appointed to represent the defendants and trial proceeded after a volunteer attorney from another state appeared on the first day of trial but confessed he had not had an opportunity to prepare for trial). *United States v. Cronic,* 466 U.S. at 659–61, 104 S.Ct. 2039. In a footnote, the Supreme Court recognized the continuing efficacy of its earlier holding in *Cuyler,* presuming prejudice where a defendant establishes an actual conflict of interest adversely affected his counsel's performance. *United States v. Cronic,* 466 U.S. at 661 n. 31, 104 S.Ct. 2039.

In *Bell v. Cone,* 535 U.S. 685, 695–96, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002), the Supreme Court reiterated the second exception to the requirement of *Strickland* "prejudice" it had envisioned in *Cronic* was limited to situations in which defense counsel completely failed to subject the prosecution's case to meaningful adversarial testing. *See Bell v. Cone,* 535 U.S. at 697–98, 122 S.Ct. 1843 (holding complaints about trial counsel's waiver of closing argument at the punishment phase of trial and failure to adduce mitigating evidence insufficient to create a presumption of prejudice absent a showing trial counsel completely failed to challenge the prosecution's case throughout the sentencing proceeding).

■ The presumption of prejudice recognized in *Cronic* does not apply where the defendant complains of merely shoddy or poor performance by his trial counsel; for a defendant to be entitled to such a presumption, his attorney's failure must be complete. *See Bell v. Cone,* 535 U.S. at 697, 122 S.Ct. 1843 (holding the presumption applicable only when counsel failed to subject the prosecution's case to meaningful adversarial testing); *United States v. Griffin,* 324 F.3d 330, 364, (5th Cir.2003) ("When the defendant complains of errors, omissions, or strategic blunders, prejudice is not presumed; bad lawyering, regardless of how bad, does not support the *per se* presumption of prejudice."); *Riddle v. Cockrell,* 288 F.3d 713, 718 (5th Cir.) (holding "constructive denial of counsel" sufficient to support a presumption of prejudice arises only when counsel was absent from the courtroom, there was an actual conflict of interest, or there was official interference with the defense), *cert. denied,* 537 U.S. 953, 123 S.Ct. 420, 154 L.Ed.2d 300 (2002); *Mayo v. Cockrell,* 287 F.3d 336, 340 n. 3 (5th Cir.) (holding the same), *cert. denied,* 537 U.S. 975, 123 S.Ct. 443, 154 L.Ed.2d 332 (2002); *Burdine v. Johnson,* 262 F.3d 336, 344 n. 4 (5th Cir. 2001) (holding the same), *cert. denied,* 535 U.S. 1120, 122 S.Ct. 2347, 153 L.Ed.2d 174 (2002); *Gochicoa v. Johnson,* 238 F.3d 278, 284 (5th Cir.2000) (" 'A constructive denial of counsel occurs in only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all.' We have found constructive denial in cases

involving the absence of counsel from the courtroom, conflicts of interest between defense counsel and the defendant, and official interference with the defense; and have stated that constructive denial will be found when counsel fails to subject the prosecution's case to any meaningful adversarial testing." (citations *and footnote omitted* )).

At all times throughout voir dire, petitioner was represented by his lead counsel, attorney Vincent D. Callahan, in addition to attorney Michael Sawyer. Thus, even assuming Mr. Sawyer was somehow rendered constructively absent during voir dire by virtue of his relationship with the Cook family, petitioner was not completely devoid of legal representation during jury selection; the first *Cronic* exception to *Strickland* has no application to petitioner's trial.

Petitioner's allegations his trial counsel inadequately investigated the case against petitioner, failed to interview potential witnesses, failed to discover and develop exculpatory and mitigating evidence, and inadequately examined venire members during voir dire do not fall within the narrow scope of the presumed prejudice rule announced in *Cronic*. *Bell v. Cone*, 535 U.S. at 697, 122 S.Ct. 1843 (holding the presumption applicable only when counsel entirely failed to subject the prosecution's case to meaningful adversarial testing). The second *Cronic* exception to *Strickland* does not apply to petitioner's trial.

Finally, petitioner presented the state habeas court with no evidence showing Michael Sawyer's relationship with the Cook family, whatever it might have been, had any effects on Mr. Sawyer's performance during voir dire analogous to the extreme situations in which the Supreme Court has found the third *Cronic* exception to *Strickland* applicable. On the contrary, the record before the state habeas court appears to suggest the state trial court granted Michael Sawyer's motion to withdraw primarily in an effort to avoid even the appearance of impropriety, rather than to address an actual conflict of interest. Petitioner presented the state habeas court with no evidence establishing the precise nature of Michael Sawyer's personal relationship with the Cook family.

### D. *Conclusion*

Petitioner failed to present the state habeas court with any evidence showing either (1) Sawyer suffered from "an actual conflict of interest" which had an "adverse effect," within the meaning of *Cuyler*, on petitioner's capital murder trial, or (2) petitioner was constructively denied legal representation during voir dire within the meaning of *Cronic*. Accordingly, the Texas Court of Criminal Appeals' rejection on the merits of petitioner's conflict of interest claim during the course of petitioner's state habeas corpus proceeding was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

## V. *Ineffective Assistance Claims*

### A. *The Claims*

In his third group of claims, petitioner argues his trial counsel rendered ineffective assistance by failing to: (1) adequately investigate the evidence against petitioner at the guilt-innocence phase of trial, (2) interview prosecution witnesses, (3) investigate footprint evidence, (4) meet with petitioner's parents, (5) cross-examine prosecution witness Joey Banks about his criminal record, (6) cross-examine prosecution witness Rick Wood about his criminal record, (7) request limiting instructions regarding allegedly improper prosecution

jury arguments, (8) search for "Snake" and "Throw down," (9) obtain a mental health examination of petitioner, (10) interview petitioner's family members for mitigating evidence, and (11) present more than two mitigation witnesses.[55]

## B. State Court Disposition

### 1. The State Habeas Hearing

During petitioner's state habeas corpus proceeding, petitioner's former lead trial counsel testified, in part: (1) the defense team attempted without success to locate the persons petitioner had identified as "Snake" and "Throw down" or to corroborate petitioner's account suggesting those two persons had been inside the Cook residence on the night of the murder, (2) he interviewed petitioner extensively regarding the contradictions between petitioner's first and second statements to police, (3) petitioner's version of the relevant events surrounding David Cook's murder changed radically throughout his representation of petitioner from "I wasn't there" to "I saw who did it and I had to run away because I was afraid," (4) once petitioner admitted he was present at the time of David Cook's murder, it was unnecessary to continue investigations into locating potential alibi witnesses, (5) admission of petitioner's second statement into evidence was beneficial to petitioner in that it permitted the defense to present the jury with petitioner's version of the offense without the necessity of petitioner testifying, (6) the guilt-innocence phase trial strategy was to attack the prosecution's circumstantial case based on the absence of any evidence directly linking petitioner to David Cook's murder, (7) he never felt petitioner had any mental health problems, (8) petitioner consistently indicated he had no interest in seeking a plea bargain, and (9) he interviewed petitioner's mother.[56]

Petitioner's father testified during the same hearing, in part, as follows:, (1) he had only about five brief telephone conversations with attorney Callahan before he testified as a character witness during the punishment phase of petitioner's trial, (2) he had no personal knowledge regarding the crime, (3) he told the jury everything he wanted to tell them regarding petitioner's character, (4) petitioner had no history of mental illness, had never been abused as a child, and had no history of drug abuse, and (5) no one in petitioner's family was aware of the facts of the offense.[57]

One of petitioner's prosecuting attorneys, William Pennington, testified: (1) he interviewed purported defense witness Robert Keith Adams, (2) Adams and petitioner knew each other, (3) the only information Mr. Adams had regarding David Cook's murder was information petitioner had given to him during conversations which took place following petitioner's arrest for David Cook's murder, and (4) he personally informed petitioner's trial co-

---

**55.** *Petition,* at pp. 33–56; *Reply,* at pp. 7–10.
 Petitioner's representation during his state habeas hearing was disjointed, at best. On January 3, 2000, attorney John Wilson Rowland filed petitioner's state habeas corpus application, asserting 37 claims for relief, including a multi-faceted claim of ineffective assistance by petitioner's trial counsel. However, by the time of petitioner's evidentiary hearings in September, 2004, attorney Rowland had withdrawn and attorney Richard Langlois represented petitioner during those proceedings. Perhaps as a result, petitioner apparently abandoned many of his claims during his evidentiary hearing by failing to present any evidence supporting same to the state habeas trial court.

**56.** State Habeas Hearing September 8, 2004, testimony of Vincent D. Callahan, found at State Habeas Transcript, Volume 3 of 4, at pp. 580–647.

**57.** *Id.,* testimony of James Bartee, found at State Habeas Transcript, Volume 3 of 4, at pp. 648–78.

counsel Joel Perez of the foregoing information.[58]

Thomas Orsen Caldwell testified: (1) he assisted court-appointed defense investigator John M. Kemmy in connection with petitioner's case, (2) he and Mr. Kemmy checked alias files in Bexar County and unsuccessfully attempted to identify and locate the persons petitioner had identified as "Snake" and "Throw down," and (3) they were never able to identify any persons who matched petitioner's descriptions of either of those two individuals.[59]

Petitioner's affidavit, along with the affidavits of petitioner's parents and John Connors, quoted extensively in petitioner's pleadings and relied upon by petitioner in this proceeding, were all excluded from consideration by the state habeas trial court because of their hearsay character and, thus, were not properly before the state habeas court.[60]

### 2. State Habeas Trial Court's Findings

The state habeas trial court found petitioner had failed to present any evidence showing: (1) any additional exculpatory or mitigating evidence was available at the time of petitioner's trial, (2) the bases underlying petitioner's trial counsel's investigative strategies, i.e., the reasons why pe-

titioner's trial counsel chose to investigate certain matters but not others in preparation for trial, (3) any benefit would have been derived from additional investigation of petitioner's background, (4) the strategic bases underlying petitioner's trial counsel's trial tactics, (5) the persons petitioner identified as "Snake" and "Throw down" have ever existed, or (6) precisely what any uncalled witnesses might have furnished in terms of admissible testimony at petitioner's trial.[61]

### C. AEDPA Analysis

#### 1. The Constitutional Standard of Review

As explained in Section IV.C.1. above, the applicable standard of review for petitioner's ineffective assistance claims herein are the dual prongs of the test set forth in *Strickland v. Washington.* To satisfy the first prong of *Strickland*, i.e., establish that his counsel's performance was constitutionally deficient, a convicted defendant must show counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Williams v. Taylor*, 529 U.S. 362, 390–91, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). In so doing, a convicted defendant must carry the burden of proof

---

**58.** S.F. State Habeas Hearing September 8, 2004, testimony of William Penington, found in State Habeas Transcript, Volume 3 of 4, at pp. 681–83, 687.

**59.** S.F. State Habeas Hearing September 9, 2004, testimony of Thomas Orsen Caldwell, found in State Habeas Transcript, Volume 4 of 4, at pp. 700–34.

**60.** S.F. State Habeas Hearing September 8, 2004, found at State Habeas Transcript, Volume 3 of 4, at pp. 578–80.

**61.** State Habeas Transcript, Volume 4 of 4, at pp. 776–83.

 The state habeas trial court pointed out that although petitioner's lead trial counsel, Vin-

cent D. Callahan, was called to testify during petitioner's state habeas corpus hearing, petitioner did not question counsel regarding the reasons behind the defense team's decisions to: (1) refrain from certain avenues of pretrial investigation, (2) not raise certain objections at trial, (3) not request certain limiting instructions, (4) not ask certain questions on cross-examination of prosecution witnesses, and (5) present only the mitigating evidence and witnesses they actually presented during the punishment phase of petitioner's trial. *Id.* Petitioner likewise presented no testimony from his co-counsel at trial, attorney Joel Perez.

and overcome a strong presumption the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington,* 466 U.S. 668, 687–91, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith,* 539 U.S. at 523, 123 S.Ct. 2527 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of counsel at the time). It is strongly presumed counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington,* 466 U.S. at 690, 104 S.Ct. 2052.

To satisfy the second or "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. 2527; *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. 2052. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.* In evaluating prejudice, a federal habeas court must "re-weigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. 2527.

In evaluating petitioner's complaints about the performance of his counsel under the AEDPA, the issue before this Court is whether the Texas Court of Criminal Appeals could reasonably have concluded petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis.

*Schaetzle v. Cockrell,* 343 F.3d 440, 444 (5th Cir.2003), *cert. denied,* 540 U.S. 1154, 124 S.Ct. 1156, 157 L.Ed.2d 1050 (2004). In making this determination, this Court must consider the underlying *Strickland* standard. *Id.* In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test, this Court's review of the unadjudicated prong is *de novo. See Rompilla v. Beard,* 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. 2527 (holding the same).

### 2. Petitioner's Failure to Address the Presumption of Reasonableness Afforded an Attorney's Performance

A habeas petitioner has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the *evidence. Montoya v. Johnson,* 226 F.3d 399, 408 (5th Cir.2000), *cert. denied,* 532 U.S. 1067, 121 S.Ct. 2220, 150 L.Ed.2d 212 (2001).

Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bell v. Cone,* 535 U.S. at 698, 122 S.Ct. 1843; *Strickland v. Washington,* 466 U.S. at 690, 104 S.Ct. 2052; *Scheanette v. Quarterman,* 482 F.3d 815, 820 (5th Cir.2007); *Sonnier v. Quarterman,* 476 F.3d 349, 356 (5th Cir.), *cert. denied,* —— U.S. ——, 128 S.Ct. 374, 169 L.Ed.2d 259 (2007); *Amador v. Quarterman,* 458 F.3d 397, 410 (5th Cir.2006); *Gonzales v. Quarterman,* 458 F.3d 384, 390 (5th Cir.2006), *cert. denied,* —— U.S.

——, 127 S.Ct. 1909, 167 L.Ed.2d 568 (2007).

Furthermore, under the AEDPA, in order to obtain federal habeas relief on an ineffective assistance claim rejected on the merits by a state court, the petitioner must do more than convince the federal court the state court applied *Strickland* incorrectly—the petitioner must show the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner. *Bell v. Cone,* 535 U.S. at 699, 122 S.Ct. 1843.

The problem with petitioner's complaints of ineffective assistance in this cause is the fact petitioner failed to present the state habeas court with any evidence, other than that contained in the petitioner's trial and appellate records, addressing the objective reasonableness of petitioner's trial counsels' strategic and tactical decision-making. During the evidentiary hearing held in petitioner's state habeas corpus proceeding, petitioner presented the state habeas court with little evidence regarding the factual and legal underpinnings for his trial counsels' strategic and tactical decisions. Attorney Callahan's memory permitted him to opine on only those matters outlined above. Petitioner made no effort to explore with either attorney Callahan or petitioner's co-counsel at trial, attorney Joel Perez, whether either of petitioner's trial counsel were aware of the existence of any exculpatory or mitigating evidence available at the time of petitioner's trial beyond the evidence they actually presented during petitioner's trial. Thus, petitioner made no effort to overcome the presumption of reasonableness afforded his trial counsels' decisions under *Strickland.*

 Absent some showing a counsel's subjective decision-making was objectively unreasonable in view of the information and evidence then available to counsel, it is almost impossible for a habeas corpus petitioner to overcome the presumption of reasonableness afforded his counsel's strategic and tactical decisions under *Strickland.* See *Gutierrez v. Dretke,* 392 F.Supp.2d 802, 875–76 (W.D.Tex.2005), *Certificate of Appealability denied,* 201 Fed.Appx. 196 (5th Cir.2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 1297, 167 L.Ed.2d 112 (2007) (recognizing the burden on a habeas petitioner asserting a *Wiggins* claim includes demonstrating that, in light of the potentially mitigating evidence and information available at the time of trial, his trial counsel's efforts to investigate, develop, and present potentially mitigating evidence were *objectively* unreasonable).

Other than ascertaining the fact Mr. Kemmy conducted an investigation for petitioner's trial counsel, petitioner's state habeas counsel made little effort during petitioner's state habeas corpus evidentiary hearing to inquire of petitioner's trial counsel either (1) precisely what steps petitioner's trial counsel took to investigate (a) the facts of petitioner's offense in a search for witnesses who could have furnished exculpatory or mitigating testimony or (b) petitioner's background in search of potentially mitigating evidence, (2) whether petitioner's trial counsels' pretrial investigation revealed to them any potential exculpatory evidence or any potentially mitigating evidence beyond that actually presented to petitioner's jury, (3) why, if petitioner's trial counsel were aware of this additional exculpatory or mitigating evidence, said counsel chose not to present such evidence to petitioner's jury, or (4) why, if petitioner's trial counsel were unaware of any additional, potentially exculpatory or mitigating evidence, said counsel chose not to investigate any further than they did. In failing to do so, petitioner's state habeas counsel all but abandoned petitioner's extra-record ineffective assistance claims. See *Neal v. Puckett,* 286 F.3d 230, 237 (5th Cir.2002) (recognizing

that, in evaluating the performance of trial counsel against a claim that said counsel failed to investigate and present mitigating evidence, the relevant inquiry focuses on what counsel did to prepare for sentencing, what mitigating evidence counsel accumulated, what additional leads counsel had, and the results said counsel might reasonably have expected from those leads), *cert. denied,* 537 U.S. 1104, 123 S.Ct. 963, 154 L.Ed.2d 772 (2003).

It is essential a habeas petitioner asserting a claim of ineffective assistance by his trial counsel arising from deficient performance not manifested on the face of the trial or appellate record develop and present the state habeas court with evidence regarding the objective unreasonableness of his trial counsel's performance in light of the circumstances as they existed at the time of the petitioner's trial. This necessarily requires inquiry into both the quality of said trial counsel's subjective thought processes and the objective reasonableness of same. *Moore v. Quarterman,* 526 F.Supp.2d 654, 695 (W.D.Tex.2007). More specifically, this means a habeas petitioner must place each of the attorneys who represented the petitioner at trial under oath and inquire into precisely what information helpful to petitioner counsel knew at the time of petitioner's trial, the steps counsel took to obtain additional information which might have helped petitioner's cause at trial, and the reasons why counsel chose not to investigate the case against the petitioner or the petitioner's background further than they did so. *Id.*

These are the essential inquiries necessary to support a claim that a trial counsel's alleged failure to adequately investigate, develop, and present exculpatory or mitigating evidence in a capital murder trial was "objectively unreasonable." *See Wiggins v. Smith,* 539 U.S. at 521–22, 123 S.Ct. 2527. The Court in *Wiggins* explained that in *Strickland v. Washington,*

the Court "defined the deference owed such strategic judgments in terms of the adequacy of the investigations supporting those judgments" as follows:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* (*quoting Strickland v. Washington,* 466 U.S. 668, 690–91, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Assuming the existence of additional, potentially exculpatory or mitigating evidence was discernable through the exercise of due diligence at the time of a petitioner's trial, a state habeas petitioner who has been furnished with an opportunity to interrogate his former trial counsel on these subjects during an evidentiary hearing and who fails to do so, practically by definition, fails to exercise due diligence in pursuit of such an ineffective assistance claim. *Moore v. Quarterman,* 526 F.Supp.2d at 695.

Likewise, while petitioner presented the state habeas court with a number of "nonrecord" ineffective assistance claims, i.e., claims asserting his counsel failed to develop and present exculpatory or mitigating evidence that was available at the time of petitioner's capital trial, petitioner failed to present the state habeas court with any evidence showing any of the allegedly exculpatory or mitigating evidence was actu-

ally available at the time of petitioner's trial. Petitioner has offered this Court no explanation for his state habeas counsel's failure to interrogate petitioner's trial counsel concerning trial counsels' alleged failure to adequately investigate, develop, and present this new, purportedly exculpatory and mitigating evidence to petitioner's jury.

Nor has petitioner furnished this Court with any explanation for his state habeas counsel's failure to present testimony during petitioner's state habeas hearing from or about the two persons identified in petitioner's state habeas corpus pleadings and, now, in petitioner's federal habeas corpus pleadings, as the real culprits, i.e., "Snake" and "Throw down." In fact, petitioner presented the state habeas court with no evidence establishing either "Snake" or "Throw down" has ever existed. Such an absence in the evidentiary record now before this Court undermines petitioner's complaints about his trial counsels' failure to present evidence regarding the identities of those two persons during petitioner's trial. *See Anderson v. Collins,* 18 F.3d 1208, 1221 (5th Cir.1994) (holding absent a specific, affirmative showing of precisely what evidence or testimony was rendered unavailable due to a trial counsel's failure to investigate, develop, and present same, i.e., a showing of exactly what the missing evidence or testimony would have been, a court cannot apply the *Strickland* analysis because it is very difficult to determine whether the defendant was prejudiced by any such deficiencies in counsel's performance). Petitioner failed to present the state habeas court with any evidence showing the identities of "Snake" or "Throw down" were discernable at the time of petitioner's trial.

Complaints of uncalled witnesses are disfavored because presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative. *See Coble v. Quarterman,* 496 F.3d 430, 436 (5th Cir.2007) (complaints regarding uncalled witnesses address a matter of trial strategy and are speculative in nature); *Miller v. Dretke,* 420 F.3d 356, 362 (5th Cir.2005) (such complaints necessarily involve matters of trial strategy); *Graves v. Cockrell,* 351 F.3d 143, 156 (5th Cir.2003) (such complaints impinge on matters of trial strategy and are speculative in nature); *Evans v. Cockrell,* 285 F.3d 370, 377 (5th Cir. 2002) (such complaints are speculative in nature). Thus, the burden was on petitioner during his state habeas corpus proceeding to allege and prove specific facts which showed his trial counsels' failure to pursue and present the potentially exculpatory or mitigating evidence fell outside the wide range of presumptively reasonable professional performance.

With the foregoing principles in mind, this Court now turns to the AEDPA review of the specific allegations supporting petitioner's multi-faceted claim of ineffective assistance by his trial counsel.

### 3. Synthesis

■ Petitioner complains his trial counsel failed to: (1) adequately consult prior to trial with petitioner, (2) adequately meet with petitioner's parents and family, (3) interview prosecution witnesses, (4) interview Robert Keith Adams, (5) "do a specific investigation" into a footprint found on the door? ? ? leading from the interior of David Cook's home to the garage, (6) compare fingerprints found at the crime scene to "other people who had been in the complainant's home that evening," (7) contact more than six of the thirty witnesses on the prosecution's witness list, (8) get a ruling on a motion seeking appointment of an expert witness to assist the defense, (9) obtain unspecified impeachment evidence

for use against prosecution witnesses Joey Banks and Rick Wood, (10) request limiting instructions or a mistrial regarding allegedly improper prosecutorial jury argument, (11) obtain a mental health evaluation of petitioner, (12) obtain petitioner's military and school records, (13) interview unspecified friends of petitioner, and (14) adequately prepare petitioner's father to testify at the punishment phase of petitioner's trial.

The problem with these complaints is the fact petitioner failed to present the state habeas court with any evidence showing either: (1) his trial counsel were aware of any information at the time of petitioner's trial suggesting any of these actions were likely to lead to the discovery or development of admissible exculpatory, mitigating, or beneficial impeachment evidence or (2) but for the failure of petitioner's trial counsel to undertake any of these actions, any admissible exculpatory, mitigating or beneficial impeachment evidence would have been discovered prior to or during petitioner's trial. Thus,' petitioner failed to carry his burden of proving the actions of his trial counsel, as well as their inactions, fell outside the wide range of objectively reasonable professional conduct. Likewise, petitioner failed to demonstrate he was "prejudiced" within the meaning of *Strickland* by any of these alleged failures by his trial counsel.

For instance, petitioner's father testified during petitioner's state habeas hearing he had furnished the jury with all the information he wished to give them regarding petitioner's background and character.[62] More significantly, he failed to identify any other, potentially helpful, information regarding petitioner's character which he might have been able to furnish to the jury had he been more thoroughly prepared prior to his punishment-phase testimony.

Petitioner complains his trial counsel failed to impeach prosecution witnesses Joey Banks and Rick Wood with unspecified information relating to their criminal records. Yet the jury was made aware during petitioner's trial of both: (1) the fact Joey Banks had pleaded guilty to assaulting Heidi Munoz, received a probated sentence for that offense, and been released from jail only weeks before David Cook's murder[63] and (2) Richard Wood was serving a term of deferred adjudication probation for possession of a controlled substance when he testified at petitioner's trial.[64] Petitioner offered the state habeas court no evidence showing any additional impeachment evidence was available with regard to either of these prosecution witnesses at the time of petitioner's trial.

Petitioner failed to present the state habeas court with any evidence showing any information available to petitioner's trial counsel at the time of petitioner's trial would have alerted reasonably diligent counsel of the possibility favorable evidence or information might be obtained from a review of petitioner's military, school, prison, or medical records. Petitioner presented the state habeas court with no such records and no other evidence suggesting those records contained any exculpatory or mitigating evidence.

Petitioner failed to present the state habeas court with any evidence establishing the content of any mental health records relating to petitioner or suggesting objectively reasonable reasons existed at the

---

**62.** S.F. State Habeas Hearing September 8, 2004, testimony of James Bartee, found at State Habeas Transcript, Volume 3 of 4, at pp. 648–78.

**63.** S.F. Trial, Volume XXI, testimony of Joey Cortez Banks, at pp. 40–41.

**64.** S.F. Trial, Volume XIX, testimony of Richard Craig Wood, at pp. 198–99, 235–36.

time of petitioner's trial to suspect a mental health examination of petitioner might prove beneficial to petitioner at trial. Even now, petitioner identifies no evidence in existence indicating petitioner has ever suffered any form of mental illness or defect.[65]

Petitioner failed to present the state habeas court with any evidence showing further investigation into the fingerprints, hair fibers, or footprint found at the crime scene would have produced any exculpatory or otherwise beneficial evidence.[66]

Finally, petitioner failed to present the state habeas court with any evidence showing any potentially exculpatory, mitigating, or beneficial impeachment evidence would have been discovered had his trial counsel interviewed Robert Keith Adams, members of petitioner's family, petitioner's friends, or any other person prior to or during petitioner's trial. Likewise, petitioner offered the state habeas court no evidence showing there was any information or evidence available from any known or discoverable source at the time of petitioner's trial which would have enabled petitioner's trial counsel to identify either "Snake" or "Throw down."

Having independently reviewed the entirety of the evidence from petitioner's trial, direct appeal, and state habeas corpus proceedings, this Court concludes none of petitioner's complaints regarding the performance of his trial counsel satisfy either prong of the *Strickland* test.

D. *Conclusion*

The Texas Court of Criminal Appeals' conclusions that none of petitioner's complaints about the performance of his trial counsel satisfy both prongs of the *Strickland* test was a reasonable application of the appropriate federal constitutional standard. The Texas Court of Criminal Appeals' rejection on the merits of petitioner's multi-faceted ineffective assistance claim during the course of petitioner's state habeas corpus proceeding was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

VI. *Constructive Denial of Counsel*

A. *The Claim*

In his fourth claim herein, petitioner re-urges essentially the same complaint set forth in *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), discussed in Section IV.C. above.[67]

---

**65.** At trial, petitioner's paramour testified: (1) she believed petitioner had been sexually abused as an adolescent, (2) petitioner demonstrated many symptoms attributable to such abuse, and (3) she based her conclusions upon statements made to her by petitioner and from her own, first-hand observations of petitioner following his release from prison. S.F. Trial, Volume XXIII, testimony of Mary Karen Sedung, at pp. 97–104, 106, 109, 111–12, 121, 131. However, petitioner alleged no facts and presented no evidence to the state habeas court suggesting any other evidence supporting such a diagnosis existed at the time of petitioner's trial.

**66.** In fact, petitioner's former lead trial counsel testified during petitioner's state habeas hearing the petitioner had furnished him with information which showed petitioner's shoe size matched that of the footprint found on the door leading from the interior of David Cook's home to the garage where Mr. Cook routinely parked his Harley and (2) the petitioner also indicated to him the petitioner had, in fact, kicked a wall inside the house during his escape. S.F. State Habeas Hearing, testimony of Vincent D. Callahan, found at State Habeas Transcript, Volume 3 of 4, at pp. 597–600.

**67.** *Petition*, at pp. 57–58; *Reply*, at pp. 7–10.

## B. State Court Disposition

The state habeas trial court concluded petitioner's *Cronic* claim lacked any arguable merit.[68]

## C. AEDPA Analysis

For the same reasons discussed in Section IV.C.3. above, petitioner's assertion he was constructively denied the assistance of counsel under the standard announced in *United States v. Cronic* lacks any merit. *See Bell v. Cone,* 535 U.S. 685, 697, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (holding the presumption applicable only when counsel entirely failed to subject the prosecution's case to meaningful adversarial testing); *United States v. Griffin,* 324 F.3d 330, 364 (5th Cir.2003) ("When the defendant complains of errors, omissions, or strategic blunders, prejudice is not presumed; bad lawyering, regardless of how bad, does not support the *per se* presumption of prejudice."); *Riddle v. Cockrell,* 288 F.3d 713, 718 (5th Cir.) (holding "constructive denial of counsel" sufficient to support a presumption of prejudice arises only when counsel was absent from the courtroom, there was an actual conflict of interest, or there was official interference with the defense), *cert. denied,* 537 U.S. 953, 123 S.Ct. 420, 154 L.Ed.2d 300 (2002).

## D. Conclusion

The Texas Court of Criminal Appeals' rejection on the merits of petitioner's constructive denial of counsel claim during the course of petitioner's state habeas corpus proceeding was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

## VII. Inadequate Funding for Trial Counsel

### A. The Claim

In his fifth claim herein, petitioner argues the fee schedule Bexar County has established for attorneys appointed in criminal cases is insufficient and effectively limits the amount of time an attorney can prepare for trial as to constructively deny effective legal representation.[69]

### B. State Court Disposition

The state habeas trial court found petitioner had failed to present that court with any evidence showing petitioner's representation at trial was negatively impacted by the compensation schedule.[70]

### C. AEDPA Review

■ Respondent correctly points out petitioner's failure to support this same complaint about Bexar County's fee schedule during petitioner's state habeas evidentiary hearing. The state habeas court had no evidence before it linking any identified deficiency in the performance of petitioner's trial counsel or court-appointed investigator with Bexar County's allegedly inadequate fee schedule. More specifically, petitioner offered the state habeas court no evidence showing petitioner's trial counsel or court-appointed investigator failed to undertake any identified investigation due to a lack of funding. Accordingly, there was nothing unreasonable with the state habeas court's conclusion petitioner had failed to carry his burden of showing his trial representation had been negatively impacted by the Bexar County fee schedule.

---

**68.** State Habeas Transcript, Volume 4 of 4, at p. 783.

**69.** *Petition,* at pp. 59–62; *Reply,* at pp. 7–10.

**70.** State Habeas Transcript, Volume 4 of 4, at pp. 784–85.

## D. Conclusion

The Texas Court of Criminal Appeals' rejection on the merits of petitioner's complaints about the Bexar County fee schedule during the course of petitioner's state habeas corpus proceeding was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

## VIII. Challenges to Voir Dire Rulings

### A. The Claims

In his sixth through twelfth claims herein, petitioner argues the state trial court

71. *Petition*, at pp. 63–82; *Reply*, at pp. 11–16.

72. Petitioner's Appellant's Brief, at pp. 24–41.

73. Petitioner's Appellant's Brief, filed in his direct appeal on July 18, 1999, appears among the state court records relating to petitioner's case submitted to this Court by respondent. Petitioner's first six points of error therein consist of complaints about the state trial court's rulings on various challenges for cause during voir dire. Specifically, petitioner complained about the state trial court's granting of the prosecution's challenge for cause to venire member Bruno Eugene Ramon and the trial court's denials of petitioner's challenges for cause to venire members Kenneth Mailey, Steven Cawthorn, Kenneth Mabbott, Alice Jones, and Sarah Hoffman. At four places in petitioner's Appellant's Brief, petitioner included the following statement: "The United States and Texas Constitutions provide that an accused is entitled to trial by an impartial jury." Petitioner's Appellant's Brief, at pp. 27, 32, 36, 40. At one point, petitioner argued "This principle is consistent with the long-standing United States constitutional standard of fair and impartial deliberations." *Id.*, at p. 38. However, petitioner did not cite any specific federal case authority or elaborate on any federal constitutional principles in support of his challenges to the state trial court's rulings on the challenges for cause in question. Instead, petitioner's legal arguments in support of his first six points of error on direct appeal were premised exclu-

erroneously ruled on a host of challenges for cause to specific venire members during voir dire, erroneously granting the prosecution's challenges for cause, and erroneously denying defense counsel's challenges for cause.[71]

### B. State Court Disposition

Petitioner presented a series of complaints about the state trial court's rulings on these same challenges for cause during his direct appeal.[72] As respondent correctly points out, however, all of these challenges were premised entirely upon state law principles.[73] The Texas Court of Criminal Appeals rejected each of these points of error on the merits.[74]

sively on state law principles, i.e., provisions of the Texas Code of Criminal Procedure, the Texas Rules of Appellate Procedure, and Texas case law interpreting same.

74. *Bartee v. State*, No. 73,126 (Tex.Crim.App. May 3, 2000), slip op. at pp. 2–9.

More specifically, the Texas Court of Criminal Appeals ruled as follows on petitioner's direct appeal with regard to petitioner's complaints about the trial court's rulings on the challenges for cause in question, respectively: (1) petitioner's complaints about the trial court's granting of the prosecution's challenge for cause to venire member Ramon did not establish the jury which actually heard petitioner's case was unconstitutionally partial; (2) petitioner's complaints about the trial court's denial of petitioner's challenges for cause to venire members Malley, Cawthorn, and Mabbott lacked merit because all three venire members demonstrated an understanding of the difference between "probability" and "possibility" during their voir dire examination; (3) venire member Jones was not properly subject to a challenge for cause because the trial court did not abuse its discretion in finding Ms. Jones could carry out her oath and instructions in accordance with law; and (4) venire member Hoffman had merely expressed her intention to re-evaluate her own opinion should she find herself at odds with the vast majority of jurors during deliberations and, thus, was not properly subject to

In the course of his state habeas corpus proceeding, petitioner re-represented these same state law complaints in the same format as in his direct appeal but substituted the term "Sixth, Amendment" for the "United States Constitution." [75] The state habeas trial court concluded these claims had already been resolved during petitioner's direct appeal and could not be re-litigated in petitioner's state habeas corpus proceeding or, alternatively, these complaints could have been presented during petitioner's direct appeal and, therefore, were procedurally barred from state habeas review.[76]

## C. AEDPA Review

### 1. Federal Habeas Relief Does Not Lie for State Law Errors

Insofar as petitioner complains the Texas Court of Criminal Appeals erroneously applied state law principles in rejecting his complaints about the trial court's rulings on various challenges for cause, his arguments do not furnish a basis for federal habeas relief. Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also presented. See Estelle v. McGuire, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (holding complaints regarding the admission of evidence under California law did not present grounds for federal habeas relief absent a showing that admission of the evidence in question violated due process); Lewis v. Jeffers, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) (recognizing that federal habeas relief will

not issue for errors of state law); Pulley v. Harris, 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) (holding a federal court may not issue the writ on the basis of a perceived error of state law).

In the course of reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does not sit as a super-state appellate court. Estelle v. McGuire, 502 U.S. at 67–68, 112 S.Ct. 475; Lewis v. Jeffers, 497 U.S. at 780, 110 S.Ct. 3092; Pulley v. Harris, 465 U.S. at 41, 104 S.Ct. 871.

When a federal district court reviews a state prisoner's habeas petition pursuant to 28 U.S.C. § 2254 it must decide whether the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." The court does not review a judgment, but the lawfulness of the petitioner's custody simpliciter.

Coleman v. Thompson, 501 U.S. 722, 730, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

A federal court may grant habeas relief based on an erroneous state court evidentiary ruling only if the ruling violates a specific federal constitutional right or is so egregious it renders the petitioner's trial fundamentally unfair. Brown v. Dretke, 419 F.3d 365, 376 (5th Cir.2005), cert. denied, 546 U.S. 1217, 126 S.Ct. 1434, 164 L.Ed.2d 137 (2006); Wilkerson v. Cain, 233 F.3d 886, 890 (5th Cir.2000); Johnson v. Puckett, 176 F.3d 809, 820 (5th Cir. 1999).

Thus, the question before this Court is not whether the state trial court properly

---

a challenge for cause under the principles set forth in Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

**75.** State Habeas Transcript, Volume 1 of 4, at pp. 110–130. In his eighth through fourteenth claims in his state habeas application, petitioner presented the same six arguments he had included as his first six points of error

on direct appeal in almost identical form. Significantly, petitioner's state habeas application again posed these arguments as complaints about alleged violations of state procedural rules and relief exclusively on state case law to support his claims.

**76.** State Habeas Transcript, Volume 4 of 4, at pp. 785–90.

applied state procedural rules but, rather, whether petitioner's federal constitutional rights were violated by the state trial court's rulings on the challenges for cause in question. *See Bigby v. Dretke,* 402 F.3d 551, 563 (5th Cir.) (holding federal habeas review of a state court's evidentiary ruling focuses exclusively on whether the ruling violated the federal Constitution), *cert. denied,* 546 U.S. 900, 126 S.Ct. 239, 163 L.Ed.2d 221 (2005).

■ Moreover, a finding an individual who served on a capital murder jury was disqualified under state law from jury service does not, standing alone, establish the same individual was so biased or so partial as to deprive the defendant of his federal constitutional rights. *See Montoya v. Scott,* 65 F.3d 405, 418–20 (5th Cir.1995) (recognizing the issue of juror disqualification under state law and a showing of bias are two, entirely different, issues), *cert. denied,* 517 U.S. 1133, 116 S.Ct. 1417, 134 L.Ed.2d 542 (1996). Even assuming under a proper view of applicable state-law principles the state trial court should have granted one or more of petitioner's challenges for cause to the venire members in question, or denied the state's challenge for cause to venire member Ramon, that error did not necessarily deprive petitioner of an impartial jury or a fundamentally fair trial. *See Fuller v. Johnson,* 158 F.3d 903, 908 (5th Cir.1998) (holding a convicted capital murder defendant's complaint that one of his jurors was disqualified from jury service under Texas law failed to assert a basis for federal habeas relief in the absence of a showing the juror's service rendered the entire trial fundamentally unfair), *cert. denied,* 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999).

### 2. *Procedural Default on Unexhausted Constitutional Claims*

■ Respondent correctly argues the petitioner has failed to exhaust available state remedies and thereby procedurally defaulted on the federal constitutional gloss petitioner now seeks to add to his complaints about the state trial court's rulings on the challenges for cause in question.

#### a. *The Duty to Exhaust Available State Remedies*

Before seeking federal habeas corpus relief, a state prisoner must exhaust available state remedies thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *Baldwin v. Reese,* 541 U.S. 27, 29, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004); *O'Sullivan v. Boerckel,* 526 U.S. 838, 842, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Duncan v. Henry,* 513 U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995); *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); 28 U.S.C. § 2254(b)(*l*). To provide the State with this necessary "opportunity," the prisoner must "fairly present" his claim to the appropriate state court in a manner that alerts that court to the federal nature of the claim. *See Baldwin v. Reese,* 541 U.S. at 29–32, 124 S.Ct. 1347 (rejecting the argument a petitioner "fairly presents" a federal claim, despite failing to give any indication in his appellate brief of the federal nature of the claim through reference to any federal source of law, when the state appellate court could have discerned the federal nature of the claim through review of the lower state court opinion); *O'Sullivan v. Boerckel,* 526 U.S. at 844–45, 119 S.Ct. 1728 (holding comity requires a state prisoner present the state courts with the first opportunity to review a federal claim by invoking one complete round of that State's established appellate review process); *Gray v. Netherland,* 518 U.S. 152, 162–63, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996) (holding that, for purposes of exhausting state remedies, a claim for fed-

eral relief must include reference to a specific constitutional guarantee, as well as a statement of facts that entitle the petitioner to relief and rejecting the contention that the exhaustion requirement is satisfied by presenting the state courts only with the facts necessary to state a claim for relief). The exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts and, thereby, to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings. *Carey v. Saffold,* 536 U.S. 214, 220, 122 S.Ct. 2134, 153 L.Ed.2d 260 (2002); Duncan v. Walker, 533 U.S. 167, 179, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001); *O'Sullivan v. Boerckel,* 526 U.S. at 845, 119 S.Ct. 1728; *Rose v. Lundy,* 455 U.S. 509, 518–19, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).

Under the AEDPA, federal courts lack the power to grant habeas corpus relief on unexhausted claims. *Kunkle v. Dretke,* 352 F.3d 980, 988 (5th Cir.2003) ("28 U.S.C. § 2254(b)(1) requires federal habeas petitioners fully exhaust remedies available in state court before proceeding in federal court."), *cert. denied,* 543 U.S. 835, 125 S.Ct. 250, 160 L.Ed.2d 56 (2004); *Riley v. Cockrell,* 339 F.3d 308, 318 (5th Cir.2003); *Anderson v. Johnson,* 338 F.3d 382, 386 (5th Cir.2003); *Henry v. Cockrell,* 327 F.3d 429, 432 (5th Cir.) ("Absent special circumstances, a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief."), *cert. denied,* 540 U.S. 956, 124 S.Ct. 408, 157 L.Ed.2d 293 (2003); *Mercadel v. Cain,* 179 F.3d 271, 276–77 (5th Cir.1999); *Alexander v. Johnson,* 163 F.3d 906, 908 (5th Cir.1998); *Jones v. Jones,* 163 F.3d 285, 299 (5th Cir.1998), *cert. denied,* 528 U.S. 895, 120 S.Ct. 224, 145 L.Ed.2d 188 (1999). However, Title 28 U.S.C. § 2254(b) (2) empowers a federal habeas court to deny an exhausted claim on the merits. *Smith v. Cockrell,* 311 F.3d 661, 684 (5th Cir.2002), *cert. dism'd,* 541 U.S. 913, 124 S.Ct. 1652, 158 L.Ed.2d 263 (2004); *Daniel v. Cockrell,* 283 F.3d 697, 701–02 (5th Cir.), *cert. denied,* 537 U.S. 874, 123 S.Ct. 286, 154 L.Ed.2d 126 (2002). The exhaustion of all federal, claims in state court is a fundamental prerequisite to requesting federal collateral relief under Title 28 U.S.C. Section 2254. *Wilder v. Cockrell,* 274 F.3d 255, 259 (5th Cir.2001); *Sterling v. Scott,* 57 F.3d 451, 453 (5th Cir.1995), *cert. denied,* 516 U.S. 1050, 116 S.Ct. 715, 133 L.Ed.2d 669 (1996); 28 U.S.C. § 2254(b)(1)(A).

In order to "exhaust" available state remedies, a petitioner must "fairly present" all of his claims to the state courts. *Duncan v. Henry,* 513 U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995); *Picard v. Connor,* 404 U.S. 270, 275–76, 92 S.Ct. 509, 30 L.Ed.2d 438, (1971); *Kunkle v. Dretke,* 352 F.3d at 988; *Riley v. Cockrell,* 339 F.3d at 318; *Anderson v. Johnson,* 338 F.3d at 386; *Jones v. Jones,* 163 F.3d at 296; *Shute v. State of Texas,* 117 F.3d at 237 ("a habeas petitioner 'must fairly apprise the highest court of his state of the federal rights which were allegedly violated.' "). In Texas, the highest state court with jurisdiction to review the validity of a state criminal conviction is the Texas Court of Criminal Appeals. *Richardson v. Procunier,* 762 F.2d 429, 431–32 (5th Cir. 1985).

More simply, the exhaustion doctrine requires the petitioner present his federal claim in a manner reasonably designed to afford the State courts a meaningful opportunity to address same. The exhaustion requirement is satisfied when the substance of the federal habeas claim has been "fairly presented" to the highest state court, i.e., the petitioner presents his claims before the state courts in a proce-

durally proper manner according to the rules of the state courts. *Baldwin v. Reese,* 541 U.S. at 29–32, 124 S.Ct. 1347 (holding a petitioner failed to "fairly present" a claim of ineffective assistance by his state appellate counsel merely by labeling the performance of said counsel "ineffective," without accompanying that label with either a reference to federal law or a citation to an opinion applying federal law to such a claim); *Moore v. Cain,* 298 F.3d 361, 364 (5th Cir.2002), *cert. denied,* 537 U.S. 1236, 123 S.Ct. 1360, 155 L.Ed.2d 202 (2003); *Mercadel v. Cain,* 179 F.3d at 275. However, the petitioner need not spell out each syllable of the claim before the state court for the claim to have been "fairly presented" and thereby fulfill the exhaustion requirement. *Riley v. Cockrell,* 339 F.3d at 318; *Fisher v. Texas,* 169 F.3d 295, 303 (5th Cir.1999).

The presentation of claims for the first time on discretionary review to the state's highest court does not constitute "fair presentation" for exhaustion purposes. *Castille v. Peoples,* 489 U.S. 346, 351, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989); *Satterwhite v. Lynaugh,* 886 F.2d 90, 92 (5th Cir.1989). Full exhaustion of all claims presented is required before federal habeas corpus relief is available. *Rose v. Lundy,* 455 U.S. 509, 518–22, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982); *Thomas v. Collins,* 919 F.2d 333, 334 (5th Cir.1990).

The exhaustion requirement is not met if the petitioner presents new legal theories or factual claims in his federal habeas petition. *Anderson v. Harless,* 459 U.S. 4, 6–7, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982); *Riley v. Cockrell,* 339 F.3d at 318 ("It is not enough that the facts applicable to the federal claims were all before the State court, or that the petitioner made a similar state-law based claim. The federal claim must be the 'substantial equivalent' of the claim brought before the State court."); *Wilder v. Cockrell,* 274 F.3d at 259 ("where

petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement"); *Finley v. Johnson,* 243 F.3d 215, 219 (5th Cir.2001). Likewise, to have "fairly presented" his federal claim, the petitioner must have reasonably alerted the state courts to the federal nature of his claim. *Baldwin v. Reese,* 541 U.S. at 29–32, 124 S.Ct. 1347 (holding a petitioner failed to "fairly present" a claim of ineffective assistance by his state appellate counsel merely by labeling the performance of said counsel "ineffective," without accompanying that label with either a reference to federal law or a citation to an opinion applying federal law to such a claim); *Wilder v. Cockrell,* 274 F.3d at 260 ("A fleeting reference to the federal constitution, tacked onto the end of a lengthy, purely state-law evidentiary argument, does not sufficiently alert and afford a state court the opportunity to address an alleged violation of federal rights.").

b. *Procedural Default on Unexhausted Claims*

The Fifth Circuit has consistently held that federal habeas review on unexhausted claims presented by a convicted Texas criminal defendant is barred under the procedural default doctrine. *See, e.g., Aguilar v. Dretke,* 428 F.3d 526, 533 (5th Cir.2005) (holding the Texas abuse of the writ rule ordinarily is an adequate and independent procedural ground on which to base a procedural default ruling), *cert. denied,* 547 U.S. 1136, 126 S.Ct. 2059, 164 L.Ed.2d 793 (2006); *Matchett v. Dretke,* 380 F.3d 844, 848 (5th Cir.2004) (holding the violation of the Texas writ-abuse rule ordinarily furnishes an adequate and independent procedural ground which bars federal habeas review of a claim), *cert. denied,* 543 U.S. 1124, 125 S.Ct. 1067, 160 L.Ed.2d 1074 (2005); *Bagwell v. Dretke,* 372 F.3d

748, 755–56 (5th Cir.) (holding a petitioner procedurally defaulted by failing to "fairly present" a claim to the state courts in his state habeas corpus application), *cert. denied,* 543 U.S. 989, 125 S.Ct. 498, 160 L.Ed.2d 374 (2004); *Cotton v. Cockrell,* 343 F.3d 746, 755 (5th Cir.2003) (holding the Texas writ abuse doctrine is an adequate and independent barrier to federal habeas review of unexhausted claims), *cert. denied,* 540 U.S. 1186, 124 S.Ct. 1417, 158 L.Ed.2d 92 (2004); *Henderson v. Cockrell,* 333 F.3d 592, 605 (5th Cir.2003) (recognizing the Texas writ-abuse doctrine has been strictly and regularly applied since before August, 1997), *cert. denied,* 540 U.S. 1163, 124 S.Ct. 1170, 157 L.Ed.2d 1208 (2004); *Smith v. Cockrell,* 311 F.3d 661, 684 (5th Cir.2002) (holding unexhausted claims were procedurally barred), *cert. dism'd,* 541 U.S. 913, 124 S.Ct. 1652, 158 L.Ed.2d 263 (2004); *Jones v. Johnson,* 171 F.3d 270, 276–77 (5th Cir.) (holding unexhausted ineffective assistance claim procedurally barred from federal habeas review), *cert. denied,* 527 U.S. 1059, 120 S.Ct. 29, 144 L.Ed.2d 832 (1999); *Muniz v. Johnson,* 132 F.3d 214, 221 (5th Cir.) (holding unexhausted claims procedurally barred), *cert. denied,* 523 U.S. 1113, 118 S.Ct. 1793, 140 L.Ed.2d 933 (1998); *Nobles v. Johnson,* 127 F.3d 409, 423 (5th Cir.1997) (holding the Texas writ-abuse rule an adequate and independent barrier to federal habeas review of unexhausted claims), *cert. denied,* 523 U.S. 1139, 118 S.Ct. 1845, 140 L.Ed.2d 1094 (1998).

Section 5 of Article 11.071 of the Texas Code of Criminal procedure prohibits a successive state habeas corpus application except in limited circumstances which do not apply to petitioner's complaint about the violation of the presumption of innocence arising from the alleged vagueness of the first Texas capital sentencing special issue. *See* Tex.Code Crim. Proc. Ann. art 11.071 § 5 (Vernon Supp.2006) (barring consideration on the merits of new claims contained in a subsequent state habeas corpus application unless: (1) the new claims could not have been presented in a previous application because the legal or factual basis for the new claims were unavailable at the time the previous application was filed; (2) by a preponderance of the evidence, but for a violation of the United States Constitution, no rational juror could have found the applicant guilty beyond a reasonable doubt; or (3) by clear and convincing evidence, but for a violation of the United States Constitution, no rational juror would have answered in the state's favor one or more of the capital sentencing special issues). Nothing prevented petitioner from asserting this same federal constitutional complaint about the state trial court's rulings on the challenges for cause in question in the course of his direct appeal or state habeas corpus proceeding. Likewise, petitioner alleges no facts in this Court and presented the state habeas court with no evidence which satisfies either of the final two exceptions to the Texas writ-abuse barrier erected by Section 5 of Article 11.071. On the contrary, the evidence of petitioner's guilt, though circumstantial, was overwhelming as was the evidence supporting the jury's answers to the petitioner's capital sentencing special issues.

Nothing in petitioner's appellant's brief or state habeas corpus application "fairly presented" the Texas Court of Criminal Appeals with the same federal constitutional arguments contained in petitioner's sixth through twelfth claims for relief before this Court. On the contrary, the Fifth Circuit may well have petitioner's pleadings on direct appeal and in his state habeas proceeding in mind when it opined in *Wilder v. Cockrell,* 274 F.3d at 260 as follows: "A fleeting reference to the federal constitution, tacked onto the end of a lengthy, purely state-law evidentiary argument, does not sufficiently alert and afford

a state court the opportunity to address an alleged violation of federal rights." Petitioner's passing references to "the Sixth Amendment" and "the United States Constitution" in his direct appeal brief and state habeas application failed to "fairly present" the Texas Court of Criminal Appeals with the detailed federal constitutional claims petitioner now presents in his sixth through twelfth claims herein. In short, nothing in petitioner's pleadings in any of his state court proceedings to date "fairly presented" any state court with the federal constitutional arguments underlying petitioner's sixth through twelfth claims herein.

If petitioner were to attempt at this juncture to return to state court and assert these new federal constitutional arguments underlying his sixth through twelfth claims herein in a successive state habeas application, the applicable provisions of the Texas writ-abuse statute would preclude him from doing so. Thus, petitioner failed to exhaust available state remedies on his sixth through twelfth claims herein and, thereby, procedurally defaulted on same. *See Hughes v. Dretke,* 412 F.3d 582, 594–95 (5th Cir.2005) (holding petitioner procedurally defaulted on a jury misconduct claim by presenting the state courts with purely state-law arguments supporting same and waiting until he reached federal court to first urge federal constitutional arguments), *cert. denied,* 546 U.S. 1177, 126 S.Ct. 1347, 164 L.Ed.2d 60 (2006); *Beazley v. Johnson,* 242 F.3d 248, 264–68 (5th Cir.) (holding petitioner procedurally defaulted on a claim by failing to present same to the Texas Court of criminal Appeals either on direct appeal or in a state habeas corpus application where claim was readily available at the time petitioner filed his state habeas application), *cert. denied,* 534 U.S. 945, 122 S.Ct. 329, 151 L.Ed.2d 243 (2001); *Hicks v. Johnson,* 186 F.3d 634, 637–38 (5th Cir.1999) (petitioner procedurally defaulted on an unexhausted

claim for relief), *cert. denied,* 528 U.S. 1132, 120 S.Ct. 976, 145 L.Ed.2d 844 (2000).

### c. *Exceptions Inapplicable*

The Supreme Court has recognized exceptions to the doctrine of procedural default where a federal habeas corpus petitioner can show "cause and actual prejudice" for his default or that failure to address the merits of his procedurally defaulted claim will work a "fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. at 750, 111 S.Ct. 2546; *Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). To establish "cause," a petitioner must show either that some objective external factor impeded the defense counsel's ability to comply with the state's procedural rules or that petitioner's trial or appellate counsel rendered ineffective assistance. *Coleman v. Thompson,* 501 U.S. at 753, 111 S.Ct. 2546; *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397, (1986) (holding that proof of ineffective assistance by counsel satisfies the "cause" prong of the exception to the procedural default doctrine). While a showing of ineffective assistance can satisfy the "cause" prong of the "cause and actual prejudice" exception to the procedural default doctrine, petitioner does not argue or allege any specific facts suggesting his state appellate counsel's failure to present the same federal constitutional complaints about the trial court's rulings on the challenges for cause in question petitioner presents to this Court somehow rendered said counsel's performance ineffective under the standard of *Strickland v. Washington.*

In order to satisfy the "miscarriage of justice" test, the petitioner must supplement his constitutional claim with a color-

able showing of factual innocence. *Sawyer v. Whitley*, 505 U.S. 333, 335–36, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). In the context of the punishment phase of a capital trial, the Supreme Court has held a showing of "actual innocence" is made when a petitioner shows by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found petitioner eligible for the death penalty under applicable state law. *Sawyer v. Whitley*, 505 U.S. at 346–48, 112 S.Ct. 2514. The Supreme Court explained in *Sawyer v. Whitley* this "actual innocence" requirement focuses on those elements which render a defendant eligible for the death penalty and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error. *Sawyer v. Whitley*, 505 U.S. at 347, 112 S.Ct. 2514. Petitioner has alleged no, specific facts satisfying this "factual innocence" standard. Because petitioner has failed to satisfy the "actual innocence" test, he is not entitled to relief from his procedural defaults under the fundamental miscarriage of justice exception to the procedural default doctrine.

### 3. *No Merits*

Alternatively, petitioner's federal constitutional complaints about the state trial court's rulings on various challenges for cause do not present a basis for federal habeas relief.

#### a. *Harmless Error*

Petitioner has identified no member of the jury which actually heard his case whom petitioner claims was prohibited from service on petitioner's jury under federal constitutional principles. The possibility petitioner may have found some of the jurors who actually sat on his jury "objectionable" does not establish, without more, any of those jurors were precluded

from jury service under federal constitutional principles. Petitioner admits in his state habeas application he peremptorily struck venire members Malley, Cawthorn, Mabbott, Jones, and Hoffman.[77] Thus, none of these allegedly objectionable jurors actually sat on petitioner's jury.

Any error made by the state trial court in the course of denying petitioner's challenges for cause to venire members who never actually sat on petitioner's capital jury was harmless as a matter of law. *See Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (holding the test for harmless error in a federal habeas corpus action brought by a state prisoner is "whether the error had substantial and injurious effect or influence in determining the jury's verdict"). While it is true constitutional error of the type envisioned by the Supreme Court in its *Witherspoon, Adams, Witt, Uttecht* line of cases discussed hereinafter cannot be harmless, as is also explained below, petitioner's complaints in his sixth through twelfth claims herein do not implicate any of the rights recognized in applicable Supreme Court jurisprudence.

#### b. *The Federal Constitutional Standard*

As another judge in this District has recently noted, *see Berkley v. Quarterman*, 507 F.Supp.2d 692, 723–25 (W.D.Tex.2007), the federal constitutional standard for determining jury qualifications for service on a capital sentencing jury is set forth in a series of Supreme Court opinions dating back four decades:

In *Witherspoon v. Illinois*, 391 U.S. 510, 521–23, 88 S.Ct. 1770, 1776–77, 20 L.Ed.2d 776 (1968), the Supreme Court held that prospective jurors may not be excused from sitting on a capital jury simply because they voiced general ob-

---

**77.** State Habeas Transcript, Volume 1 of 4, at pp. 116–27.

jections to the death penalty or expressed conscientious or religious scruples against its infliction. Rather, the Supreme Court held as follows:

> The most that can be demanded of a venireman in this regard is that he be willing to consider all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty regardless of the facts and circumstances that might emerge in the course of the proceedings.

*Witherspoon v. Illinois,* 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21.

In *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), the Supreme Court emphasized the limitations *Witherspoon* imposed on the ability of the State to exclude members of a jury venire from service on a petit capital jury and directly addressed jury selection in Texas capital murder trials:

> a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.

*Adams v. Texas,* 448 U.S. at 45, 100 S.Ct. at 2526

In *Adams,* the Supreme Court further discussed the many practical consequences of its *Witherspoon* holding:

> If the juror is to obey his oath and follow the law of Texas, he must be willing not only to accept that in certain circumstances death is an acceptable penalty but also to answer the statutory questions without conscious distortion or bias. The State does not violate the *Witherspoon* doctrine when it excludes prospective jurors who are unable or unwilling to address the penalty questions with this degree of impartiality. * * *

> [A] Texas juror's views about the death penalty might influence the manner in which he performs his role but without exceeding the "guided jury discretion" permitted him under Texas law. In such circumstances, he could not be excluded consistently with *Witherspoon.*

> The State could, consistently with *Witherspoon,* use § 12.31(b) to exclude prospective jurors whose views on capital punishment are such as to make them unable to follow the law or obey their oaths. But the use of § 12.31(b) to exclude jurors on broader grounds based on their opinions concerning the death penalty is impermissible. * * *

> [N]either nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty. * * * Nor in our view would the Constitution permit the exclusion of jurors from the penalty phase of a Texas murder trial if they aver that they will honestly find the facts and answer the questions in the affirmative if they are convinced beyond a reasonable doubt, but not otherwise, yet who frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will be or what they may deem to be a reasonable doubt. * * * [T]he State may bar from jury service those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths.

*Adams v. Texas*, 448 U.S. at 46–50, 100 S.Ct. at 2527–29 (citations omitted).

In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court further clarified its holdings in *Witherspoon* and *Adams*, holding that the proper inquiry when faced with a venire member who expresses personal, conscientious, or religious views on capital punishment is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. at 424, 105 S.Ct. at 852. In *Wainwright v. Witt*, the Supreme Court also emphasized that considerable deference is to be given the trial court's first-hand evaluation of the potential juror's demeanor and that no particular magical incantation or word choice need necessarily be followed in interrogating the potential juror in this regard. *Id.,* 469 U.S. at 430–35, 105 S.Ct. at 855–58.

The Supreme Court subsequently held that the erroneous dismissal of a potential juror in violation of *Witherspoon* is not subject to harmless error analysis. *Gray v. Mississippi*, 481 U.S. 648, 668, 107 S.Ct. 2045, 2057, 95 L.Ed.2d 622 (1987).

More recently, in *Uttecht v. Brown,* —— U.S. ——, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007), the Supreme Court reviewed its *Witherspoon–Witt* line of opinions and identified the following "principles of relevance":

> First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts.

*Uttecht v. Brown,* —— U.S. at ——, 127 S.Ct. at 2224 (*citations omitted* ).

The Supreme Court emphasized the critical inquiry for *Witherspoon–Witt* purposes is not whether a state appellate court properly reviewed the propriety of the exclusion but, rather, whether the trial court correctly applied the appropriate federal constitutional standard. *Uttecht v. Brown,* —— U.S. at ——, 127 S.Ct. at 2228. Finally, the Supreme Court admonished reviewing courts to defer to the trial court's resolution of questions of bias arising from a potential juror's conflicting voir dire answers because the trial court had the opportunity to observe the demeanor of the potential juror. *Uttecht v. Brown,* U.S. at, 127 S.Ct. at 2229–30 ("where, as here there is a lengthy questioning of a prospective juror and the trial court has supervised a diligent and thoughtful *voir dire,* the trial court has broad discretion."). "Courts reviewing claims of *Witherspoon–Witt* error, however, especially federal courts considering habeas petitions, owe deference to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror." *Uttecht v. Brown,* —— U.S. at ——, 127 S.Ct. at 2231.

*Berkley v. Quarterman,* 507 F.Supp.2d 692, 723–25 (W.D.Tex.2007).

### c. Venire Member Ramon

Because no state court has ruled on petitioner's federal constitutional challenge to the trial court ruling granting the prosecution's challenge for cause to venire member Ramon, this Court's review is necessarily *de novo*. *See Rompilla v. Beard*, 545 U.S. 374, 390, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. 2527 (holding the same).

During voir dire examination by the prosecution, venire member Ramon repeatedly indicated he would require additional evidence, beyond the facts of the crime itself, in order to make an affirmative finding to the Texas capital sentencing scheme's future dangerousness special issue.[78] Petitioner's trial counsel attempted to rehabilitate venire member Ramon by explaining what answer venire member Ramon needed to give to be eligible for jury service and the prosecution objected to same as improper.[79] When venire member Ramon indicated he might be able to give an affirmative answer to the future dangerousness special issue without hearing additional evidence, defense counsel argued Ramon was eligible to serve. The state trial court disagreed and granted the prosecution's challenge for cause.[80] Significantly, the basis for Ramon's dismissal had nothing to do with the federal constitutional standard for capital jury eligibility discussed above in *Witherspoon*, *Witt*, *Adams*, and *Uttecht*. Neither party specifically interviewed Ramon concerning his ability to set aside his own personal views concerning capital punishment and render a verdict based solely upon the evidence and trial court's instructions. Thus, the state trial court's granting of the prosecution's challenge for cause to Mr. Ramon does not appear to implicate any of the federal constitutional concerns discussed in the Supreme Court cases of *Witherspoon–Adams–Witt–Uttecht*.

### d. Venire Members Malley, Cawthorn, and Mabbott

The same deficiency applies to petitioner's complaints about the trial court's denials of defense counsels' challenges for cause to venire members Malley, Cawthorn, and Mabbott. The trial court denied petitioner's challenges for cause to each of these venire members based upon the venire member's purported inability to discern the difference between the terms "probability" and "possibility," as the former term was employed in the future dangerousness special issue.[81]

The state trial court denied petitioner's challenge for cause to venire member Malley after Mr. Malley, who had a master's degree in business administration, explained that under well-settled mathematical principles, even a remote chance of an event occurring could be termed "a probability."[82] A cursory review of Mr.

---

78. The voir dire examination of venire member Ramon appears at S.F. Trial, Volume 2, pages 161–90. His responses indicating he would require additional evidence, beyond the facts of the crime itself, to answer the future dangerousness special issue affirmatively appear at pages 172–73, 180, 186.

79. *Id.*, at pp. 187–89.

80. *Id.*, at p. 190.

81. Venire member Malley's voir dire examination appears at S.F. Trial, Volume 2, at pages 192–235. Venire member Cawthorn's voir dire examination appears at S.F. Trial, Volume 11, at pages 195–229. Venire member Mabbott's voir dire examination appears at S.F. Trial, Volume 15, at pages 3–36.

82. S.F. Trial, Volume 2, at p. 222.

Malley's voir dire examination shows Mr. Malley was referring to a "statistical probability" when he gave that answer. There is nothing in Mr. Malley's voir dire answers indicating he was unwilling to adhere to the definition of "probability" applicable to the future dangerousness special issue under Texas law. Nor does petitioner identify any other voir dire answers given by Mr. Malley which demonstrate his inability or unwillingness to render a verdict based solely upon the evidence and trial court's instructions regarding applicable law. Petitioner's federal constitutional challenge for cause to Mr. Malley lacks merit.

The trial court denied petitioner's challenge for cause when venire member Cawthorn responded to a question about the meaning of the term "probability" with the answer "good possibility." [83] Petitioner made no voir dire further inquiry of Cawthorn concerning this subject. Nothing in Cawthorn's voir dire examination suggests Cawthorn was unwilling to apply the definition of "probability" contained in the trial court's jury instructions. Petitioner identifies no other answers by Cawthorn which purportedly demonstrated an inability or unwillingness on Cawthorn's part to return a verdict based solely upon the evidence and trial court's instructions as to applicable law. Petitioner's complaints about Cawthorn's answers do not implicate any federal constitutional right.

The same is true for petitioner's complaints about the trial court's denial of petitioner's challenge for cause to venire member Mabbott. The trial court initially denied petitioner's challenge for cause after Mr. Mabbott equated the term "probability" with "a likelihood." [84] After the trial court had petitioner's trial counsel

explain to Mr. Mabbott that, under applicable state law, the term "probability" meant "more likely than not," Mr. Mabbott indicated his comprehension of that information, he again defined "probability" as "a likelihood," and the trial court again denied petitioner's trial counsel's challenge for cause. [85] Petitioner made no further inquiry into that subject. None of Mr. Mabbott's voir dire answers indicated an unwillingness or inability on his part to return a verdict based solely upon the evidence and the state trial court's instructions regarding applicable law.

Petitioner did not challenge any of these three venire members based on their perceived inability to set aside their own personal views about capital punishment and render a verdict based solely upon the evidence and trial court's instructions. None of these three venire members gave any voir dire answers suggesting they were unable or unwilling to return a verdict based solely upon the evidence and the trial court's jury instructions. Thus, the *Witherspoon, Adams, Witt, Uttecht* line of cases was not implicated by the state trial court's denial of petitioner's challenges for cause to any of these venire members.

e. *Venire Member Jones*

Venire member Jones indicated during her voir dire examination by defense counsel she would not automatically vote to impose the death penalty in every murder case, while it depended on the case, she felt a person who took a life for no reason owed theirs, and she felt the death penalty applied to those convicted of murder. [86] Petitioner did not specifically inquire whether Jones could set aside her personal

---

**83.** S.F. Trial, Volume 15, at pp. 211–12, 224–25, 229.

**84.** S.F. Trial, Volume 15, at pp. 29–30.

**85.** *Id.*, at pp. 33–36.

**86.** S.F. Trial, Volume VI, at pp. 112–13, 117.

feelings about the death penalty and render a verdict based solely on the evidence and the trial court's instructions. Ms. Jones' voir dire answers regarding her personal feelings about the propriety of the death penalty in murder cases generally never addressed the specific issue whether she could set aside her feelings and render a verdict consistent solely with the evidence and jury instructions. Thus, the *Witherspoon, Adams, Witt, Uttecht* line of cases was not implicated by the state trial court's denial of petitioner's challenge for cause to venire member Jones.

In addition, Ms. Jones' voir dire answers do not indicate she was unwilling or unable to consider and weigh all the mitigating evidence before returning a verdict on the Texas capital sentencing special issues at the punishment phase of petitioner's capital murder trial. Ms. Jones' ambiguous and vacillating answers regarding her personal opinion on the applicability of the death penalty did not establish she was unwilling or unable to consider all relevant mitigating evidence in answering the capital sentencing special issues. In fact, at one point during her voir dire examination, Ms. Jones specifically disavowed a willingness to "automatically" impose the death penalty on all persons convicted of murder.[87] Under such facts, the concerns voiced by the Supreme Court in *Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998) ("In the selection phase, our cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence."), and *Morgan v. Illinois*, 504 U.S. 719, 738, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) ("Any juror who states that he or she will automatically vote for the death penalty without regard to the mitigating

evidence is announcing an intention not to follow the instructions to consider the mitigating evidence"), are not implicated by the trial court's denial of petitioner's challenge for cause.

### f. *Venire Member Hoffman*

Petitioner's attack upon venire member Hoffman is less tenuous. Ms. Hoffman indicated during her voir dire examination she would doubt her own view and would likely reconsider same if she were to find herself confronted with eleven other jurors who held a view different from her own.[88] Petitioner's reliance on the Supreme Court's opinion in *Allen v. United States*, 164 U.S. 492, 501–02, 17 S.Ct. 154, 41 L.Ed. 528 (1896), is misplaced. In *Allen,* the Supreme Court implicitly acknowledged the reasonableness of venire member Hoffman's comments during her voir dire examination:

"While undoubtedly, the verdict of the jury should represent the opinions of each individual juror, it by no means follows that opinions may not be changed by conference in the jury room. The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments, and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion of the case at that moment, or that he should close his ears to the arguments of men who are equally honest and intelligent as himself."

---

**87.** *Id.,* at p. 112.

**88.** S.F. Trial, Volume 7, at pp. 111–14, 119–22.

Venire member Hoffman's comments regarding her likely reconsideration of her own view should she find herself at odds with the vast majority of other jurors did not render her unqualified to serve as a juror under the foregoing principles announced in *Allen*. Nor did venire member Hoffman's voir dire answers indicate she was unable or unwilling to render a verdict based solely upon the evidence and the trial court's instructions.

D. *Conclusions*

Petitioner's re-urging of the same state-law claims which underlay his first six points of error on direct appeal and his eighth through fourteenth claims for state habeas relief, fails to assert an arguable basis for federal habeas corpus relief.

Insofar as petitioner asserts federal constitutional arguments in support of his sixth through twelfth claims herein, petitioner procedurally defaulted on those claims by failing to exhaust available state remedies on the federal constitutional aspect of his sixth through twelfth claims herein. More specifically, petitioner's failure to present the Texas Court of Criminal Appeals with these same federal constitutional arguments during the course of petitioner's direct appeal constitutes a procedural barrier to this Court's review of the merits of petitioner's sixth through twelfth claims herein.

The Fifth Circuit has recognized the same procedural default rule relied upon by the Texas Court of Criminal Appeals in its adopted findings and conclusions denying petitioner state habeas corpus relief was "firmly established" for federal procedural default purposes long before the date the Texas Court of Criminal Appeals disposed of petitioner's direct appeal. *See Busby v. Dretke*, 359 F.3d 708, 719 (5th Cir.) (holding the Texas Court of Criminal Appeals' opinion in *Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex.Crim.App.1996) *modified* on motion for rehearing on February

2, 1998, to recognize this new procedural default rule, "firmly entrenched" that procedural default rule on that date), *cert. denied*, 541 U.S. 1087, 124 S.Ct. 2812, 159 L.Ed.2d 249 (2004); *Finley v. Johnson*, 243 F.3d 215, 219 (5th Cir.2001) (holding a federal habeas petitioner procedurally defaulted on an unexhausted newly discovered evidence theory supporting a *Brady* claim by failing to raise same on direct appeal); *Soria v. Johnson*, 207 F.3d 232, 249 (5th Cir.) (holding a federal habeas petitioner procedurally defaulted on a fair cross–section complaint by failing to raise it in a direct appeal that became final in 1997), *cert. denied*, 530 U.S. 1286, 121 S.Ct. 2, 147 L.Ed.2d 1027 (2000).

At the time petitioner filed his appellant's brief, the law in Texas, as established on rehearing in *Ex parte Gardner*, required a convicted criminal defendant to present any and all claims then available as points of error on direct appeal. *See Busby v. Dretke*, 359 F.3d at 719 (holding the Texas Court of Criminal Appeals' opinion in *Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex.Crim.App.1996) *modified* on motion for rehearing on February 2, 1998, to recognize this new procedural default rule, "firmly entrenched" that procedural default rule on that date); *Finley v. Johnson*, 243 F.3d at 219 (holding a federal habeas petitioner procedurally defaulted on an unexhausted newly discovered evidence theory supporting a *Brady* claim by failing to raise same on direct appeal); *Soria v. Johnson*, 207 F.3d at 249 (holding a federal habeas petitioner procedurally defaulted on a fair cross-section complaint by failing to raise it in a direct appeal that became final in 1997). For reasons unknown, petitioner's state appellate counsel chose not to present the Texas Court of Criminal Appeals with the same federal constitutional arguments petitioner has presented this Court in his sixth through twelfth claims. Petitioner thereby proce-

durally defaulted on federal habeas review of same.

Alternatively, having independently reviewed the voir dire examinations of each of the venire members in question and having conducted a de *novo* review of petitioner's sixth through twelfth claims, this Court independently concludes the state trial court's granting of the prosecution's challenge for cause to venire member Ramon and rejections of petitioner's challenges for cause to venire members Malley, Cawthorn, Mabbott, Jones, and Hoffman were consistent with governing federal constitutional principles. Petitioner's sixth through twelfth claims herein do not warrant federal habeas relief.

## IX. *Batson Claim*

### A. *The Claim*

█ In his thirteenth claim, petitioner argues the prosecution's use of a peremptory challenge against venire member Mark Avery Collins was racially-based and violated the principle announced by the Supreme Court in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).[89]

### B. *State Court Disposition*

During his voir dire examination, venire member Mark Collins testified he had been arrested in Ohio for auto theft, his wife had outstanding municipal traffic warrants, his step-brother had been convicted of bank robbery, and he had been falsely accused of child abuse after disciplining one of his children.[90] When the prosecution used a peremptory strike, petitioner's

trial counsel objected.[91] Once Mr. Collins left the courtroom, the prosecution explained its reasons for the peremptory were Mr. Collins' arrest, his feelings he had been falsely accused of child abuse, and the fact Mr. Collins' wife had multiple outstanding traffic warrants.[92] The trial court then overruled petitioner's objection to the prosecution's peremptory strike of Mark Collins.[93]

In his seventh point of error on direct appeal, petitioner argued the prosecution's use of a peremptory challenge against venire member Collins violated the rule in *Batson*.[94] The Texas Court of Criminal Appeals concluded the record fully supported the trial court's implicit decision that petitioner had failed to prove racial discrimination was the basis of the prosecution's strike of Mr. Collins.[95]

In the course of his state habeas corpus proceeding, petitioner re-urged the same *Batson* claim as his fifteenth ground for state habeas relief.[96] The state habeas trial court concluded the denial of the same claim on direct appeal foreclosed re litigation of this claim and, insofar as petitioner presented new arguments supporting his *Batson* claim, those could have been raised on direct appeal and were procedurally barred from state habeas review.[97]

### C. *AEDPA Review*

A defendant's showing of a prima facie case of discriminatory jury selection does not, standing alone, warrant reversal of his state criminal conviction; rather, such a

---

**89.** *Petition*, at p. 83–89; *Reply*, at pp. 16–17.

**90.** S.F. Trial, Volume IX, at pp. 82–84, 89–90, 92.

**91.** *Id.*, at pp. 92–93.

**92.** *Id.*, at p. 94.

**93.** *Id.*, at p. 95.

**94.** Appellant's Brief, at pp. 41–44.

**95.** *Bartee v. State*, No. 73,126 (Tex.Crim.App. May 3, 2000), slip op. at pp. 9–10.

**96.** State Habeas Transcript, Volume 1 of 4, at pp. 131–34.

**97.** State Habeas Transcript, Volume 4 of 4, at p. 790.

showing merely shifts the burden to the prosecution to come forward with a race-neutral explanation for its peremptory challenges targeting venire members of a particular group. *See Hernandez v. New York,* 500 U.S. 352, 358–59, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (holding a three-step inquiry is necessary to determine whether a party has violated *Batson,* i.e., used peremptory challenges in a way that violates the Equal Protection Clause: first, the opponent of the strike must make a prima facie showing the proponent of the strike exercised it on the basis of a juror's cognizable racial background; second, the burden then shifts to the proponent of the strike to articulate a race-neutral explanation for removing the potential juror in question; and finally, the trial court must determine whether the opponent of the strike has carried his burden of proving purposeful discrimination). The Supreme Court's recent opinions analyzing *Batson* claims demonstrate the continuing application of this same three-step approach to allegations of racially discriminatory jury selection. *See Rice v. Collins,* 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006) (applying the three-step inquiry set forth above to analyze a *Batson* claim); *Miller–El v. Dretke,* 545 U.S. 231, 239, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (*Miller–El II* ) (employing the same three-step approach first announced in *Batson* to the analysis of equal protection claims attacking allegedly racially discriminatory jury selection procedures).

The Supreme Court's opinion in *Miller–El II* makes clear a prima facie *Batson* equal protection violation can be established and the prosecution's proffered race-neutral reasons for the use of a peremptory strike undermined by evidence showing the prosecution engaged in a pattern of discriminatory behavior, including, but not limited to: (1) a request for a jury shuffle when members of the target group are disproportionately seated near the front of the jury venire, (2) employing a significantly different approach to the questioning of members of the target group during individual voir dire examination, and (3) evidence of an official policy or longstanding custom or practice of systematically excluding members of the target group from juries. *See Miller–El II,* 545 U.S. at 253–66, 125 S.Ct. 2317 (discussing these factors, along with the discriminatory impact of the prosecution's exercise of its peremptory strikes against black members of a series of jury venires and evidence of explicit racially discriminatory animus contained in an official training manual for Assistant District Attorneys as establishing not only a prima facie *Batson* claim but also undermining the prosecution's proffered race-neutral reasons for excluding all blacks from the defendant's jury). Here, however, petitioner offered the state trial court and Texas Court of Criminal Appeals no evidence to support a finding of racial discrimination in the prosecution's peremptory strike of Mark Collins other than suggesting there were few Blacks on the jury venire and there was something improper with the prosecution's questioning of Mr. Collins regarding whether Mr. Collins had any opinions or problems with the fact both he and petitioner were members of the same race. As the Texas Court of Criminal Appeals noted in its opinion on petitioner's direct appeal, there was nothing inappropriate with the prosecution inquiring whether Mark Collins felt his racial identity with petitioner would be a potential source of bias in favor of petitioner or against the prosecution. Both parties had the right to inquire into each venire member's attitudes on racial issues as potential sources of bias in favor, or to the detriment, of either side. Throughout the entire three-step *Batson* inquiry, the burden remains on the defendant to demonstrate purposeful discrimination motivated the prosecution's use of the peremptory strike in ques-

tion. *Rice v. Collins,* 546 U.S. at 338, 126 S.Ct. 969; *Miller–El II,* 545 U.S. at 250–52, 125 S.Ct. 2317; *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995).

The state trial court's ruling in favor of the prosecution constitutes an implicit factual finding regarding the credibility of the prosecutor's proffered reasons for striking Mark Collins to which this Court must defer absent clear and convincing evidence to the contrary in the record. *See Rice v. Collins,* 546 U.S. at 338–39, 126 S.Ct. 969 (recognizing state court factual findings regarding the credibility of a prosecutor's race-neutral explanation for a peremptory strike are entitled to a presumption of correctness absent clear and convincing evidence to the contrary); *Moody v. Quarterman,* 476 F.3d 260, 268–72 (5th Cir. 2007) (holding a state appellate court's factual findings on a *Batson* claim were entitled to federal court deference even where the state trial court failed to employ the three-step approach required for analysis of *Batson* claims), *cert. denied,* — U.S. ——, 128 S.Ct. 88, 169 L.Ed.2d 67 (2007).

Petitioner offered the state trial court and Texas Court of Criminal Appeals no evidence of racial animus underlying the peremptory strike of Mr. Collins approaching that found in the *Miller–El* cases from Dallas County. On the contrary, the prosecution's identification of Mark Collins'

record of an arrest for theft, the making of an apparently false allegation of child abuse against him, and the existence of outstanding traffic warrants against his wife furnished the state court with ample race-neutral reasons for the prosecution's use of a peremptory strike. It appears unlikely the prosecution would have ignored these red-flags as potential sources of bias on the part of Mr. Collins against the prosecution when exercising its peremptory strikes. Petitioner has identified no other evidence in the record establishing these proffered reasons were pre-textual or a subterfuge for an otherwise racially-motivated peremptory strike. There was nothing objectively unreasonable with either the state trial court's implicit factual findings or the Texas Court of Criminal Appeals' legal conclusions rejecting petitioner's *Batson* claim on the merits.

Petitioner's belated reliance on notations found on Mr. Collins' juror questionnaire does not support petitioner's assertion of racial motivation in connection with the prosecutor's strike of him. First, Mark Collins' juror questionnaire was never formally admitted into evidence during petitioner's state habeas corpus proceeding.[98] Second, the notations most likely reflect the lack of any apparent racial bias; they do not establish racial motivation on the part of the prosecution in striking Mark Collins.[99] Nothing in Mr. Collins' juror

---

98. As was explained above, at the commencement of petitioner's state habeas hearing, the State successfully moved to exclude all the hearsay documents, including Mr. Collins' juror questionnaire, which had been attached to petitioner's state habeas application. State Habeas Transcript, Volume 3 of 4, at pp. 578–80.

99. Petitioner made no effort during his state habeas hearing to introduce evidence establishing there was a racial motivation behind the prosecution's strike of Mr. Collins. Petitioner called petitioner's prosecutor William Pennington to testify but never questioned

him regarding that subject. Petitioner did not call petitioner's other prosecuting attorney, Jill Mata, to testify during petitioner's state habeas hearing or offer any evidence during that proceeding suggesting either prosecutor struck Mr. Collins based on his race.

Mr. Collins' juror questionnaire appears at State Habeas Transcript, Volume 2 of 4, at pages 417–38. There are numerous handwritten notations thereon but petitioner offered the state habeas court no testimony or other evidence indicating who made those notations. Notations on page 417 read "Hard to say if he could be part of death

questionnaire or the notations thereon represents evidence of racial animus underlying the prosecution's peremptory strike of him.

### D. *Conclusion*

Under these circumstances, the Texas Court of Criminal Appeals' rejection on the merits of petitioner's *Batson* claim during petitioner's direct appeal was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial court and direct appeal proceedings.

## X. *Prosecutorial Arguments About the Victim's Good Character*

### A. *The Claim*

 In his fourteenth claim, petitioner argues the trial court erred when it denied petitioner's motion for mistrial after petitioner's trial counsel successfully objected to the prosecutor's opening arguments at the guilt-innocence phase of trial suggesting David Cook was a well-respected and hard-working employee.[100]

### B. *State Court Disposition*

During opening argument at the guilt-innocence phase of petitioner's trial, the following exchange occurred:

MRS. MATA: * * * And you will hear testimony that he was a valued employee there, very well respected and hard working.

MR. CALLAHAN: Your Honor, I object. It's never proper for the State to introduce the good character of the deceased before it is attacked. I object.

THE COURT: Sustained.

MR. CALLAHAN: I ask the jury be instructed to disregard the argument of counsel.

THE COURT: Ladies and gentlemen, please disregard the argument of counsel.

MR. CALLAHAN: We move for a mistrial, respectfully, as the Code compels.

THE COURT: That's denied.

MRS. MATA: The evidence will show you that David also was close to his family. * * *[101]

Petitioner raised the same claim as his eighth point of error on direct appeal.[102] The Texas Court of Criminal Appeals concluded the state trial court's instructions to disregard cured any error.[103]

Petitioner re-urged the same claim as his sixteenth ground for state habeas relief.[104] The state habeas trial court concluded the denial of the same claim on direct appeal foreclosed re-litigation of this claim and, insofar as petitioner presented new arguments supporting this claim,

---

process," "TUPOR HAS Crim Hist = Ohio," "Wife Has *TRAFFIC* WARRANTS," "SON HAS TRAFFIC ARRESTS/BOOKING," "NO." On page 427, a notation reads "Daughter accused him of abuse." On page 431, notations read "Step brother: bank robber" and "Spoke often w/ him—he was a big brother." On page 436, a notation reads "Doesn't give much thought to blacks." As respondent correctly points out, none of these notations, whether standing alone or in combination, suggest any racial animus motivated the prosecution's peremptory strike of Mr. Collins.

**100.** *Petition*, at pp. 90–93; *Reply*, at pp. 17–18.

**101.** S.F. Trial, Volume XVIII, at p. 10.

**102.** Appellant's Brief, at pp. 44–46.

**103.** *Bartee v. State*, No. 73,126 (Tex.Crim.App. May 3, 2000), slip op. at pp. 10–11.

**104.** State Habeas Transcript, Volume 1 of 4, at pp. 135–38.

those could have been raised on direct appeal and were procedurally barred from state habeas review.[105]

## C. *AEDPA Review*

An improper prosecutorial argument which does not implicate a specific constitutional provision is not cognizable on collateral review unless the defendant shows an abridgment of due process, i.e., the improper argument rendered the proceeding fundamentally unfair. *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) ("it is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant inquiry is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process"); *Harris v. Cockrell,* 313 F.3d 238, 245 (5th Cir.2002) (prosecutorial remarks are a sufficient ground for habeas relief only if they are so prejudicial they render the trial fundamentally unfair and such unfairness exists only if the prosecutor's remarks evince either persistent and pronounced misconduct or the evidence was so insubstantial that, in probability, but for the remarks no conviction would have occurred), *cert. denied,* 540 U.S. 1218, 124 S.Ct. 1503, 158 L.Ed.2d 152 (2004); *Dowthitt v. Johnson,* 230 F.3d 733, 755 (5th Cir.2000) (holding the relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process, and the prosecutor is permitted to argue to the jury those inferences and conclusions the prosecutor wishes the jury to draw from the evidence as long as those inferences are grounded upon evidence), *cert. denied,* 532 U.S. 915, 121 S.Ct. 1250, 149 L.Ed.2d 156 (2001); *Barrientes v. Johnson,* 221 F.3d 741, 753 (5th Cir.2000) (holding federal habeas review of allegedly

improper prosecutorial statements made during the punishment phase of a capital trial focuses on whether the remarks so infected the punishment phase as to make the resulting sentence a denial of due process, and a trial is fundamentally unfair only if there is a reasonable probability the verdict might have been different had the trial been properly conducted), *cert. dism'd,* 531 U.S. 1134, 121 S.Ct. 902, 148 L.Ed.2d 948 (2001).

The same standard applies to the review of complaints of improper prosecutorial argument raised in federal direct appeals. *See United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) ("a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial"); *United States v. Thompson,* 482 F.3d 781, 785 (5th Cir.2007) (inappropriate prosecutorial comments, standing alone, would not justify reversal of a criminal conviction obtained in an otherwise fair proceeding); *United States v. Hitt,* 473 F.3d 146, 161 (5th Cir. 2006) (improper argument warrants reversal when taken as a whole in the context of the entire case, it prejudicially affected substantial rights of the defendant), *cert. denied,* —— U.S. ——, 127 S.Ct. 2083, 167 L.Ed.2d 802 (2007); *United States v. Gamez–Gonzalez,* 319 F.3d 695, 701 (5th Cir.) (inappropriate prosecutorial argument constitutes reversible error only if it is so improper as to affect the defendant's substantial rights), *cert. denied,* 538 U.S. 1068, 123 S.Ct. 2241, 155 L.Ed.2d 1126 (2003); *United States v. Virgen–Moreno,* 265 F.3d 276, 290–91 (5th Cir.2001) (the determinative question is whether the prosecution's remarks cast serious doubt on the correct-

---

**105.** State Habeas Transcript, Volume 4 of 4, at p. 791.

ness of the jury's verdict), *cert. denied,* 534 U.S. 1095, 122 S.Ct. 843, 151 L.Ed.2d 721 (2002).

 Improper jury argument by the state does not present a claim of constitutional magnitude in a federal habeas action unless it is so prejudicial the state court trial was rendered fundamentally unfair within the meaning of the Due Process Clause of the Fourteenth Amendment. *Darden v. Wainwright,* 477 U.S. at 181, 106 S.Ct. 2464; *Harris v. Cockrell,* 313 F.3d at 245. To establish a prosecutor's remarks were so inflammatory, the petitioner must demonstrate the misconduct was persistent and pronounced or the evidence of guilt so insubstantial the conviction would not have occurred but for the improper remarks. *Harris v. Cockrell,* 313 F.3d at 245; *Turner v. Johnson,* 106 F.3d 1178, 1188 (5th Cir.1997); *Nichols v. Scott,* 69 F.3d 1255, 1278 (5th Cir.1995) (apart from the issue of procedural bar, failure to object to an argument is an indication it was not perceived as having a substantial adverse effect or would not naturally and necessarily be understood as advancing improper considerations), *cert. denied,* 518 U.S. 1022, 116 S.Ct. 2559, 135 L.Ed.2d 1076 (1996); *Milton v. Procunier,* 744 F.2d 1091, 1095 (5th Cir.1984) (holding the same), *cert. denied,* 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985); *Buxton v. Collins,* 925 F.2d 816, 825 (5th Cir.) (recognizing the four proper areas for prosecutorial jury argument are summation of the evidence, reasonable inference from the evidence, answers to opposing counsel's argument, and pleas for law enforcement), *cert. denied,* 498 U.S. 1128, 111 S.Ct. 1095, 112 L.Ed.2d 1197 (1991).

"A prosecutor's improper argument will, in itself, exceed constitutional limitations in only the most egregious cases." *Harris v.*

*Cockrell,* 313 F.3d at 245 n. 12; *Ortega v. McCotter,* 808 F.2d 406, 410 (5th Cir.1987); *Menzies v. Procunier,* 743 F.2d 281, 288–89 (5th Cir.1984). The burden is on the habeas petitioner to show a reasonable probability that, but for the prosecutor's remarks, the result of the trial would have been different. *Nichols v. Scott,* 69 F.3d at 1278.

In reviewing complaints about allegedly improper prosecutorial argument, the relevant inquiry considers; (1) the magnitude of the prejudicial effect of the statements; (2) the efficacy of any cautionary instructions; and (3) the strength of the evidence of the defendant's guilt. *United States v. Thompson,* 482 F.3d 781, 785 (5th Cir. 2007); *United States v. Hitt,* 473 F.3d at 161; *United States v. Gamez–Gonzalez,* 319 F.3d at 701; *United States v. Virgen–Moreno,* 265 F.3d at 290–91.

The prosecutor's objectionable argument about David Cook's good character did not infect petitioner's trial as to render it fundamentally unfair. Given the early stage of the proceedings when the comment was made and the tangential nature of the comment to any issue ultimately before the jury at the guilt-innocence phase of petitioner's trial, the prejudicial effect of the comment was minimal. Whether David Cook was a good employee or a bad one had no relevance to any issue the jury ultimately decided at the guilt-innocence phase of petitioner's trial.[106] Nor was the prosecutor's isolated comment about David Cook being a "well respected and hard working employee" persistent or pronounced misconduct.

Furthermore, the trial court promptly granted petitioner's objection and instructed petitioner's jury to disregard the prosecutor's argument. Ordinarily, proper jury

---

**106.** David Cook's murder appears to have been unrelated to his employment as a computer technician or to his employer.

instructions can suffice to prevent any possibility of prejudice. *See Zafiro v. United States*, 506 U.S. 534, 540–41, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) (recognizing juries are presumed to follow their instructions).

There is no reasonable probability that, but for the prosecutor's remarks in question, the outcome of either phase of petitioner's trial would have been different. While circumstantial, there was ample evidence in the form of petitioner's statements to his acquaintances showing petitioner planned and executed David Cook's robbery and murder and thereafter exercised dominion over Mr. Cook's motorcycle. There was also overwhelming evidence favoring the prosecution on both of petitioner's capital sentencing special issues.

The Texas Court of Criminal Appeals' rejection on the merits of petitioner's complaint about the trial court's denial of petitioner's motion for mistrial was a reasonable application of the well-settled principles discussed above.

#### D. *Conclusion*

The Texas Court of Criminal Appeals' rejection on the merits of petitioner's claim protesting the prosecutor's opening comment about David Cook being a good employee during petitioner's direct appeal was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial court and direct appeal proceedings.

### XI. *Additional Lesser–Included Offense Instructions*

#### A. *The Claims*

 In his fifteenth and sixteenth claims, petitioner argues the state trial court erred in refusing to give petitioner's requested jury instructions on the lesser-included offenses of robbery and aggravated robbery.[107]

#### B. *State Court Disposition*

At the guilt–innocence phase of his capital murder trial, petitioner requested and received a jury instruction on the lesser-included offense of murder but the state trial court denied petitioner's requests for additional lesser-included offense instructions on aggravated robbery, robbery, and theft.[108]

Petitioner raised these same complaints in his ninth and tenth points of error on direct appeal.[109] Petitioner presented both of these points of error as pure state-law complaints without any citation or reference in his appellant's brief to any federal legal principles. The Texas Court of Criminal Appeals rejected both points of error on the merits, concluding no rational jury could have convicted petitioner of either of those two offenses, as defined under state law, without also finding petitioner guilty of capital murder.[110] More specifically, the state appellate court concluded only three rational interpretations of the evidence were available to petitioner's jury at the conclusion of the guilt-innocence phase of petitioner's trial, none of which permitted a verdict finding petitioner guilty only of robbery or aggravated

---

**107.** *Petition*, at pp. 93–98; *Reply*, at pp. 19–20.

**108.** S.F. Trial, Volume XXI, at pp. 150–55. Petitioner's guilt-innocence phase jury instructions appear at Trial Transcript, Volume III of III, at pp. 290–302.

**109.** Appellant's Brief, at pp. 46–50.

**110.** *Bartee v. State*, No. 73,126 (Tex.Crim.App. May 3, 2000), slip op. at pp. 11–16.

robbery: first, petitioner was guilty of capital murder as charged in the indictment; second, David Cook was killed by gang members as petitioner fled the scene on his motorcycle, thus rendering petitioner guilty of neither assault nor robbery nor murder; and third, petitioner assaulted David Cook with a knife but others fatally shot him while or after petitioner rode off on his motorcycle.[111]

In his state habeas application, petitioner re-urged the same arguments as his seventeenth and eighteenth grounds for state habeas relief, again presenting them as purely state-law claims.[112] The state habeas trial court concluded these claims were foreclosed by the Texas Court of Criminal Appeals' rejection of same on the merits on direct appeal.[113]

## C. Procedural Default Does Not Foreclose Federal Habeas Review

In his federal habeas corpus pleadings, petitioner for the first time presents his complaints about the missing lesser-included offense instructions as federal constitutional claims. As explained above, prior to filing his federal habeas petition in this Court, petitioner had presented these same complaints to the state courts as state-law claims. In addition, petitioner presents this Court with a new factual theory suggesting how he could have been guilty of aggravated robbery but not guilty of capital murder. Respondent has not, however, urged rejection of these newly-federalized claims or this new factual theory as unexhausted or procedurally defaulted. Therefore, this Court must now address the merits of claims never addressed by any state court.

## D. De Novo Review

Insofar as petitioner argues the Texas Court of Criminal Appeals erroneously construed applicable Texas law in denying petitioner's complaints he was denied lesser-included offense instructions on robbery and aggravated robbery, that argument fails for two reasons: first, the Texas Court of Criminal Appeals' construction of applicable state law during petitioner's direct appeal binds this Court's federal habeas review of same, see Bradshaw v. Richey, 546 U.S. 74, 76, 126 S.Ct. 602, 163 L.Ed.2d 407 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); Amador v. Quarterman, 458 F.3d 397, 412 (5th Cir.2006) (holding a federal habeas court must defer to a state court's interpretation of state law); Fuhrman v. Dretke, 442 F.3d 893, 901 (5th Cir.2006) (holding the same); Young v. Dretke, 356 F.3d 616, 628 (5th Cir.2004) ("In our role as a federal habeas court, we cannot review the correctness of the state habeas court's interpretation of state law."); Johnson v. Cain, 215 F.3d 489, 494 (5th Cir.2000) (holding a federal habeas court may not review a state court's interpretation of its own law); Gibbs v. Johnson, 154 F.3d 253, 259 (5th Cir.1998) (holding the same), cert. denied, 526 U.S. 1089, 119 S.Ct. 1501, 143 L.Ed.2d 654 (1999); and second, errors in the construction or application of state law do not furnish an independent ground for federal habeas relief. See Estelle v. McGuire, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (holding complaints regarding the admission of evidence under California law did not present grounds for federal habeas

---

**111.** Id.

**112.** State Habeas Transcript, Volume 1 of 4, at pp. 139–42.

**113.** State Habeas Transcript, Volume 4 of 4, at pp. 791–92.

relief absent a showing that admission of the evidence in question violated due process); *Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) (recognizing that federal habeas relief will not issue for errors of state law); *Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) (holding a federal court may not issue the writ on the basis of a perceived error of state law).

Because petitioner has never presented his federal constitutional complaints about the denial of his requested lesser-included offense instructions to any state court, this Court's review of those new federal constitutional claims is necessarily *de novo. See Rompilla v. Beard,* 545 U.S. at 374, 390, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith,* 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (holding the same).

1. *The Federal Constitutional Standard*

■■ A capital murder defendant is constitutionally entitled to an instruction on a lesser-included offense if the evidence would permit a jury rationally to find the defendant guilty of the lesser offense and acquit him of the greater. *See Hopper v. Evans,* 456 U.S. 605, 611–12, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982) (holding due process requires a lesser-included offense instruction be given only when the evidence warrants such an instruction); *Beck v. Alabama,* 447 U.S. 625, 637–38, 100 S.Ct. 2382, 65 L.Ed.2d 392, (1980) (holding unconstitutional a state statutory prohibition against the submission of lesser-included offense instructions in capital murder cases). Due process requires a jury charge on a lesser-included offense when the evidence "unquestionably establishes"

the defendant is guilty of a serious, violent offense but leaves some doubt with respect to an element that would justify conviction of a capital offense. *Reed v. Quarterman,* 504 F.3d 465, 488–89 (5th Cir.2007); *Pippin v. Dretke,* 434 F.3d 782, 791 (5th Cir. 2005), *cert. denied,* —— U.S. ——, 127 S.Ct. 351, 166 L.Ed.2d 49 (2006); *Aguilar v. Dretke,* 428 F.3d 526, 531 (5th Cir.2005). A defendant is entitled to the instruction if the jury could rationally acquit the defendant on the capital crime and convict on the non-capital crime. *Reed v. Quarterman,* 504 F.3d at 488–89; *Aguilar v. Dretke,* 428 F.3d at 531; *Jones v. Johnson,* 171 F.3d 270, 274 (5th Cir.), *cert. denied,* 527 U.S. 1059, 120 S.Ct. 29, 144 L.Ed.2d 832 (1999); *Ransom v. Johnson,* 126 F.3d 716, 724–25 (5th Cir.), *cert. denied,* 522 U.S. 944, 118 S.Ct. 361, 139 L.Ed.2d 281 (1997); *Cordova v. Lynaugh,* 838 F.2d 764, 767 (5th Cir.), *cert. denied,* 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 932 (1988). This inquiry necessarily requires *careful review of the elements of each offense and other applicable provisions of state law. See Livingston v. Johnson,* 107 F.3d 297, 312–13 (5th Cir.) (analyzing the difference under Texas law between felony murder and capital murder in the course of rejecting a *Beck* claim), *cert. denied,* 522 U.S. 880, 118 S.Ct. 204, 139 L.Ed.2d 141 (1997); *East v. Scott,* 55 F.3d 996, 1005–06 (5th Cir.1995) (examining the distinction under Texas law between murder and felony murder, as well as the impact under Texas law of evidence of voluntary intoxication, in analyzing a *Beck* claim); *Cordova v. Lynaugh,* 838 F.2d at 768–70 (analyzing the distinction under Texas law between capital murder and murder, as well as the Texas law of parties, while granting federal habeas relief based on *Beck* error).

2. *Definitions of Robbery and Aggravated Robbery Under Texas Law*

At all times relevant to petitioner's offense, applicable Texas law provided a per-

son commits the offense of robbery if, in the course of committing theft and with the intent to obtain or maintain control of the property, he either: (1) intentionally, knowingly, or recklessly causes bodily injury to another or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death.[114] Likewise, at all times relevant to petitioner's offense, Texas law provided, in pertinent part, a person commits the offense of aggravated robbery if he commits robbery and either: (1) causes serious bodily injury to another or (2) uses or exhibits a deadly weapon.[115] In the course of petitioner's direct appeal, the Texas Court of Criminal Appeals held, under applicable state law, both of these offenses were lesser-included offenses of the crime charged.[116]

### 3. *Synthesis*

In this Court, petitioner argues for the first time a rational jury could have concluded the petitioner: (1) went to David Cook's residence the evening of the murder with the intent to rob him, (2) assaulted David Cook in a non-fatal manner, i.e., stabbed him superficially in the shoulder, (3) went to the garage to steal Mr. Cook's motorcycle, (4) observed "Snake" and "Throw down" fatally shoot David Cook, (5) took advantage of the opportunity to steal David Cook's motorcycle, (6) fled the scene, and (7) thereafter kept David Cook's motorcycle.[117] Respondent argues no rational jury could have concluded two other people fatally shot David Cook after petitioner stabbed Mr. Cook because, in part, the medical examiner testified one of

David Cook's knife wounds (a slashing wound to his neck) had likely been inflicted post-mortem due to the lack of bleeding at the site, in his statements to the police, petitioner consistently denied he had ever assaulted David Cook or intended to rob him, and petitioner asserted he fled Mr. Cook's residence out of fear, not out of a desire to steal his motorcycle.[118]

The Court notes, in response to this argument, the state trial court did instruct petitioner's jury on the lesser-included offense of non-capital murder and this fact eliminates the fundamental constitutional concern discussed in *Beck* from petitioner's trial. *See Schad v. Arizona*, 501 U.S. 624, 646–47, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) (the goal of the rule in *Beck* was to eliminate the distortion of the fact-finding process created when the jury is forced into an all-or-nothing choice between capital murder and innocence, a concern not implicated where the jury is not faced with such an all-or-nothing choice); *Pippin v. Dretke*, 434 F.3d 782, 791 (5th Cir.2005) (because Pippin's jury was instructed on the lesser-included offenses of kidnaping and aggravated kidnaping, the due process concerns at the heart of *Beck* did not mandate an additional instruction on the lesser-included offense of felony murder) *cert. denied*, —— U.S. ——, 127 S.Ct. 351, 166 L.Ed.2d 49 (2006).

Alternatively, under this new factual theory set forth for the first time in his federal habeas pleadings, petitioner assaulted David Cook with a knife prior to the fatal shots being fired by others. Although Heidi Munoz testified she had seen petitioner carry a knife upon occasion,[119]

**114.** Tex. Penal Code Ann. § 29.02(a) (Vernon 2003).

**115.** Tex. Penal Code Ann. § 29.03(a)(1) & (2) (Vernon 2003).

**116.** *Bartee v. State*, No. 73,126 (Tex.Crim.App. May 3, 2000), slip op. at p. 12.

**117.** *Petition*, at p. 97.

**118.** Respondent's Answer and Motion for Summary Judgment, docket entry no. 17, filed September 28, 2007, at p. 43.

**119.** S.F. Trial, Volume XX, testimony of Heidi Garza Munoz, at pp. 101–02.

there was no evidence suggesting either of the two persons whom petitioner claimed to have witnessed fatally shoot David Cook also stabbed him in the back or slashed his neck. The uncontested testimony of the medical examiner established the front of David Cook's neck had been cut after his heart stopped beating. More specifically, the medical examiner testified: (1) there was minimal bleeding from the minor stab wound to petitioner's back right shoulder because that wound was small (less than an inch) and confined to muscle tissue, (2) there was very minimal bleeding, practically no blood at all, in the superficial incised wound to the front of Mr. Cook's neck because there was no blood pressure in his body at the time that wound was inflicted, and (3) the neck wound was likely the last wound Mr. Cook suffered.[120]

This Court concludes no rational jury could have found petitioner guilty of only the offense of robbery as defined by applicable Texas law. Under petitioner's newest suggested factual scenario, petitioner admits not only that he intentionally caused bodily injury to David Cook while acting with the requisite *mens rea*, i.e., the intent to commit the theft of Mr. Cook's motorcycle and to obtain or maintain control of same, but petitioner also admits he used or exhibited a deadly weapon, i.e., a knife, to physically assault him. Thus, under the Texas statutory definitions of robbery and aggravated robbery outlined above, petitioner's newest, proposed factual scenario admits all the essential elements of the offense of aggravated robbery. No rational jury could have acquitted petitioner of capital murder and found him guilty merely of robbery.

The remaining question before this Court is whether a rational jury could have concluded petitioner was guilty only of aggravated robbery. The main flaw in petitioner's argument in connection with this aggravated offense is the absence of any evidence in the record showing David Cook's other purported assailants were responsible for either the minor stab wound to his back or the post-mortem slashing wound to his neck. The medical examiner's testimony established beyond any doubt that either of the gunshot wounds to David Cook's head would have been instantly incapacitating and immediately lethal.[121] There was no evidence suggesting the slashing wound to Mr. Cook's neck was inflicted prior to either of the fatal shots having been fired. Petitioner identifies no evidence in the record from which a rational juror could have concluded any person other than petitioner was responsible for the post-mortem wound to David Cook's neck. Under petitioner's latest factual theory, petitioner was the only person present at David Cook's residence the night of the murder who assaulted Mr. Cook with a knife.

Petitioner identifies no evidence in the trial record establishing that either "Snake" or "Throw down" ever assaulted David Cook with a knife. Petitioner never claimed in his second statement to have witnessed either of these persons assault Mr. Cook with a knife. There was no testimony by any of the law enforcement personnel who examined the crime scene identifying any knife found inside or near David Cook's residence as showing signs of being used to slash Mr. Cook's neck. Petitioner neither testified nor suggested in his second written statement to police that he ever saw "Snake" or "Throw down" carrying, using, or displaying a knife before or after petitioner heard gunshots. Nor does petitioner identify any evidence suggesting that, having shot Mr. Cook

---

**120.** S.F. Trial, Volume XIX, testimony of Vincent DiMaio, at pp. 99–105, 114.

**121.** *Id.*, at pp. 92, 96–97, 101.

twice in the head, "Snake" or "Throw down" would have had any reason to suspect David Cook was still alive. There was no evidence indicating any knives were missing from the Mr. Cook's residence following the murder. Thus, there appears to be no evidence in the record from which a rational juror could infer that either "Snake" or "Throw down" was responsible for the post-mortem wound to the front of David Cook's neck.

Assuming petitioner stabbed David Cook prior to the firing of the fatal shots (as petitioner now argues), and petitioner inflicted the post-mortem knife wound to the front of Mr. Cook's neck (the only rational interpretation of the evidence in the record before petitioner's jury), petitioner, at a minimum, inflicted multiple wounds upon David Cook with a knife at the same time or almost simultaneously with the firing of the fatal shots. Even if the knife wounds were not independently fatal to Mr. Cook, no rational juror could conclude petitioner's assault upon David Cook was separate and distinct from the simultaneous fatal gunshots fired by "Snake" or "Throw down." When viewed in the light most favorable to petitioner's latest factual theory, the physical evidence permits only one reasonable inference: David Cook was assaulted with a knife both before (stab wound to back) and after (slashing wound to front of neck) the fatal shots were fired. There was no evidence from which a rational jury could infer anyone other than petitioner assaulted David Cook with a knife.

Even assuming petitioner did not fire the fatal shots as he now alleges, the evidence permits only one rational inference: acting with the intent to rob David Cook, petitioner attempted to actively participate in the fatal assault upon Mr. Cook by stabbing him before the fatal shots were fired and then slashing his neck after the fatal shots were fired. In such circum- stances, petitioner would have been guilty of capital murder under the Texas law of parties. *See Montoya v. Scott,* 65 F.3d 405, 415 (5th Cir.1995) (discussing the status of the Texas law of parties applicable at the time of petitioner's offense herein and holding that §§ 7.02(a)2) and 7.02(b) of the Texas Penal Code authorized Texas juries to convict persons for capital murder even when those persons were mere accomplices to the murder and had not personally participated in the acts which caused the death of the decedent), *cert. denied,* 517 U.S. 1133, 116 S.Ct. 1417, 134 L.Ed.2d 542 (1996). Under the Texas law of parties, a person is criminally responsible for an offense committed by another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *See Aguilar v. Dretke,* 428 F.3d 526, 531 (5th Cir.2005) (quoting TEX. PEN.CODE ANN. § 7.02(a)(2)). The only conclusion consistent with the evidence presented to petitioner's jury during the guilt innocence phase of trial was petitioner stabbed David Cook prior to the fatal shootings and then slashed his neck after the fatal shootings, actions which, at a minimum, constituted an "attempt to aid" the murder of Mr. Cook.

When viewed in the light most favorable to petitioner's latest factual theory, the evidence before petitioner's jury permitted only one rational inference: acting with the intent to rob David Cook, petitioner attempted to aid in the fatal assault upon Mr. Cook, stabbing him before the fatal shots were fired and slashing his neck afterward. Under the Texas law of parties, petitioner's actions constituted an attempt to aid the murder of David Cook and, therefore, petitioner was criminally responsible for Mr. Cook's murder. A rational jury could have determined petitioner participated in David Cook's murder and stole his motorcycle as an after-

thought. Consistent with this possibility, the state trial court instructed petitioner's jury on the lesser-included offense of non-capital murder. The evidence did not permit a rational jury to acquit petitioner of capital murder while convicting petitioner of aggravated robbery. If the jury had believed either of petitioner's statements to the police, petitioner would not have been found guilty of any criminal offense.

Admittedly, a rational jury could have chosen to believe, as petitioner now contends, petitioner went to David Cook's home with the intent to rob him, displayed or used a deadly weapon, i.e., a knife, inflicted non-fatal bodily injury upon Mr. Cook, and then stole his motorcycle. However, that same jury rationally could not have separated petitioner's non-fatal assaults upon Mr. Cook from the simultaneous fatal assault upon him by persons acting in apparent concert with petitioner. Slashing David Cook's throat with a knife after others fatally shot him was nothing less than an attempt to aid in his murder. The undisputed physical evidence does not permit a rational inference that petitioner's allegedly non-fatal assault upon David Cook ended prior to the time the fatal shots were fired. Even assuming the accuracy of petitioner's contention that he stabbed Mr. Cook but did not fire the fatal shots, the physical evidence establishes beyond any doubt that petitioner's assault upon David Cook continued after the fatal shots were fired and was, at a minimum, an attempt to aid in his murder.

### E. Conclusions

The fact petitioner's jury was instructed on the lesser-included offense of non-capital murder removes petitioner's case from the fundamental constitutional concerns

discussed in *Beck.* Based on the evidence presented during the guilt-innocence phase of petitioner's capital murder trial, no rational jury could have acquitted petitioner of capital murder and convicted petitioner of either robbery or aggravated robbery. Accordingly, the state trial court's refusal to instruct petitioner's jury on the additional lesser-included offenses of robbery and aggravated robbery did not deprive petitioner of any right protected by the Due Process Clause of the Fourteenth Amendment. Neither petitioner's fifteenth nor sixteenth claim warrants federal habeas corpus relief.

### XII. Comments on Petitioner's Failure to Testify

#### A. The Claims

In his seventeenth and eighteenth claims herein, petitioner argues on two occasions during the punishment phase of trial, the prosecution improperly commented on petitioner's failure to testify.[122]

#### B. State Court Disposition

Petitioner raised these same complaints initially as his eleventh and twelfth points of error on direct appeal.[123] The Texas Court of Criminal Appeals rejected both arguments on the merits, concluding the prosecution's arguments claiming petitioner was not a "model prisoner" because petitioner had refused to acknowledge his guilt in connection with his previous convictions for aggravated sexual assault were not comments upon petitioner's failure to testify, and the prosecution's comment about petitioner's inability to accept responsibility for his criminal conduct did not justify a reversal because the trial court promptly sustained defense counsel's objection thereto and instructed the jury to disregard same.[124]

**122.** *Petition,* at pp. 98–103; *Reply,* at pp. 20–21.

**123.** Appellant's Brief, at pp. 50–54.

**124.** *Bartee v. State,* No. 73,126 (Tex.Crim.App. May 3, 2000), slip op. at pp. 16–19.

Petitioner re-urged the same arguments as his nineteenth and twentieth grounds for state habeas relief.[125] The state habeas court concluded the disposition of these claims on direct appeal precluded state habeas review of same.[126]

## C. AEDPA Review

### 1. Trial Court Proceedings

During the punishment phase of petitioner's trial, the prosecution introduced witnesses and documentary evidence establishing petitioner had previously been convicted of two counts of aggravated rape, arising from petitioner's sexual assaults at knife-point of a teenage girl and a 2 0–year–old woman.[127]

The defense presented a pair of character witnesses, namely petitioner's father, James Bartee, and petitioner's former paramour, Mary Karen Sedung. On cross-examination, the prosecution elicited the following admissions from petitioner's father: (1) petitioner told his father he (petitioner) felt he had been treated unfairly by the criminal justice system and (2) petitioner never informed his father of the fact petitioner had pleaded guilty to a second aggravated rape charge.[128] On cross-examination, Ms. Sedung testified in pertinent part as follows: (1) petitioner told her his rape convictions had resulted from instances of consensual sex and (2) petitioner had denied responsibility for his prior rape convictions.[129]

In their closing argument at the punishment phase of trial, petitioner's trial counsel argued in part petitioner's good conduct in prison during a previous term of incarceration was relevant to the future dangerousness special issue and showed petitioner was capable of being rehabilitated, and during his previous incarceration petitioner was a "model prisoner." [130]

During closing argument at the punishment phase of trial, prosecuting attorney Mata argued, in part, as follows:

MRS MATA: * * * What would he do? We know what he would do, don't we? We have seen. We know his pattern. He will manipulate people. He will befriend people. He will suck them in, lure them in, set them up, and take what he wants. And if he has to rape them to do it, he will rape them. If he has to kill them to do it, he will kill them. And he will do it without blinking an eye. He will do it without losing a moment's bit of sleep. He will do it and not think twice. That's the kind of man he is, and that's what he's going to do.

You can answer that issue based on that alone. You can answer that issue on what would he do if he's free to do what he wants. But let's take it a step farther than that. What about when he's incarcerated in prison and he's part of a prison system? Are we safe? Is anybody safe? You know what he does when he's in prison? He holds himself out to be a model prisoner. We have heard that word 15, 20 times this morning alone.

---

125. state Habeas Transcript, Volume 1 of 4, at pp. 143–47.

126. State Habeas Transcript, Volume 4 of 4, at pp. 792–93.

127. S.F. Trial, Volume XXIII, testimony of Yvette Brown Summers, at pp. 3–20; testimony of Kanna Lynn Vanvelser, at pp. 21–44; State Exhibit 141, found at S.F. Trial, Volume XXV, at pp. 95–105.

128. S.F. Trial, Volume XXIII, testimony of James Bartee, at pp. 78–79.

129. S.F. Trial, Volume XXIII, testimony of Mary Karen Sedung, at pp. 144, 147.

130. S.F. Trial, Volume XXIV, at pp. 21, 23, 31–33, 36.

Now, I'm sorry, but do you think he's a model prisoner? Is a model prisoner somebody who doesn't admit they have committed a crime?

MR. CALLAHAN: Objection, comment on failure to testify.

THE COURT: Overruled.

MRS. MATA: Is a model prisoner somebody that tells his girlfriend, or whatever you want to call her, is that someone, who doesn't admit his culpability—

MR. CALLAHAN: Objection, comment on failure to testify.

THE COURT: That's overruled.

MRS. MATA: Now, is that a model prisoner? Is a model prisoner somebody who the minute they get out of 13 years of incarceration, they start using drugs, they start hanging out at all hours of the night with whoever they want, they befriend 17–year–old girls and smoke spot [sic] with them, they kill, they steal. Is this a model prisoner? I'm sorry, but I don't see how that fits. I don't see how that works.

And what's the scariest thing about Anthony Bartee sitting in prison for forty years? What is the scariest thing? How many chances is he going to have to meet a group of 13 to 16–year–old young people and tell them about life. That is the scariest thing about this man's continued existence. Because how many parents do you think have a clue who their kid is going to be talking to when they go into the Texas Department of Corrections and meet with Anthony Bartee, man, he's a role model. He's the guy I want talking to my young people. Yeah, send my ten-year-old kid down there, my 14–year–old kid down to listen to him tell them the facts of life. What it's like to live in prison. This man can't even own up to one bit—

MR. CALLAHAN: Objection, comment on failure to testify.

MRS. MATA:—of responsibility.

THE COURT: Sustained.

MR. CALLAHAN: Ask that the jury be instructed to disregard that remark.

THE COURT: Ladies and gentlemen, please disregard that remark.

MR. CALLAHAN: Move for mistrial.

THE COURT: Denied.

MRS. MATA: And when I talk about this Defendant making those types of comments, I'm referring to the time that you listened to his father testify and his girlfriend testify about his lack of culpability in those rapes. What did he tell Karen Sadung [sic]? They were consensual. He is spending 13 years in prison on a rape case, and he's telling her it was consensual. This is the person that is talking to our young people. This is the person that is going to be a role model. And you can bet he will be right back in that position.[131]

### 2. *Clearly Established Federal Law*

The Fifth Amendment prohibits a prosecutor from commenting on a defendant's failure to testify. *Griffin v. California*, 380 U.S. 609, 614–15, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *Cotton v. Cockrell*, 343 F.3d 746, 751 (5th Cir.2003), *cert. denied*, 540 U.S. 1186, 124 S.Ct. 1417, 158 L.Ed.2d 92 (2004). A prosecutor's allegedly improper comments on the defendant's failure to testify must be evaluated in the context of trial. *See United States v. Robinson*, 485 U.S. 25, 31–34, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988) (holding prosecutor was permitted to respond to defense counsel's argument the prosecution had prevented the defendant from giving his version of the relevant facts by pointing out nothing prevented the defendant from taking the

---

**131.** S.F. Trial, Volume XXIV, at pp. 40–46.

stand at trial and testifying to her version of those facts); *Cotton v. Cockrell,* 343 F.3d at 751 (recognizing prosecutor's challenged comments must be evaluated in the context of the trial in which they were made); *United States v. Wharton,* 320 F.3d 526, 538 (5th Cir.) (the comments complained of must be viewed within the context of the trial in which they were made), *cert. denied,* 539 U.S. 916, 123 S.Ct. 2288, 156 L.Ed.2d 132 (2003); *United States v. Morrow,* 177 F.3d 272, 300 (5th Cir.) (holding the same), *cert. denied,* 528 U.S. 932, 120 S.Ct. 333, 145 L.Ed.2d 260 (1999).

▬ In this Circuit, for a prosecutor's jury argument to rise to the level of a denial of a criminal defendant's Fifth Amendment right to remain silent, either the prosecutor's manifest intent in making the remark must have been to comment on the defendant's silence, or the character of the remark must have been such that the jury would naturally and necessarily have construed it as a comment on the defendant's silence. *Cotton v. Cockrell,* 343 F.3d at 751; *United States v. Wharton,* 320 F.3d at 538; *United States v. Virgen–Moreno,* 265 F.3d 276, 291 (5th Cir.2001), *cert. denied,* 534 U.S. 1095, 122 S.Ct. 843, 151 L.Ed.2d 721 (2002); *Barrientes v. Johnson,* 221 F.3d 741, 780 (5th Cir.2000), *cert. denied,* 531 U.S. 1134, 121 S.Ct. 902, 148 L.Ed.2d 948 (2001); *Jackson v. Johnson,* 194 F.3d 641, 652 (5th Cir.1999), *cert. denied,* 529 U.S. 1027, 120 S.Ct. 1437, 146 L.Ed.2d 326 (2000). The prosecutor's remarks are not a manifest comment on the defendant's silence if there is some other, equally plausible, explanation for the remark. *Cotton v. Cockrell,* 343 F.3d at 751; *United States v. Green,* 324 F.3d 375, 381–82 (5th Cir.), *cert. denied,* 540 U.S. 823, 124 S.Ct. 152, 157 L.Ed.2d 43 (2003); *United States v. Virgen–Moreno,* 265 F.3d at 291; *Barrientes v. Johnson,* 221 F.3d at 780; *Jackson v. Johnson,* 194 F.3d at 652. As for whether the jury would naturally and necessarily construe a remark as a comment on the defendant's failure to testify, the question is not whether the jury possibly or even probably would view the challenged remark in this manner but whether the jury necessarily would have done so. *Cotton v. Cockrell,* 343 F.3d at 751; *United States v. Virgen–Moreno,* 265 F.3d at 291; *Barrientes v. Johnson,* 221 F.3d at 780; *Jackson v. Johnson,* 194 F.3d at 652.

3. *Synthesis*

Viewed in proper context, none of the prosecution's allegedly objectionable comments, including the one to which the state trial court sustained petitioner's trial counsel's objection either manifested a prosecutorial intent to comment on petitioner's failure to testify at trial, or were of such a character as to necessarily have been construed by the jury as a comment on petitioner's failure to testify.

On the contrary, given the evidence then before petitioner's capital sentencing jury, especially the punishment-phase testimony of petitioner's father and petitioner's former girlfriend about petitioner's unwillingness to accept responsibility for his rape convictions, the prosecutor's comments were a clear and direct response to defense counsel's arguments suggesting petitioner's status as a "model prisoner" during a prior term of incarceration meant petitioner could be rehabilitated. *See Buxton v. Collins,* 925 F.2d 816, 825 (5th Cir.) (recognizing the four proper areas for prosecutorial jury argument are summation of the evidence, reasonable inference from the evidence, answers to opposing counsel's argument, and pleas for law enforcement), *cert. denied,* 498 U.S., 1128, 111 S.Ct. 1095, 112 L.Ed.2d 1197 (1991); *Watts v. Quarterman,* 448 F.Supp.2d 786, 814–16 (W.D.Tex.2006) (holding the same), *Certificate of Appealability denied,* 244

Fed.Appx. 572 (5th Cir.2007), *cert. denied*, —— U.S. ——, 128 S.Ct. 876, 169 L.Ed.2d 737 (2008).

Commenting on the absence of specific evidence in the record does not constitute a comment on the defendant's failure to testify when witnesses other than the defendant could have testified to such information. *United States v. Jefferson*, 258 F.3d 405, 414 (5th Cir.), *cert. denied*, 534 U.S. 967, 122 S.Ct. 379, 151 L.Ed.2d 289 (2001); *United States v. Morrow*, 177 F.3d at 300. Prosecutor Mata's arguments petitioner had failed to admit or accept responsibility for his prior rape convictions were, when viewed in proper context, directed not at the absence of petitioner's trial testimony but at the actual trial testimony of petitioner's father and former girlfriend, both of whom admitted petitioner had attempted in conversations with them to downplay or diminish his own criminal culpability vis-a-vis petitioner's previous rape convictions. No reasonable juror could have construed Mrs. Mata's arguments as a comment on petitioner's failure to testify at trial.

To construe her arguments as a comment would have diminished the impact of those arguments. Mrs. Mata sought to remind the jury there was evidence before the jury establishing the petitioner repeatedly told those closest to him that he (petitioner) was not responsible for his two rape convictions despite the overwhelming evidence of his guilt, including petitioner's own plea of guilty to one of those charges, and the petitioner concealed his guilty plea as to one of the rape charges from his father. Mrs. Mata argued these facts undermined petitioner's trial counsel's arguments suggesting petitioner had been a "model prisoner" during petitioner's previous period of incarceration for rape. On the contrary, Mrs. Mata argued, petitioner was a highly manipulative individual who had merely posed as a "model prisoner" while refusing to accept responsibility for two aggravated rapes in which petitioner lured a teenage girl and a 20–year–old woman to isolated locations and then raped them at knife-point. No other rational construction of Mrs. Mata's jury argument is plausible.

Moreover, if there was any ambiguity in Mrs. Mata's final comment regarding petitioner's failure to accept responsibility or "to own up" for his rape convictions, the state trial court's prompt instruction to disregard sufficiently eliminated any threat of prejudice to petitioner. *See United States v. Wharton*, 320 F.3d at 539 (trial court's prompt instruction to disregard eliminated any threat of burden-shifting or prejudice arising from alleged comment on defendant's failure to testify).

Finally, having reviewed the record from petitioner's trial in its entirety, this Court independently concludes any error arising from the alleged impropriety of prosecutor Mata's closing argument was harmless. *See Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (holding the test for harmless error in a federal habeas corpus action brought by a state prisoner is "whether the error had substantial and injurious effect or influence in determining the jury's verdict"); *Cotton v. Cockrell*, 343 F.3d at 752 (applying *Brecht* harmless error analysis in the course of an AEDPA review of a *Griffin v. California* claim).

By the conclusion of the punishment phase of petitioner's capital murder trial, the evidence established petitioner: (1) had twice been convicted of aggravated rapes, (2) despite being labeled by prison officials as a "model prisoner," began abusing drugs and alcohol almost as soon as he was released from prison, (3) told his family and a close friend he was not responsible for his rape convictions, (4) had been twice convicted of theft prior to commit-

ting the two rapes, (5) had a spotty work record, (6) fatally shot and slashed the neck of David Cook, (7) stole David Cook's motorcycle, (8) told friends and others whom he met a variety of false stories about how he came to acquire Mr. Cook's motorcycle, (9) refused to acknowledge he was even present at David Cook's residence on the night of the murder until police informed him weeks later they had recovered Mr. Cook's motorcycle, and (10) attempted to blame two other persons for David Cook's murder. Under these circumstances, prosecutor Mata's arguments calling the jury's attention to the trial testimony of petitioner's father and former girlfriend had no substantial or injurious effect or influence in determining the jury's verdict at the punishment phase of petitioner's capital murder trial.

### D. Conclusions

The Texas Court of Criminal Appeals' rejection on the merits of petitioner's *Griffin v. California* claims during the course of petitioner's direct appeal was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial court and direct appeal proceedings.

## XIII. Instructions to Disregard State Parole Law

### A. The Claims

In his nineteenth and twentieth claims, petitioner argues the state trial court violated petitioner's Fourteenth and Eighth Amendment rights when it instructed petitioner's jury, in accordance with Texas law, to disregard the impact of state parole law

when returning its verdict at the punishment phase of petitioner's capital trial.[132]

### B. State Court Disposition

Petitioner presented these arguments for the first time as grounds twenty-one and twenty-two in petitioner's state habeas corpus application.[133] The state habeas trial court concluded these claims could have been presented during the course of petitioner's direct appeal and, because petitioner had failed to do so, were precluded from state habeas review.[134]

### C. Procedural Default

Petitioner's failure to present the Texas Court of Criminal Appeals with these same federal constitutional arguments during the course of petitioner's direct appeal constitutes a procedural barrier to this Court's review of the merits of petitioner's nineteenth and twentieth claims herein. *See Dorsey v. Quarterman*, 494 F.3d 527, 532 (5th Cir.2007) (recognizing the Texas Court of Criminal Appeals' rule in *Ex parte Gardner*, which bars state habeas review of claims which should have been raised on direct appeal, sets forth an adequate state ground capable of barring federal habeas review), *cert. denied*, —— U.S. ——, 128 S.Ct. 1444, 170 L.Ed.2d 277 (2008); *Brewer v. Quarterman*, 466 F.3d 344, 347 (5th Cir.2006) (holding state court's finding petitioner should have but failed to raise a claim on direct appeal foreclosed state habeas review constituted a procedural barrier to federal habeas review of the same claim), *cert. denied*, —— U.S. ——, 128 S.Ct. 63, 169 L.Ed.2d 52 (2007); *Aguilar v. Dretke*, 428 F.3d 526, 535 (5th Cir.2005) (holding the *Gardner* rule is an adequate state ground capable of

---

**132.** *Petition,* at pp. 104–11; *Reply,* at pp. 21–22.

**133.** State Habeas Transcript, Volume 1 of 4, at pp. 148–52.

**134.** State Habeas Transcript, Volume 4 of 4, at p. 793.

barring federal habeas review). The Fifth Circuit has recognized the same procedural default rule relied upon by the Texas Court of Criminal Appeals in its adopted findings and conclusions denying petitioner state habeas corpus relief was "firmly established" for federal procedural default purposes long before the date the Texas Court of Criminal Appeals disposed of petitioner's direct appeal. *See Busby v. Dretke,* 359 F.3d 708, 719 (5th Cir.) (holding the Texas Court of Criminal Appeals' opinion in *Ex parte Gardner,* 959 S.W.2d 189, 199 (Tex.Crim.App.1996) *modified* on motion for rehearing on February 2, 1998, to recognize this new procedural default rule, "firmly entrenched" that procedural default rule on that date), *cert. denied,* 541 U.S. 1087, 124 S.Ct. 2812, 159 L.Ed.2d 249 (2004); *Finley v. Johnson,* 243 F.3d 215, 219 (5th Cir.2001) (holding a federal habeas petitioner procedurally defaulted on an unexhausted newly discovered evidence theory supporting a *Brady* claim by failing to raise same on direct appeal); *Soria v. Johnson,* 207 F.3d 232, 249 (5th Cir.) (holding a federal habeas petitioner procedurally defaulted on a fair cross-section complaint by failing to raise it in a direct appeal that became final in 1997), *cert. denied,* 530 U.S. 1286, 121 S.Ct. 2, 147 L.Ed.2d 1027 (2000).

At the time petitioner filed his appellant's brief, the law in Texas, as established on rehearing in *Ex parte Gardner,* required a convicted criminal defendant to present any and all claims then available as points of error on direct appeal. *Brewer v. Quarterman,* 466 F.3d at 347; *Aguilar v. Dretke,* 428 F.3d at 535; *Busby v. Dretke,* 359 F.3d at 719. Petitioner's state appellate counsel chose not to present the Texas Court of Criminal Appeals with the same federal constitutional arguments petitioner has presented this Court in his sixth through twelfth claims. Petitioner thereby procedurally defaulted on federal habeas review of same. *Dorsey v. Quar-*

*terman,* 494 F.3d at 532; *Brewer v. Quarterman,* 466 F.3d at 347; *Aguilar v. Dretke,* 428 F.3d at 535; *Busby v. Dretke,* 359 F.3d at 719.

Petitioner does not allege any specific facts satisfying either the "cause and actual prejudice" or "fundamental miscarriage of justice" exceptions to the procedural default doctrine. Petitioner complains of many alleged defects in his trial counsel's representations but does not allege any facts showing his appellate counsel rendered ineffective assistance by failing to raise these same challenges as points of error in petitioner's direct appeal. Likewise, petitioner alleges no facts showing he is "actually innocent of the death penalty" as that term is defined by the Supreme Court. *See Sawyer v. Whitley,* 505 U.S. 333, 346–48, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992) (a showing of "actual innocence" is made in the punishment phase of a capital trial when a petitioner shows by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found petitioner eligible for the death penalty under applicable state law). Therefore, petitioner's nineteenth and twentieth claims herein are procedurally barred from federal habeas review. *Dorsey v. Quarterman,* 494 F.3d at 532; *Brewer v. Quarterman,* 466 F.3d at 347.

**D. *Teague Foreclosure***

▇ Respondent correctly notes the non-retroactivity principle announced in *Teague v. Lane,* 489 U.S. 288, 310, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), forecloses adoption of the new Fourteenth Amendment and Eighth Amendment principles advocated by petitioner in his nineteenth and twentieth claims herein. Under the holding in *Teague,* federal courts are generally barred from applying new constitutional rules of criminal procedure retroactively on collateral review. *Caspari*

*v. Bohlen,* 510 U.S. 383, 389–90, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994). A "new rule" for *Teague* purposes is one which was not dictated by precedent existing at the time the defendant's conviction became final. *See O'Dell v. Netherland,* 521 U.S. 151, 156, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997) (holding a "new rule" either "breaks new ground," "imposes a new obligation on the States or the Federal Government," or was not "dictated by precedent existing at the time the defendant's conviction became final"). Under this doctrine, unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review. *Id.*

The holding in *Teague* is applied in three steps: first, the court must determine when the petitioner's conviction became final; second, the court must survey the legal landscape as it then existed and determine whether a state court considering the petitioner's claim at the time his conviction became final would have felt compelled by existing precedent to conclude the rule he seeks was required by the Constitution; and third, if the rule advocated by the petitioner is a new rule, the court must determine whether the rule falls within one of the two narrow exceptions to the non-retroactivity principle. *Caspari v. Bohlen,* 510 U.S. at 390, 114 S.Ct. 948.

The two exceptions to the *Teague* non-retroactivity doctrine are reserved for new rules forbidding criminal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendants because of their status or offense, and "watershed" rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding, i.e., a small core of rules requiring observance of those procedures that are implicit in the concept of ordered liberty. *O'Dell v. Netherland,* 521 U.S. at 157, 117 S.Ct. 1969. A conviction becomes final for *Teague* purposes when either the United States Supreme Court denies a certiorari petition on the defendant's direct appeal or the time period for filing a certiorari petition expires. *Caspari v. Bohlen,* 510 U.S. at 390, 114 S.Ct. 948.

Petitioner's conviction became final for *Teague* purposes not later than August 2, 2000, i.e., the ninety-first day after the Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence on direct appeal and the date the deadline for the filing of petitioner's petition for writ of certiorari with the United States Supreme Court expired. *Beard v. Banks,* 542 U.S. 406, 411–12, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004) (recognizing a state criminal conviction ordinarily becomes final for *Teague* purposes when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for writ of certiorari has elapsed or a timely filed petition for certiorari has been denied); *Caspari v. Bohlen,* 510 U.S. at 390, 114 S.Ct. 948 ("A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied."); 21 U.S.C. § 2101(d) (the deadline for filing a certiorari petition from a state criminal conviction shall be established by Supreme Court rule); Sup.Ct. R. 13.1 (setting the deadline for the filing of a certiorari petition at 90 days from the date of the state court judgment for which review is sought).

*Teague* remains applicable after the passage of the AEDPA. *See Horn v. Banks,* 536 U.S. 266, 268–72, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002) (applying *Teague* in an

AEDPA context); *Robertson v. Cockrell,* 325 F.3d 243, 255 (5th Cir.) (recognizing the continued vitality of the *Teague* nonretroactivity doctrine under the AEDPA), *cert. denied,* 539 U.S. 979, 124 S.Ct. 28, 156 L.Ed.2d 691 (2003).

As of the date petitioner's conviction and sentence became final for *Teague* purposes, no federal court had held a Texas criminal defendant was entitled to have his capital sentencing jury consider the applicability of Texas parole law when answering the Texas capital sentencing special issues. The Supreme Court has never held jurisdictions which do not offer the jury the option of imposing a term of life imprisonment without the possibility of parole (such as Texas at the time of petitioner's offense and trial) are constitutionally obligated to inform a capital sentencing jury regarding the impact of state parole laws on a life sentence. Nor was such a holding arguably discernable based on any then-existing Supreme Court precedent. Thus, petitioner's nineteenth and twentieth claims herein are foreclosed by the nonretroactivity doctrine of *Teague.* The new rules proposed by petitioner in his nineteenth and twentieth claims fall within neither of the recognized exceptions to the *Teague* doctrine. Even assuming the Supreme Court may rule some day there is a duty to instruct a capital sentencing jury regarding state parole law in jurisdictions which do not offer a capital sentencing jury the option to impose a term of life without parole, that possibility does not help petitioner in this case.

The Fourteenth and Eighth Amendment claims asserted by petitioner in his nineteenth and twentieth claims herein all constitute proposed "new rules of criminal procedure" which the non-retroactivity rule of *Teague v. Lane* precludes this Court from recognizing or applying in a federal habeas context. *Martinez v. Dretke,* 426 F.Supp.2d 403, 514 (W.D.Tex.2006),

*Certificate of Appealability denied,* 2008 WL 698946 (5th Cir. March 17, 2008).

### E. *No Merits*

Petitioner's nineteenth and twentieth claims herein are premised upon interpretations of Supreme Court precedent and present arguments rejected by both the Fifth Circuit and this Court. The Supreme Court, the Fifth Circuit, and this Court have consistently rejected all of the federal constitutional arguments underlying petitioner's nineteenth and twentieth claims. *See Martinez v. Dretke,* 426 F.Supp.2d at 509–14 (explaining the Supreme Court has consistently distinguished jurisdictions such as Texas (at the time of petitioner's offense and trial), which did not then furnish capital sentencing juries with the option of imposing a sentence of life without parole, from the rule in *Simmons v. South Carolina* requiring capital sentencing juries be advised of the defendant's ineligibility for parole, and the Fifth Circuit and this Court have likewise consistently rejected efforts to impose such a requirement premised upon the Supreme Court's Eighth Amendment jurisprudence).

### F. *Conclusions*

Petitioner procedurally defaulted on his nineteenth and twentieth claims by failing to present same to the Texas Court of Criminal Appeals during petitioner's direct appeal. The legal arguments presented by petitioner in his nineteenth and twentieth claims are all "new rules" precluded by the doctrine announced in *Teague v. Lane.* Finally, petitioner's nineteenth and twentieth claims present federal constitutional arguments all rejected by the Supreme Court, the Fifth Circuit, and this Court. Accordingly, neither petitioner's nineteenth nor twentieth claim warrant federal habeas relief.

## XIV. Brady *Claim*

### A. *The Claim*

 In his twenty-first claim herein, petitioner argues his constitutional rights were violated by the prosecution's failure to disclose favorable evidence in the form of information regarding the "deals" a pair of prosecution witnesses allegedly had struck with prosecutors in exchange for their testimony against petitioner.[135]

### B. *State Court Disposition*

Petitioner presented this same claim as part of his twenty-fifth ground for state habeas relief.[136] More specifically, petitioner argued prosecution witnesses Joey Banks and Richard Wood had made undisclosed "deals" with the prosecution. In support of this contention, petitioner offered his own affidavit. However, at the start of the evidentiary hearing in petitioner's state habeas proceeding, the state habeas trial court sustained the State's objection to petitioner's hearsay affidavit.[137] Thereafter, petitioner neither testified nor again proffered his affidavit supporting his otherwise conclusory *Brady* claims.

During the evidentiary hearing held in petitioner's state habeas corpus proceeding, petitioner called only four witnesses, i.e., petitioner's former lead trial counsel (Vincent D. Callahan), petitioner's father (James Bartee), one of the two prosecuting attorneys (William Pennington), and an investigator who had assisted petitioner's court-appointed defense investigator (Thomas Caldwell). None of these witnesses offered any testimony establishing that, in fact, either Mr. Banks or Mr.

Wood had cut a "deal" with prosecutors in exchange for their trial testimony against petitioner. Petitioner offered the state habeas court no other evidence establishing that either Mr. Banks or Mr. Wood had a "deal" with prosecutors relating to their testimony against petitioner.

The state habeas trial court specifically found "Bartee presented no evidence to establish the existence of any 'deals' between the prosecution and witnesses Joey Cortex Banks and Rick Woods," [sic] and "no evidence was produced to establish that they received favorable treatment in their criminal cases after they testified." [138] The state habeas trial court concluded any "nebulous expectation of help" either witness might have anticipated in exchange for their trial testimony against petitioner did not constitute material information under *Brady*.[139]

### C. *AEDPA Review*

#### 1. *Clearly Established Federal Law*

As this Court has noted, few constitutional principles are more firmly established by Supreme Court precedent than the rule that " 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' " *Banks v. Dretke*, 540 U.S. 668, 691, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004); *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Moore v. Quarterman*, 526 F.Supp.2d 654, 678–79 (W.D.Tex.2007); *Berkley v. Quarterman*,

---

**135.** *Petition*, at pp. 112–16; *Reply*, at pp. 22–25.

**136.** State Habeas Transcript, Volume 1 of 4, at pp. 155–58.

**137.** State Habeas Transcript, Volume 3 of 4, at pp. 578–80.

**138.** State Habeas Transcript, Volume 4 of 4, at p. 795.

**139.** *Id.*

507 F.Supp.2d 692, 746 (W.D.Tex.2007); *Avila v. Quarterman,* 499 F.Supp.2d 713, 743 (W.D.Tex.2007); *Mass v. Quarterman,* 446 F.Supp.2d 671, 691 (W.D.Tex.2006); *Gutierrez v. Dretke,* 392 F.Supp.2d at 850.

The Supreme Court has consistently held the prosecution's duty to disclose evidence material to either guilt or punishment, i.e., the rule announced in *Brady v. Maryland,* applies even when there has been no request by the accused. *Banks v. Dretke,* 540 U.S. at 690, 124 S.Ct. 1256; *Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). This duty also applies to impeachment evidence. *Strickler v. Greene,* 527 U.S. at 280, 119 S.Ct. 1936; *United States v. Bagley,* 473 U.S. 667, 676 & 685, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

The rule in *Brady* encompasses evidence known only to police investigators and not personally known by the prosecutor. *Strickler v. Greene,* 527 U.S. at. 280–81; *Kyles v. Whitley,* 514 U.S. 419, 438, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Strickler v. Greene,* 527 U.S. at 281, 119 S.Ct. 1936; *Kyles v. Whitley,* 514 U.S. at 437, 115 S.Ct. 1555.

Under clearly established Supreme Court precedent, there are three elements to a *Brady* claim: (1) the evidence must be favorable to the accused either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be "material," i.e., prejudice must have ensued from its non-disclosure. *Banks v. Dretke,* 540 U.S. at 691, 124 S.Ct. 1256; *Strickler v. Greene,* 527 U.S. at 281–82, 119 S.Ct. 1936. Evidence is "material" under *Brady* where there exists a "reasonable probability" that had the evidence been disclosed the result at trial would have been different. *Banks v. Dretke,* 540 U.S. at 698–99, 124 S.Ct. 1256.

The Supreme Court has emphasized four aspects of the *Brady* materiality inquiry. First, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant's acquittal. *See United States v. Bagley,* 473 U.S. at 682, 105 S.Ct. 3375 (expressly adopting the "prejudice" prong of the *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), analysis of ineffective assistance claims as the appropriate standard for determining "materiality" under *Brady* ). Second, the materiality standard is not a sufficiency of the evidence test. *Kyles v. Whitley,* 514 U.S. at 434–35, 115 S.Ct. 1555. Third, once materiality is established, harmless error analysis has no application. *Kyles v. Whitley,* 514 U.S. at 435–36, 115 S.Ct. 1555. Finally, materiality must be assessed collectively, not item by item. *Kyles v. Whitley,* 514 U.S. at 436–37, 115 S.Ct. 1555.

### 2. *Synthesis*

The rule in *Brady* applies to impeachment evidence. *Strickler v. Greene,* 527 U.S. at 280, 119 S.Ct. 1936; *United States v. Bagley,* 473 U.S. at 676 & 685, 105 S.Ct. 3375. Failure to disclose a prosecution witness has reached a beneficial sentencing agreement in exchange for his or her testimony violates the rule in *Brady. Tassin v. Cain,* 517 F.3d 770, 779–81 (5th Cir.2008). However, a witness must possess more than a mere unilateral expectation or subjective belief he or she will receive a benefit in exchange for their testimony before information regarding the arrangement between the witness and

prosecution satisfies the materiality standard of *Brady*. *See Knox v. Johnson*, 224 F.3d 470, 482 (5th Cir.2000) (witness's subjective hope the State would recognize his assistance did not establish the State had even subtly offered him a deal for his testimony), *cert. denied*, 532 U.S. 975, 121 S.Ct. 1610, 149 L.Ed.2d 475 (2001); *Hill v. Johnson*, 210 F.3d 481, 486 (5th Cir.2000) (subjective beliefs of witnesses regarding the possibility of future favorable treatment are insufficient to trigger the State's duty to disclose under *Brady* ), *cert. denied*, 532 U.S. 1039, 121 S.Ct. 2001, 149 L.Ed.2d 1004 (2001); *Goodwin v. Johnson*, 132 F.3d 162, 187 (5th Cir.1997) ("a nebulous expectation of help from the state" is not *Brady* material).

Petitioner presented the state habeas court with no evidence showing either Mr. Wood or Mr. Banks had made a "deal" with prosecutors relating to their testimony against petitioner. There is no genuine dispute as to this decisive fact. Nor did petitioner present the state habeas court with any evidence showing Mr. Banks or Mr. Wood possessed anything more than a unilateral expectation of future favorable treatment from the Bexar County District Attorney at the time they testified against petitioner.

Petitioner now argues, based on documents not admitted into evidence during petitioner's state habeas corpus proceeding, as follows: (1) Mr. Wood's probation for possession of cocaine was terminated early only months after petitioner's trial and (2) Mr. Banks received a term of deferred adjudication probation for possession of a controlled substance only months after petitioner's trial.[140] However, petitioner alleges no facts showing either of these two events reasonably could have been predicted based upon any formal or informal agreement existing at the time of petitioner's trial, or Mr. Banks or Mr.

Wood had actually arranged a deal with the prosecution regarding the disposition of their criminal charges at the time they testified against petitioner. Therefore, petitioner's allegations regarding the disposition of Mr. Banks' and Mr. Wood's criminal charges months after petitioner's trial do not satisfy the standard for materiality under *Brady*. *Knox v. Johnson*, 224 F.3d at 482; *Hill v. Johnson*, 210 F.3d at 486; *Goodwin v. Johnson*, 132 F.3d at 187.

Even more problematic to petitioner's twenty-first claim is the fact it is premised upon evidence never presented to the state habeas court. Under the AEDPA, it is not within the province of this Court to second-guess a state court's factual determinations based upon newly discovered evidence. Rather, a federal habeas court's role is limited to ascertaining whether the state court's factual findings were unreasonable "in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Moreover, a state court's factual determinations are presumed correct, and the petitioner has the burden of rebutting this presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

During his state habeas proceeding, petitioner had the opportunity to explore, develop, and present evidence establishing either Mr. Banks or Mr. Wood had, despite their trial testimony to the contrary, entered into "deals" with the prosecution in exchange for, or at least in connection with, their testimony against petitioner. However, petitioner failed to offer the state habeas court any such evidence. Petitioner did not call Mr. Banks or Mr. Wood to testify. Petitioner also did not call either Mr. Banks' or Mr. Wood's attorneys to testify about any "deals" they may have helped negotiate with the prosecution. Petitioner also failed to call his own

---

140. *Petition,* at pp. 113–14.

prosecuting attorneys and the Assistant Bexar County District Attorneys who prosecuted Mr. Banks and Mr. Wood to question them regarding the existence of any "deals" between prosecutors and either Mr. Banks or Mr. Wood. As a result, petitioner failed to present the state habeas court with any evidence showing either of these witnesses had any deals with prosecutors relating to their testimony against petitioner. The state habeas trial court's factual findings on this subject, adopted by the Texas Court of Criminal Appeals, cannot be challenged.

### D. Conclusion

The rejection on the merits by the Texas Court of Criminal Appeals of petitioner's *Brady* claim during petitioner's state habeas proceeding was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial and state habeas corpus proceedings.

### XV. Unconstitutionally Vague "Aggravating Factors"

#### A. The Claim

In his twenty-second claim herein, petitioner argues the first Texas capital sentencing special issue, i.e., the "future dangerousness" inquiry, contains a number of unconstitutionally vague terms, specifically "probability," "criminal acts of violence," and "society." [141]

#### B. State Court Disposition

Petitioner first presented this argument as his twenty-seventh ground for state habeas relief.[142] The state habeas trial court

concluded both petitioner's failure to present this same argument during petitioner's direct appeal foreclosed state habeas review of same, and the complaints lacked merit.[143]

#### C. Procedural Default

For the same reasons discussed in Section XIII.C. above, petitioner's failure to present his constitutional complaints about allegedly vague terms in the Texas capital sentencing special issue on future dangerousness initially during the course of his direct appeal constitutes a procedural barrier to federal habeas review of same.

#### D. Teague Foreclosure

Respondent correctly argues the non-retroactivity doctrine of *Teague v. Lane* precludes this Court from adopting the new rule advocated by petitioner in his twenty-second claim in this federal habeas corpus proceeding.

#### E. AEDPA Review: No Merits

Alternatively, petitioner's complaints about allegedly "vague" terms in the Texas capital sentencing scheme's future dangerousness special issue lack merit. *See Turner v. Quarterman*, 481 F.3d 292, 299–300 (5th Cir.) (rejecting arguments the terms "probability," "criminal acts of violence," and "continuing threat to society" were so vague as to preclude a capital sentencing jury's consideration of mitigating evidence), *cert. denied,* —— U.S. ——, 128 S.Ct. 34, 168 L.Ed.2d 810 (2007); *Leal v. Dretke*, 428 F.3d 543, 552–53 (5th Cir.2005) (listing the Fifth Circuit opinions rejecting complaints about the failure of Texas courts to define the terms "probability," "criminal acts of violence," and "continuing

---

**141.** *Petition*, at pp. 117–20; *Reply*, at pp. 25–26.

**142.** State Habeas Transcript, Volume 1 of 4, at pp. 163–65.

**143.** State Habeas Transcript, Volume 4 of 4, at pp. 796–97.

threat to society" in the first Texas capital sentencing special issue), *cert. denied*, 547 U.S. 1073, 126 S.Ct. 1771, 164 L.Ed.2d 522 (2006); *Moore v. Quarterman*, 526 F.Supp.2d 654, 720–21 (W.D.Tex.2007) (discussing the long line of Fifth Circuit opinions, as well as numerous opinions from this Court, rejecting the same arguments raised by petitioner's twenty-second claim herein); *Martinez v. Dretke*, 426 F.Supp.2d at 403, 530 (W.D.Tex., 2006) (holding the Texas capital sentencing special issues need not be accompanied by definitions because the key terms therein are susceptible of a logical, common sense interpretation by rational jurors and the Eighth Amendment does not preclude granting Texas unfettered discretion (in the mitigation special issue) to withhold the death penalty as long as the jury is permitted to consider all mitigating evidence before it in so doing), *Certificate of Appealability denied*, 270 Fed.Appx. 277 (5th Cir.2008); *Salazar v. Dretke*, 393 F.Supp.2d 451, 488–91 (W.D.Tex.2005) (holding the same), *aff'd*, 260 Fed.Appx. 643 (5th Cir.2007), *cert. denied*, —— U.S. ——, 128 S.Ct. 2963, —— L.Ed.2d —— (2008).

### F. Conclusions

Petitioner procedurally defaulted on his complaints about allegedly vague terms in the Texas capital sentencing scheme's future dangerousness special issue by failing to present those complaints to the state court in his direct appeal. Petitioner's legal arguments supporting his twenty-second claim for relief are foreclosed by the Supreme Court's holding in *Teague v. Lane*.

The alternative holding by the Texas Court of Criminal Appeals in petitioner's state habeas corpus proceeding rejecting on the merits petitioner's complaints of allegedly vague terms in the Texas capital sentencing scheme's future dangerousness special issue was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial and state habeas corpus proceedings.

### XVI. "Perjured Testimony" Claim

#### A. The Claim

■■■ In his twenty-third claim herein, petitioner argues the prosecution knowingly used perjured testimony from Joey Banks, Rick Wood, and Heidi Munoz to obtain petitioner's conviction, more specifically that Mr. Banks and Mr. Wood testified falsely during petitioner's trial regarding the absence of any "deals" between them and prosecutors in relation to their testimony against petitioner.[144]

#### B. State Court Disposition

Petitioner presented the same arguments as his twenty-sixth ground for state habeas relief.[145] Petitioner's sole support for this claim was his own affidavit, which the state habeas court expressly excluded from evidence.[146] As was explained in Sections XIV.B. and XIV.C.2. above, during the evidentiary hearing held in petitioner's state habeas proceeding, petitioner presented the state habeas court with no evidence establishing the falsity of the trial

---

**144.** *Petition*, at pp. 121–24; *Reply*, at pp. 26–27.

Although petitioner mentions her trial testimony in his argument supporting his twenty-third claim, petitioner does not identify any allegedly false testimony given by Heidi Munoz during

**145.** State Habeas Transcript, Volume 1 of 4, at pp. 159–62.

**146.** State Habeas Transcript, Volume 3 of 4, at pp. 578–80.

testimony of either Joey Banks or Rick Wood regarding the absence of any "deal" designed to induce their trial testimony against petitioner.

The state habeas trial court found "no evidence exists establishing that the testimony of any witness was false," and "there is no evidence that prosecution knowingly used perjured testimony." [147]

## C. *AEDPA Review*

### 1. *Clearly Established Federal Law*

A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. *Giglio v. United States,* 405 U.S. 150, 153–54, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois,* 360 U.S. 264, 269–70, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). To succeed in showing a due process violation from the use of allegedly perjured testimony, a defendant has the burden of establishing: (1) the witness in question actually gave false testimony, (2) the falsity was material in that there was a reasonable likelihood that it affected the judgment of the jury, and (3) the prosecution used the testimony in question knowing it was false. *Giglio v. United States,* 405 U.S. at 153–54, 92 S.Ct. 763.

### 2. *Synthesis*

Petitioner offered the state habeas court no evidence establishing the trial testimony of prosecution witnesses Joey Banks, Rick Wood, or Heidi Munoz was in any respect factually inaccurate or otherwise false. Likewise, petitioner presented the state habeas court with no evidence showing the prosecution knew any of the testimony given by any of these witnesses during petitioner's trial was false. The state

habeas court's factual findings on these subjects cannot be challenged.

## D. *Conclusion*

The Texas Court of Criminal Appeals' rejection on the merits of petitioner's *Giglio–Napue* claim during the course of petitioner's state habeas corpus proceeding was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial and state habeas corpus proceedings.

## XVII. *Lack of "Meaningful" State Appellate Review*

### A. *The Claim*

In his twenty-fourth claim herein, petitioner argues the Texas capital sentencing scheme violates Eighth Amendment principles because it affords convicted criminal defendants no meaningful state appellate review of their death sentences, i.e., Texas law does not require the Texas Court of Criminal Appeals to engage in: (1) sufficient-evidence review of the jury's answer to the *Penry* mitigation special issue, (2) evidentiary sufficiency review of the jury's answer to the future dangerousness special issue, (3) comparative proportionality review of the propriety of capital sentences, or (4) appellate review regarding whether the capital sentencing jury properly considered and weighed all mitigating circumstances in answering the *Penry* special issue.[148]

### B. *State Court Disposition*

Petitioner presented the same arguments as his twenty-eighth ground for state habeas relief.[149] The state habeas

---

**147.** State Habeas Transcript, Volume 4 of 4, at p. 796.

**148.** *Petition,* at pp. 125–29; *Reply,* at p. 28.

**149.** State Habeas Transcript, Volume 1 of 4, at pp. 166–69.

trial court concluded petitioner's failure to present these same arguments during petitioner's direct appeal foreclosed state habeas review of same, and the complaints lacked merit.[150]

## C. *Procedural Default*

For the reasons discussed in Section XIII.C. above, petitioner's failure to present the Texas Court of Criminal Appeals with his constitutional complaints about the alleged unavailability of "meaningful" state appellate review of a Texas capital sentencing jury's answers to the Texas capital sentencing special issues during the course of petitioner's direct appeal constitutes a procedural barrier to federal habeas review of same.

## D. *Teague Foreclosure*

Respondent correctly argues this Court's adoption of any of the four proposed "new rules" contained in petitioner's twenty-fourth claim are foreclosed by the non-retroactivity doctrine of *Teague v. Lane.* At the time petitioner's conviction and sentence became final for *Teague* purposes, no federal court had held the Texas capital sentencing scheme either deprived a capital defendant of meaningful appellate review of the jury's answers to the capital sentencing special issues or deprived a Texas capital murder defendant of a constitutional right to proportionality review of his capital sentence. *See Martinez v. Dretke,* 426 F.Supp.2d at 532 (holding *Teague* foreclosure applicable to these same complaints); *Cordova v. Johnson,* 993 F.Supp. 473, 509 (W.D.Tex.1998) (holding *Teague* foreclosed claims that the Constitution mandated proportionality review of the jury's answers to the Texas capital sentencing scheme's special issues), *appeal denied,* 157 F.3d 380 (5th Cir.1998), *cert. denied,* 525 U.S. 1131, 119 S.Ct. 922, 142 L.Ed.2d 971 (1999).

## E. *AEDPA Review: No Merits*

Alternatively, petitioner's complaints about the alleged lack of "meaningful" state appellate review of a Texas jury's answers to the capital sentencing special issues are without arguable merit.

The Supreme Court has expressly rejected the argument that a state appellate court is required to independently reweigh aggravating and mitigating evidence. *See Pulley v. Harris,* 465 U.S. 37, 50–51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) ("There is thus no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death sentence is imposed and the defendant requests it.").

The Fifth Circuit has repeatedly rejected the same due process and Eighth Amendment arguments petitioner presents herein. *See Woods v. Cockrell,* 307 F.3d 353, 359–60 (5th Cir.2002) (holding Texas Court of Criminal Appeals' refusal to review the sufficiency of the evidence supporting negative answers to the Texas capital sentencing scheme's "mitigation" special issue, i.e., the *Penry* issue, did not violate due process principles); *Johnson v. Cockrell,* 306 F.3d 249, 256 (5th Cir.2002) (denying CoA on claim that Texas Court of Criminal Appeals' refusal to review whether sufficient mitigating evidence existed to support a life sentence violated Eighth Amendment), *cert. denied,* 538 U.S. 926, 123 S.Ct. 1573, 155 L.Ed.2d 319 (2003); *Beazley v. Johnson,* 242 F.3d 248, 261 (5th Cir.) (holding petitioner was afforded meaningful state appellate review of death sentence when state appellate court reviewed sufficiency of evidence supporting future dangerousness special issue), *cert. denied,* 534 U.S. 945, 122 S.Ct. 329, 151 L.Ed.2d 243 (2001); *Moore v. Johnson,* 225 F.3d 495, 505–07 (5th Cir.

---

**150.** State Habeas Transcript, Volume 4 of 4, at p. 797.

2000) (holding Texas Court of Criminal Appeals' refusal to review the sufficiency of the evidence supporting negative answers to the Texas capital sentencing scheme's "mitigation" special issue, i.e., the *Penry* issue, did not violate due process principles), *cert. denied,* 532 U.S. 949, 121 S.Ct. 1420, 149 L.Ed.2d 360 (2001); *Hughes v. Johnson,* 191 F.3d 607, 621–23 (5th Cir.1999) (holding no Eighth Amendment violation resulted from Texas Court of Criminal Appeals' refusal to engage in proportionality review of capital sentencing jury's answer to mitigation special issue because Texas is a non-weighing jurisdiction), *cert. denied,* 528 U.S. 1145, 120 S.Ct. 1003, 145 L.Ed.2d 945 (2000).

In addition, this Court has repeatedly rejected the Eighth Amendment component of petitioner's twenty-fourth claim as foreclosed by the Supreme Court's holding in *Tuilaepa. See Martinez v. Dretke,* 426 F.Supp.2d at 530–32 (holding the Supreme Court's opinion in *Tuilaepa* permits states to adopt capital sentencing schemes which vest the sentencing jury with almost unfettered discretion at the selection phase of a capital trial); *Cordova v. Johnson,* 993 F.Supp. at 509 ("Insofar as proportionality analysis is constitutionally necessary with regard to the Texas capital sentencing scheme, that analysis is incorporated in the 'eligibility decision' described in *Tuilaepa* and *Buchanan* and is accomplished in the Texas capital sentencing scheme at the guilt-innocence phase of a trial because the Texas capital murder statute itself performs the constitutionally-mandated narrowing function.").

There is no "clearly established" federal constitutional authority mandating state appellate review of the evidentiary sufficiency underlying a Texas jury's answers to the capital sentencing special issues beyond that readily available to petitioner pursuant to the Supreme Court's holding in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *See Lewis v. Jeffers,* 497 U.S. 764, 781–84, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) (holding *Jackson v. Virginia* standard of review applicable to federal habeas review of arbitrariness of a jury's answers to aggravating factors employed in a capital sentencing scheme); *Martinez v. Johnson,* 255 F.3d 229, 241–45 (5th Cir.2001) (holding *Jackson v. Virginia* standard applicable to federal habeas review of sufficiency of evidence underlying a Texas jury's answer to capital sentencing special issues), *cert. denied,* 534 U.S. 1163, 122 S.Ct. 1175, 152 L.Ed.2d 118 (2002).

Petitioner did not present the state appellate court with any points of error on direct appeal challenging the sufficiency of the evidence supporting the jury's answers to either of the capital sentencing issues. Petitioner has not identified any institutional impediment preventing his presentment to the state appellate court of insufficient evidence points of error, pursuant to *Jackson v. Virginia,* addressing his sentencing jury's answers to the Texas capital sentencing special issues. No "clearly established" Supreme Court precedent mandates state appellate review of a sentencing jury's answer to either of the Texas capital sentencing special issues beyond the requirements of *Jackson v. Virginia.*

### F. Conclusions

Petitioner procedurally defaulted on his complaints about the alleged unavailability of "meaningful" state appellate review of his jury's answers to the Texas capital sentencing special issues by failing to present those same complaints to the Texas Court of Criminal Appeals during his direct appeal. The Supreme Court's holding in *Teague v. Lane* precludes this Court from adopting any of the four proposed "new rules" advocated by petitioner in his twenty-fourth claim

The Texas Court of Criminal Appeals' alternative rejection on the merits during the course of petitioner's state habeas corpus proceeding of petitioner's complaints about the alleged lack of "meaningful" state appellate review of his jury's answers to the Texas capital sentencing special issues was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial and state habeas corpus proceedings.

## XVIII. No Burden of Proof on Mitigation Special Issue

### A. The Claim

In his twenty-fifth claim herein, petitioner argues his constitutional rights were violated by the failure of the Texas capital sentencing scheme to assign a burden of proof on the *Penry* or mitigation special issue.[151]

### B. State Court Disposition

Petitioner presented this same claim as his twenty-ninth ground for state habeas relief.[152] The state habeas trial court concluded petitioner procedurally defaulted on this facial attack on the constitutionality of the Texas capital sentencing scheme's mitigation special issue by failing to raise this claim on direct appeal, and this claim lacked merit.[153]

### C. Procedural Default

For the reasons discussed in Section XIII.C. above, petitioner's failure to present the Texas Court of Criminal Appeals during the course of his direct appeal with his constitutional complaints about absence of an express assignment of burden of proof on the Texas capital sentencing scheme's mitigation special issue constitutes a procedural barrier to federal habeas review of same.

### D. Teague Foreclosure

Respondent correctly argues this Court's adoption of a "new rule" requiring the assignment of a burden of proof on the Texas capital sentencing scheme's mitigation special issue, as advocated by petitioner's twenty-fifth claim, is foreclosed by the non-retroactivity doctrine of *Teague v. Lane.* At the time petitioner's conviction and sentence became final for *Teague* purposes, no federal court had held the Constitution mandated assignment of a burden of proof on either party in connection with the Texas capital sentencing scheme's mitigation special issue. *See Moore v. Quarterman,* 526 F.Supp.2d 654, 732–37 (W.D.Tex.2007) (discussing applicable Supreme Court and Fifth Circuit authorities and concluding federal law does not require assignment of a burden of proof on the Texas capital sentencing scheme's mitigation special issue); *Berkley v. Quarterman,* 507 F.Supp.2d 692, 738–44 (W.D.Tex. 2007) (holding the same).

### E. AEDPA Review: No Merits

The Fifth Circuit has repeatedly rejected the arguments underlying petitioner's twenty-fifth claim herein, concluding the federal Constitution does not mandate assignment of a burden of proof on the Texas capital sentencing scheme's mitigation special issue. *See Ortiz v. Quarterman,* 504 F.3d 492, 504–05 (5th Cir.2007) (the Texas death penalty scheme does not violate *Apprendi* or *Ring* by failing to require the State to prove beyond a reasonable

---

**151.** *Petition,* at pp. 130–33; *Reply,* at p. 29.

**152.** State Habeas Transcript, Volume 1 of 4, at pp. 170–71.

**153.** State Habeas Transcript, Volume 4 of 4, at pp. 797–98.

doubt the absence of mitigating circumstances), *cert. filed,* January 28, 2008, no. 07–9100; *Scheanette v. Quarterman,* 482 F.3d 815, 828 (5th Cir.2007) (Texas death penalty scheme did not violate either *Apprendi* or *Ring* by failing to require the state to prove beyond a reasonable doubt the absence of mitigating circumstances); *Granados v. Quarterman,* 455 F.3d 529, 536 (5th Cir.) (holding no burden of proof requirement applies because the jury's answer to the Texas capital sentencing scheme's mitigation special issue does not enhance the sentence to death but, rather, reduces same from death to life), *cert. denied,* —— U.S. ——, 127 S.Ct. 732, 166 L.Ed.2d 568 (2006).

Another district court in the San Antonio Division has expressly rejected the same arguments petitioner presents in his twenty-fifth claim, reasoning as follows:

> the procedural requirements applicable to the *eligibility* decision in weighing jurisdictions such as Arizona (where specific findings of aggravating factors are made during a separate post-conviction proceeding and then weighed against any "mitigating" factors also found by the sentencing authority) are inapplicable to a Texas capital sentencing jury's *selection* decision, i.e., its determination as to whether the mitigating evidence in a particular case warrants a sentence of less than death for a criminal defendant who has already been convicted beyond a reasonable doubt of capital murder and already determined beyond a reasonable doubt to pose a risk of future dangerousness. *See Turner v. Quarterman,* 481 F.3d at 300 ("*Ring* is inapposite to any discussion of the constitutional requirements of the selection phase."); *Scheanette v. Quarterman,* 482 F.3d at 828 ("a finding of mitigating circumstances reduces a sentence from death, rather than increasing it to death."); *Sonnier v. Quarterman,* 476 F.3d at 363–67 (holding the deletion of the for-

mer special issue inquiring into whether the defendant acted "deliberately" in connection with the capital murder from the Texas capital sentencing scheme did not render same vulnerable to attack on Eighth Amendment grounds); *Granados v. Quarterman,* 455 F.3d 529, 537 (5th Cir.2006) (distinguishing *Ring* and *Apprendi* on the ground a jury's affirmative answer to the Texas capital sentencing scheme's *Penry* or "mitigation" special issue reduces a sentence from death rather than increasing it to death, as was the case with the factual findings made by the trial judges in *Apprendi* and *Ring* ), *cert. denied,* —— U.S. ——, 127 S.Ct. 732, 166 L.Ed.2d 568 (2006). *Moore v. Quarterman,* 526 F.Supp.2d at 737.

Petitioner has identified no "clearly established" Supreme Court precedent recognizing a constitutional requirement for an express assignment of the burden of proof in connection with the Texas capital sentencing scheme's mitigation special issue. This is likely because the unique aspects of the Texas capital sentencing scheme make the Texas scheme's mitigation special issue readily distinguishable from the capital sentencing schemes in the weighing jurisdictions addressed in the opinions relied upon by petitioner.

## F. *Conclusions*

Petitioner procedurally defaulted on his complaint about the absence of a burden of proof assignment in connection with the Texas capital sentencing scheme's mitigation special issue by failing to present that same complaint to the Texas Court of Criminal Appeals during his direct appeal. The Supreme Court's holding in *Teague v. Lane* precludes this Court from adopting the proposed "new rule" advocated by petitioner in his twenty-fifth claim.

The Texas Court of Criminal Appeals' alternative rejection on the merit s during

the course of petitioner's state habeas corpus proceeding of petitioner's complaint about the absence of an express burden of proof assignment in the Texas capital sentencing scheme's mitigation special issue was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial and state habeas corpus proceedings.

## XIX. *Ten/Twelve Rule*

### A. *The Claim*

In his twenty-sixth claim herein, petitioner argues the Texas Code of Criminal Procedure's so-called "ten-twelve rule" contained in Articles 37.071, § 2(d)(2) & 2(f)(2) violates the constitutional principles announced by the Supreme Court in *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990).[154]

### B. *State Court Disposition*

Petitioner raised these arguments in his thirtieth ground for state habeas relief.[155] The state habeas trial court concluded petitioner procedurally defaulted on this facial attack on the constitutionality of the Texas capital sentencing scheme's "ten/twelve rule" by failing to raise this claim on direct appeal, and this claim lacked merit.[156]

### C. *Procedural Default*

For the reasons discussed in Section XIII.C. above, petitioner's failure to present the Texas Court of Criminal Appeals, during the course of his direct appeal, with his constitutional complaints about Texas "ten/twelve rule" constitutes a procedural barrier to federal habeas review of same.

### D. *Teague Foreclosure*

Respondent correctly argues this Court's adoption of the "new rule" advocated by petitioner in his twenty-sixth claim is foreclosed by the non-retroactivity doctrine of *Teague v. Lane. Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir.2000); *Webb v. Collins*, 2 F.3d 93, 95–96 (5th Cir.1993). At the time petitioner's conviction and sentence became final for *Teague* purposes, no federal court had held the Texas "ten/twelve rule" violated the constitutional principles announced in either *Mills* or *McKoy*. Extension of the rules in *Mills* or *McKoy* to Texas capital trials is foreclosed by the rule in *Teague*. See *Beard v. Banks*, 542 U.S. 406, 416, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004) (holding *Mills* announced a new rule for *Teague* purposes); *Hughes v. Dretke*, 412 F.3d 582, 594 (5th Cir.2005) (holding extension of the rule in *Mills* to Texas is foreclosed by *Teague* ), *cert. denied*, 546 U.S. 1177, 126 S.Ct. 1347, 164 L.Ed.2d 60 (2006); *Alexander v. Johnson*, 211 F.3d at 897 (holding *Teague* forecloses the same arguments made by petitioner herein); *Martinez v. Dretke*, 426 F.Supp.2d at 534 (holding the same "new rule" advocated by petitioner herein was foreclosed by *Teague* ).

### E. *AEDPA Review: No Merits*

Because the Texas capital sentencing scheme is very different from those employed on Maryland and North Carolina, petitioner's reliance on the Supreme Court's opinions in *McKoy* and *Mills* is misplaced. *See Alexander v. Johnson*, 211

---

**154.** *Petition,* at pp. 137–40; *Reply,* at p. 30.

**155.** State Habeas Transcript, Volume 1 of 4, at pp. 172–75.

**156.** State Habeas Transcript, Volume 4 of 4, at p. 798.

F.3d 895, 897 (5th Cir.2000) (specifically rejecting both Fourteenth and Eighth Amendment challenges to the Texas twelve/ten rule in the course of affirming this Court's rejection of claims almost identical to those raised by petitioner herein); *Miller v. Johnson*, 200 F.3d 274, 288–89 (5th Cir.) (holding *Mills* inapplicable to a Texas capital sentencing proceeding), *cert. denied*, 531 U.S. 849, 121 S.Ct. 122, 148 L.Ed.2d 77 (2000); *Woods v. Johnson*, 75 F.3d 1017, 1036 (5th Cir.) (holding the same), *cert. denied*, 519 U.S. 854, 117 S.Ct. 150, 136 L.Ed.2d 96 (1996); *Hughes v. Johnson*, 191 F.3d 607, 628–29 (5th Cir. 1999) (holding both *Mills* and *McKoy* inapplicable to the Texas capital sentencing scheme), *cert. denied*, 528 U.S. 1145, 120 S.Ct. 1003, 145 L.Ed.2d 945 (2000); *Jacobs v. Scott*, 31 F.3d 1319, 1328–29 (5th Cir. 1994) ("Under the Texas system, all jurors can take into account any mitigating circumstance. One juror cannot preclude the entire jury from considering a mitigating circumstance. Thus, *Mills* is inapplicable."), *cert. denied*, 513 U.S. 1067, 115 S.Ct. 711, 130 L.Ed.2d 618 (1995); *Martinez v. Dretke*, 426 F.Supp.2d 403, 533–34 (W.D.Tex.2006) (holding the same).

The Supreme Court has never extended the principles announced in *Mills* and *McKoy* to Texas capital sentencing in the way petitioner advocates in his twenty-sixth claim. On the contrary, both the Fifth Circuit and this Court have repeatedly rejected efforts to extend the holdings in *Mills* and *McKoy* to the Texas capital sentencing scheme, as petitioner now advocates. Thus, no "clearly established" federal law mandated the result advocated by petitioner in his twenty-sixth claim herein.[157]

## F. Conclusions

Petitioner procedurally defaulted on his *Mills* and *McKoy* claims herein by failing to present those same legal arguments to the Texas Court of Criminal Appeals during his direct appeal. Extension of the holdings in *Mills* and *McKoy* to the Texas capital sentencing scheme in the manner advocated by petitioner in his twenty-sixth claim is foreclosed by *Teague*.

The Texas Court of Criminal Appeals' alternative rejection on the merits of petitioner's *Mills* and *McKoy* claims during the course of petitioner's state habeas corpus proceeding was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial and state habeas corpus proceedings.

## XX. Absence of a Hung Jury Instruction

### A. The Claim

In his twenty-seventh claim herein, petitioner argues his constitutional rights were violated because the trial court failed to instruct his jury on the effect of a single holdout juror.[158]

### B. State Court Disposition

Petitioner presented the same argument as his thirty-first ground for state habeas relief.[159] The state habeas trial court concluded petitioner procedurally defaulted on

---

**157.** It is not clear precisely what petitioner believes his trial court should have done in connection with the Texas ten/twelve rule during petitioner's trial. More specifically, it is unclear whether petitioner is arguing the instructions mandated by Article 37.071, § 2(d)(2) and § 2(f)(2), should have been omitted or whether petitioner is arguing some other set of instructions should have been substituted in lieu thereof.

**158.** *Petition*, at pp. 141–43; *Reply*, at p. 30.

**159.** State Habeas Transcript, Volume 1 of 4, at p. 176.

this facial attack on the Texas capital sentencing scheme's failure to instruct capital sentencing juries regarding the effect of a single holdout juror by failing to raise this claim on direct appeal, and this claim lacked merit.[160]

### C. Procedural Default

For the reasons discussed in Section XIII.C. above, petitioner's failure to present the Texas Court of Criminal Appeals during the course of his direct appeal with his constitutional complaints about the trial court's failure to instruct his jury regarding the effect of a single holdout juror constitutes a procedural barrier to federal habeas review of same.

### D. Teague Foreclosure

No federal court has ever held a capital sentencing jury must be instructed regarding the effect of a single holdout juror or of a hung jury. *Moore v. Quarterman*, 526 F.Supp.2d 654, 728–29 (W.D.Tex.2007); *Blanton v. Quarterman*, 489 F.Supp.2d 621, 645 (W.D.Tex.2007); *Martinez v. Dretke*, 426 F.Supp.2d at 536. Therefore, adoption of the "new rule" advocated in petitioner's twenty-seventh claim is foreclosed by the rule in *Teague*.

### E. AEDPA Review

The Supreme Court rejected the argument underlying petitioner's twenty-seventh claim in *Jones v. United States*, 527 U.S. 373, 382, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (the Eighth Amendment does not require a capital sentencing jury be instructed as the effect of a "breakdown in the deliberative process," because the refusal to give such an instruction does not affirmatively mislead the jury regarding the effect of its verdict, and such an in-

struction might undermine the strong governmental interest in having the jury express the conscience of the community on the ultimate question of life or death). The Supreme Court has never held the Constitution mandates a jury instruction of the type requested by petitioner in this claim.

Both the Fifth Circuit and this Court have rejected efforts identical to petitioner's to apply the Supreme Court's holding in *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), into the dissimilar context of a Texas capital trial. *See, e.g., Turner v. Quarterman*, 481 F.3d at 300 (recognizing Fifth Circuit precedent foreclosed arguments the Eighth Amendment and Due Process Clause of the Fourteenth Amendment mandated jury instructions regarding the effect of a capital sentencing jury's failure to reach a unanimous verdict); *Alexander v. Johnson*, 211 F.3d at 897 n. 5 (holding the same); *Moore v. Quarterman*, 526 F.Supp.2d at 729–30 (holding there is no constitutional requirement a capital sentencing jury be informed of the consequences of a hung jury or of a single holdout juror); *Blanton v. Quarterman*, 489 F.Supp.2d at 644–45 (holding the same); *Martinez v. Dretke*, 426 F.Supp.2d at 534–36 (holding the same).

There is no legal basis for petitioner's efforts to expand the narrow holding in *Caldwell* into a new constitutional requirement mandating an instruction regarding the effect of a hung jury or a single holdout juror. In *Caldwell*, the Supreme Court addressed an instance in which a capital murder prosecutor's jury argument suggested, in an erroneous and misleading manner, the jury was not the final arbiter of the defendant's fate.[161] To establish a

---

**160.** State Habeas Transcript, Volume 4 of 4, at pp. 798–99.

**161.** In *Caldwell*, the Supreme Court held the following statement by the prosecution during

its closing argument undermined reliable exercise of jury discretion:

> Now, [the defense] would have you believe that you're going to kill this man and they

*Caldwell* violation, "a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams,* 489 U.S. 401, 407, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989). In reviewing a *Caldwell* claim, the proper inquiry is whether under all the facts and circumstances, including the entire trial record, the State has misled the jury regarding its role under state law to believe the responsibility for determining the appropriateness of the imposition of the death penalty rests elsewhere. *See Miniel v. Cockrell,* 339 F.3d 331, 342–44 (5th Cir.2003) (holding state court reasonably concluded no *Caldwell* violation resulted from prosecutor's accurate explanation during individual voir dire of the state and federal appellate opportunities available to a Texas capital defendant sentenced to death), *cert. denied,* 540 U.S. 1179, 124 S.Ct. 1413, 158 L.Ed.2d 81 (2004); *Barrientes v. Johnson,* 221 F.3d 741, 776–78 (5th Cir.2000) (holding trial court's voir dire instructions informing jury the court would impose sentence, not the jury, but specifically explaining how the jury's answers to the capital sentencing special issues would require the court to impose either a sentence of life or death did not result in a *Caldwell* violation), *cert. denied,* 531 U.S. 1134, 121 S.Ct. 902, 148 L.Ed.2d 948 (2001); *Hughes v. Johnson,* 191 F.3d at 618 (holding voir dire explanations to potential jurors of the impact of affirmative answers to the Texas capital sentencing special issues were sufficient to avoid any possibility the jurors misunderstood their role or the effect of their punishment-phase verdict); *Montoya v. Scott,* 65 F.3d 405, 420 (5th Cir.1995) (holding a Texas trial court's instructions during voir dire which were similar to the prosecu-

tion's statements accurately explaining the Texas special sentencing issues in a capital murder trial and the effect of the jury's answers to those issues did not violate the holding in *Caldwell* ), *cert. denied,* 517 U.S. 1133, 116 S.Ct. 1417, 134 L.Ed.2d 542 (1996). No *Caldwell* error results simply because a Texas capital sentencing jury is not informed of the effect of a hung jury or of a single holdout juror.

### F. *Conclusions*

Petitioner procedurally defaulted on his *Caldwell* and *Dugger* claim herein by failing to present those same legal arguments to the Texas Court of Criminal Appeals during his direct appeal. Recognition of a new rule mandating jury instructions regarding the effect of a hung juror or a single holdout juror in the manner advocated by petitioner in his twenty-seventh claim is foreclosed by *Teague.*

The Texas Court of Criminal Appeals' alternative rejection on the merits of petitioner's *Caldwell* and *Dugger* claim during the course of petitioner's state habeas corpus proceeding was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial and state habeas corpus proceedings.

### XXI. *Open–Ended Discretion in Capital Sentencing*

### A. *The Claims*

In his twenty-eighth and thirty-first claims herein, petitioner argues the Texas capital sentencing scheme unconstitutionally confers open-ended discretion on a capital sentencing jury.[162]

---

know—they know that your decision is not the final decision. My God, how unfair can they be? Your job is reviewable. They know it.

*Caldwell v. Mississippi,* 472 U.S. at 325 & 329, 105 S.Ct. 2633.

**162.** *Petition,* at pp. 144–46; *Reply,* at p. 31.

## B. State Court Disposition

Petitioner presented this same argument as his thirty-third and thirty-sixth grounds for state habeas relief.[163] The state habeas trial court concluded petitioner procedurally defaulted on this constitutional attack on the allegedly "open-ended" discretion conferred on Texas capital sentencing juries by failing to raise these claims on direct appeal, and these claims lacked merit.[164]

## C. Procedural Default

For the reasons discussed in Section XIII.C. above, petitioner's failure to present the Texas Court of Criminal Appeals during the course of his direct appeal with his constitutional complaints about the allegedly "open-ended" discretion exercised by Texas capital sentencing juries constitutes a procedural barrier to federal habeas review of same.

## D. Teague Foreclosure

Because no federal court has ever held the Constitution precludes a Texas capital sentencing jury from exercising a degree of "open-ended" discretion in answering the Penry or mitigation special issue, the new rule advocated in petitioner's twenty-eighth and thirty-first claims are foreclosed by the holding in Teague. Moore v. Quarterman, 526 F.Supp.2d at 730.

## E. AEDPA Review

The current Texas mitigation or Penry capital sentencing special issue conforms to the Supreme Court's holdings in Buchanan v. Angelone, 522 U.S. 269, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998), and Tuilaepa v. California, 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994), both of which recognize the Eighth Amendment authorizes a state to permit a capital sentencing jury to exercise unfettered discretion at the selection phase, i.e., when it determines whether to impose or withhold a death sentence on a criminal defendant whom it has properly determined is eligible to receive same.

In Tuilaepa, the Supreme Court held States may adopt capital sentencing procedures which rely upon the jury, in its sound judgment, to exercise wide discretion. Tuilaepa v. California, 512 U.S. at 974, 114 S.Ct. 2630. The Supreme Court explained that at the selection stage, States are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment." Id. at 978, 114 S.Ct. 2630. The mitigation or Penry special issue submitted at the punishment phase of a Texas capital trial focuses exclusively on the selection decision, which the Supreme Court has held may involve a capital sentencing jury exercising unfettered discretion to withhold a death sentence from a defendant otherwise eligible to receive same. See Buchanan v. Angelone, 522 U.S. at 276, 118 S.Ct. 757 (at the selection phase of a capital sentencing proceeding, "our decisions suggest that complete jury discretion is constitutionally permissible."); Tuilaepa v. California, 512 U.S. at 978–80, 114 S.Ct. 2630 (at the selection phase, the States are not confined to submitting specific propositional questions; a capital sentencer need not be instructed how to weigh any particular fact; and discretion to evaluate and weigh the circumstances relevant to the particular defendant and the crime he committed is not impermissible).

---

**163.** State Habeas Transcript, Volume 1 of 4, at pp. 179–81, 188–89.

**164.** State Habeas Transcript, Volume 4 of 4, at pp. 799–802.

The discretion exercised by a Texas capital sentencing jury to withhold the death penalty from defendants who have been determined eligible to receive same is fully consistent with the Eighth Amendment principles set forth in *Tuilaepa* and *Buchanan*. *See Turner v. Quarterman*, 481 F.3d 292, 299 (5th Cir.) (holding *Tuilaepa* permits capital sentencing juries to exercise "unbridled discretion"), *cert. denied*, —— U.S. ——, 128 S.Ct. 34, 168 L.Ed.2d 810 (2007); *Moore v. Quarterman*, 526 F.Supp.2d at 731 (holding the same); *Martinez v. Dretke*, 426 F.Supp.2d at 537 (holding the same); *Salazar v. Dretke*, 393 F.Supp.2d at 488–91 (holding the same).

### F. *Conclusions*

Petitioner procedurally defaulted on his claims herein attacking the allegedly "open-ended" discretion exercised by Texas capital sentencing juries by failing to present those same legal arguments to the Texas Court of Criminal Appeals during his direct appeal. Recognition of the new rule advocated by petitioner in his twenty-eighth and thirty-first claims is foreclosed by *Teague*.

The Texas Court of Criminal Appeals' alternative rejection on the merits during the course of petitioner's state habeas corpus proceeding of petitioner's complaints about the allegedly open-ended discretion exercised by Texas capital sentencing juries was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial and state habeas corpus proceedings.

### XXII. *Admission of Victim Impact Evidence*

### A. *The Claim*

██ In his twenty-ninth claim herein, petitioner argues his constitutional rights were violated when the trial court failed to grant a mistrial following admission of "victim impact evidence" in the form of prosecutorial jury argument suggesting David Cook was a valued, hard-working employee.[165]

### B. *State Court Disposition*

As was explained in Section X.B. above, during opening argument at the guilt-innocence phase of petitioner's trial, the prosecutor made remarks suggesting David Cook had been a "valued" and "hard-working" employee. Petitioner's trial counsel objected to same as injecting Mr. Cook's character into evidence. The state trial court sustained that objection, instructed the jury to disregard same, but refused to grant petitioner's motion for mistrial.

At the guilt-innocence phase of petitioner's trial, the prosecution called David Cook's mother to testify regarding her role in the discovery of her son's body. During her testimony, she explained David Cook's habits regarding the care of his motorcycle, his mode of getting to and from work, the routine process he employed when he needed to use his mother's automobile to transport items he could not carry while driving his motorcycle, (4) his actions on the day of his murder, (5) the plans he communicated to her about the coming weekend, and (6) the fact she was contacted by her son's employer when David Cook failed to show up for work.[166] Petitioner's trial counsel objected at one point on the basis the testimony regarding David Cook's mood on the day of his mur-

---

**165.** *Petition*, at pp. 147–49; *Reply*, at pp. 17–18.

**166.** S.F. Trial, Volume XVIII, testimony of Phyllis Cook, at pp. 19–33.

der and his plans for the weekend delved into the area of victim-impact, but the trial judge implicitly overruled this objection when she directed the prosecutor to proceed with questioning David Cook's mother.[167]

David Cook's sister also testified regarding her role in the discovery of her brother's body. During her trial testimony, she testified without objection she had a close relationship with David Cook and possessed personal knowledge regarding his habits and his friends.[168] More specifically, she testified David Cook had no friends who resided in Corpus Christi.[169]

Petitioner's thirty-fourth ground for state habeas relief argued the trial court's rulings amounted to admission of "victim impact evidence."[170] The state habeas trial court concluded petitioner had failed to properly preserve this complaint because the trial court sustained petitioner's initial objection to "the evidence" in question, but petitioner thereafter failed to object when the prosecution introduced actual testimony regarding David Cook's status as a valuable employee and Mr. Cook's relationship with his mother and sister.[171]

## C. AEDPA Review

Neither the prosecutor's comments about David Cook nor the testimony of his mother and sister in question constituted "victim impact evidence" within the meaning of that term as used by the Supreme Court in *Payne v. Tennessee*, 501 U.S. 808, 825–26, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (holding the admission of evidence of the impact of a capital murder on the victim and his or her survivors, as well as prosecutorial jury argument regarding

same, are constitutionally permissible at the punishment phase of a capital murder trial). The prosecutor's comments in question were not "evidence" of anything. The allegedly objectionable testimony of David Cook's mother and sister simply established those two witnesses had sufficiently close relationships with David Cook that they possessed personal knowledge regarding his habits and friends; as such, their testimony did not purport to describe the impact of David Cook's murder on anyone.

For the reasons set forth in Section X.C. above, insofar as petitioner complains the prosecutor commented about Mr. Cook's status as a "valued" and "hard working" employee, those complaints do not present a basis for federal habeas relief. The trial court directed the jury to disregard the prosecutor's comments in question. Juries are presumed to follow such instructions. *Zafiro v. United States*, 506 U.S. 534, 540–41, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). The prosecutor's comments were harmless error.

To the extent petitioner complains about the trial testimony of Mr. Cook's mother and sister, the proper standard of review is whether the admission of the evidence in question rendered petitioner's entire trial fundamentally unfair. A federal court may grant habeas relief based on an erroneous state court evidentiary ruling only if the ruling violates a specific federal constitutional right or is so egregious it renders the petitioner's trial fundamentally unfair. *Payne v. Tennessee*, 501 U.S. at 825, 111 S.Ct. 2597; *Darden v. Wainwright*, 477 U.S. 168, 179–83, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *Wood v. Quarterman*,

---

**167.** *Id.* at p. 31.

**168.** S.F. Trial, Volume XVIII, testimony of Cheryl Budington, at pp. 47–49.

**169.** *Id.*, at p. 49.

**170.** State Habeas Transcript, Volume 1 of 4, at pp. 182–85.

**171.** State Habeas Transcript, Volume 4 of 4, at p. 800.

503 F.3d 408, 414 (5th Cir.2007), *cert. denied,* — U.S. —, 128 S.Ct. 1874, 170 L.Ed.2d 752, 2008 WL 102421 (April 14, 2008); *Brown v. Dretke,* 419 F.3d 365, 376 (5th Cir.2005), *cert. denied,* 546 U.S. 1217, 126 S.Ct. 1434, 164 L.Ed.2d 137 (2006); *Bigby v. Dretke,* 402 F.3d 551, 563 (5th Cir.), *cert. denied,* 546 U.S. 900, 126 S.Ct. 239, 163 L.Ed.2d 221 (2005); *Wilkerson v. Cain,* 233 F.3d 886, 890 (5th Cir.2000).

Petitioner did not object when David Cook's sister testified she and her brother had remained "close" into adulthood. Admission of her testimony did not render petitioner's trial fundamentally unfair. Nor did testimony establishing that David Cook's mother spoke with him on the phone on a daily basis and often loaned him her automobile render petitioner's trial fundamentally unfair. The testimony in question served to establish these two witnesses were personally familiar with David Cook's habits, friends, and actions immediately prior to his murder. Even assuming the testimony about which petitioner now complains was somehow prejudicial, erroneous admission of even prejudicial evidence will justify habeas relief only if the admission was a crucial, highly significant factor in the defendant's conviction. *Wood v. Quarterman,* 503 F.3d at 414. The testimony in question was neither crucial nor a "highly significant factor" leading to petitioner's conviction.

Moreover, any error in the admission of the testimony of David Cook's mother and sister was harmless as best. *See Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (holding the test for harmless error in a federal habeas corpus action brought by a state prisoner is "whether the error had substantial and injurious effect or influence in determining the jury's verdict"). Neither the testimony of David Cook's mother nor that of his sister, viewed separately or collectively,

had any substantial or injurious effect or influence on the verdict at the guilt-innocence phase of petitioner's trial.

### D. *Conclusions*

The Texas Court of Criminal Appeals' rejection on the merits during the course of petitioner's state habeas corpus proceeding of petitioner's complaints about the prosecutor's comments about David Cook's status as a "valued" and "hard working" employee and the admission of testimony by his mother and sister about their "close" relationships with him was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial and state habeas corpus proceedings.

## XXIII. *Texas' Statutory Definition of "Mitigating Evidence"*

### A. *The Claim*

In his thirtieth claim herein, petitioner argues the definition of "mitigating evidence" found in Article 37.071, § 2(f)(4) of the Texas Code Criminal Procedure (which restricts that term to evidence which reduces a defendant's "moral blameworthiness") unconstitutionally limits a Texas capital sentencing jury's ability to consider 'mitigating evidence'.[172]

### B. *State Court Disposition*

At the punishment phase of petitioner's trial, the state trial court instructed petitioner's jury without objection from petitioner as follows: "You are instructed that, in answering this second question, you shall consider 'mitigating evidence' to be evidence that a juror might regard as reducing the defendant's moral blameworthi-

---

**172.** *Petition,* at pp. 150–54; *Reply,* at p. 32.

ness."[173] This instruction was consistent with Article 37.071, § 2(f)(4) of the Texas Code of Criminal Procedure.

Petitioner presented the same argument as his thirty-fifth ground for state habeas relief.[174] The state habeas trial court concluded petitioner procedurally defaulted on his constitutional attack on the Texas capital sentencing scheme's definition of "mitigating evidence" by failing to raise this argument on direct appeal, and this claim lacked merit.[175]

## C. *Procedural Default*

For the reasons discussed in Section XIII.C. above, petitioner's failure to present the Texas Court of Criminal Appeals during the course of his direct appeal with his constitutional complaints about the allegedly narrow definition of "mitigating evidence" contained in the Texas capital sentencing scheme constitutes a procedural barrier to federal habeas review of same.

## D. *Teague Foreclosure*

No federal court has held the Texas capital sentencing scheme's definition of "mitigating evidence" deprives a criminal defendant of any right recognized by the United States Constitution. *Scheanette v. Quarterman,* 482 F.3d 815, 826–27 (5th Cir.2007); *Beazley v. Johnson,* 242 F.3d 248, 259–60 (5th Cir.), *cert. denied,* 534 U.S. 945, 122 S.Ct. 329, 151 L.Ed.2d 243 (2001). Thus, the non-retroactivity principle announced in *Teague v. Lane* precludes this Court from adopting the "new rule" advocated by petitioner in his thirtieth claim in this federal habeas corpus proceeding.

## E. *AEDPA Review*

The Supreme Court has established the constitutional standard for evaluating the propriety of a jury instruction at the punishment phase of a capital murder trial as "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). The Supreme Court has consistently applied this standard to evaluate challenges to punishment-phase jury instructions. *See Weeks v. Angelone,* 528 U.S. 225, 226, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000) (emphasizing the *Boyde* test requires a showing of a reasonable likelihood, as opposed to a mere possibility, the jury construed the jury instructions to preclude its consideration of relevant mitigating evidence); *Jones v. United States,* 527 U.S. 373, 390 & n. 9, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (holding the same); *Calderon v. Coleman,* 525 U.S. 141, 146, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998) (holding the same); *Buchanan v. Angelone,* 522 U.S. 269, 276, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998) (holding the same); *Johnson v. Texas,* 509 U.S. 350, 367, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) (holding *Boyde* requires a showing of a reasonable likelihood the jury interpreted the jury instructions so as to preclude it from considering relevant mitigating evidence).

This "reasonable likelihood" standard does not require the petitioner to prove the jury "more likely than not" interpreted the challenged instruction in an impermissible way; however, the petitioner must demonstrate more than "only a possibility"

---

**173.** Trial Transcript, Volume III of III, at p. 309.

**174.** State Habeas Transcript, Volume 1 of 4, at pp. 186–87.

**175.** State Habeas Transcript, Volume 4 of 4, at pp. 800–01.

of an impermissible interpretation. *Johnson v. Texas*, 509 U.S. at 367, 113 S.Ct. 2658 *Boyde v. California*, 494 U.S. at 380, 110 S.Ct. 1190. This Court must analyze the challenged language included in the jury charge within the context of the overall jury charge. *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). "In evaluating the instructions, we do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would—with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.'" *Johnson v. Texas*, 509 U.S. at 368, 113 S.Ct. 2658; *Boyde v. California*, 494 U.S. at 381, 110 S.Ct. 1190.

Petitioner's arguments in support of this claim misconstrue the appropriate constitutional standard for evaluating the propriety of jury instructions at the punishment phase of a capital trial. The Supreme Court identified the proper inquiry in reviewing capital sentencing jury instructions as whether there is a reasonable likelihood the jury applied the challenged instructions in a way that prevented the consideration of constitutionally relevant evidence. *Boyde v. California*, 494 U.S. at 380, 110 S.Ct. 1190. Thus, the federal constitutional issue properly before the state habeas court in connection with petitioner's challenge to the statutory definition of "mitigating evidence" contained in Article 37.071, § 2(f)(4) was not whether the statutory language in question satisfied some abstract definition of the term "mitigating evidence" but, rather, whether the jury instructions actually given during the punishment phase of petitioner's trial could reasonably be construed as precluding the jury from giving mitigating effect to any of the evidence properly before the jury at the punishment phase of petitioner's capital trial. *Id.*

Petitioner does not identify any mitigating evidence he presented during his trial which he claims his jury was precluded from considering because of the allegedly narrow definition of "mitigating evidence" included in the Texas capital sentencing statute and incorporated in petitioner's punishment-phase jury instructions. Having independently reviewed the entire record from petitioner's capital trial, this Court has been unable to identify any potentially mitigating evidence which a rational jury could have construed as outside its consideration at the punishment phase of petitioner's trial because of the definition of "mitigating evidence" included in petitioner's punishment-phase jury instructions. Petitioner's evidence showing he was a good person and a model prisoner during a prior term of incarceration and had been chosen to serve as a spokesman for the prison system could all have been adequately considered by petitioner's jury in answering the future dangerousness special issue. These assertions are indistinguishable from the type of "good character" evidence which can be given adequate consideration in connection with the future dangerousness special issue. *See Scheanette v. Quarterman*, 482 F.3d at 826 n. 64 (furnishing a lengthy list of Supreme Court and Fifth Circuit opinions recognizing evidence of good character can be assessed adequately within the context of the future dangerousness special issue); *Cordova v. Johnson*, 993 F.Supp. 473, 496–98 & n. 122 (W.D.Tex.1998) (furnishing a long list of Fifth Circuit opinions holding evidence of good character can be adequately considered under the future dangerousness special issue), *appeal denied*, 157 F.3d 380 (5th Cir.1998), *cert. denied*, 525 U.S. 1131, 119 S.Ct. 922, 142 L.Ed.2d 971 (1999). If, in fact, the jury determined petitioner was a fundamentally "good person" who would likely once again be a model prisoner during a term of life im-

prisonment, the jury could have answered "no" to the future dangerousness special issue.

The state trial court instructed petitioner's jury in the following manner at the punishment phase of trial:

> It now becomes your duty to consider all the evidence in this case and determine the answers to certain questions which will be set forth for your consideration.[176] * * *
>
> You are instructed that in deliberating on the issues submitted, you shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.[177]

Thus, the trial court's punishment-phase jury instructions specifically directed petitioner's jury to consider "all evidence" admitted at either stage of trial and focused the jury's attention on the petitioner's background, character, and the circumstances of the offense. Furthermore, the mitigation or *Penry* special issue itself directed petitioner's jury to take into consideration "all the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the Defendant" when answering that special issue.[178]

Nothing in petitioner's punishment-phase jury instructions, including the statutory definition of "mitigating evidence," purported to limit the jury's ability to consider as a mitigating circumstance any evidence actually presented to petitioner's jury relating to the petitioner's background or character or the circumstances of the offense. Thus, the petitioner's punishment-phase jury instructions, including the definition of "mitigating evidence" included therein, did not violate the standard set forth in *Boyde*.

There is no clearly established federal law in the form of Supreme Court precedent mandating a definition of "mitigating evidence" broader than the one set forth in the Texas statute. On the contrary, the Supreme Court has twice approved the following state court definition: "Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Tennard v. Dretke*, 542 U.S. 274, 284, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004); *McKoy v. North Carolina*, 494 U.S. 433, 440, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990).

The Texas statutory definition is fully consistent with the evolving notion of "mitigating evidence" contained in Supreme Court and Fifth Circuit precedent. *See Scheanette v. Quarterman*, 482 F.3d at 825–26 (rejecting the same arguments attacking the Texas capital sentencing scheme's definition of "mitigating evidence" raised by petitioner herein); *Beazley v. Johnson*, 242 F.3d at 260 (holding the same Texas statutory definition of "mitigating evidence" challenged by petitioner herein did not unconstitutionally preclude jury consideration of the mitigating aspects of any evidence of the defendant's character or background or the circumstances of the offense which the defendant presented at trial); *Cordova v. Johnson*, 993 F.Supp. at 489–98 (discuss-

---

**176.** Trial Transcript, Volume III of III, at p. 307.

**177.** Trial Transcript, Volume III of III, at p. 309,

**178.** Trial Transcript, Volume III of III, at pp. 309, 313

ing the Supreme Court's analysis of mitigating evidence).

The Supreme Court has expressly held States are not limited to submitting narrow special issues to the jury when the sentencing jury reaches the selection phase of a capital sentencing proceeding. More specifically, the Supreme Court held in *Tuilaepa*, at the selection stage, the States are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment." *Tuilaepa v. California,* 512 U.S. 967, 978, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). The Supreme Court has made it clear States are permitted to guide the discretion exercised by capital sentencing juries as long as the jury is not precluded from giving mitigating effect to evidence that does lessen the defendant's moral culpability or blameworthiness for his crime. *See Johnson v. Texas,* 509 U.S. at 362, 113 S.Ct. 2658 (holding there is no constitutional requirement of unfettered sentencing discretion in the jury, and States are free to "structure and shape consideration of mitigating evidence in an effort to achieve a more rational and equitable administration of the death penalty."); *Boyde v. California,* 494 U.S. at 377, 110 S.Ct. 1190 (holding the same). The Texas capital sentencing scheme's definition of "mitigating evidence" is a proper method of guiding the discretion exercised by a capital sentencing jury. *Martinez v. Dretke,* 426 F.Supp.2d 403, 538–41 (W.D.Tex. 2006).

### F. *Conclusions*

Petitioner procedurally defaulted on his claim attacking the Texas Code of Criminal Procedure's definition of "mitigating evidence" by failing to present the same legal argument to the Texas Court of Criminal Appeals during his direct appeal. Recognition of the new rule advocated by petitioner in his thirtieth claim is foreclosed by *Teague.*

The Texas Court of Criminal Appeals' alternative rejection on the merits during the course of petitioner's state habeas corpus proceeding of petitioner's challenge to the Texas Code of Criminal Procedure's definition of "mitigating evidence" was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial and state habeas corpus proceedings.

### XXIV. *Certificate of Appealability*

The AEDPA converted the "certificate of probable cause" previously required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a "Certificate of Appealability" ("CoA"). *See Hill v. Johnson,* 114 F.3d 78, 80 (5th Cir.1997) (recognizing the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson,* 114 F.3d 43, 45 (5th Cir.1997) (holding the standard for obtaining a CoA is the same as for a CPC). The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA. *Robison v. Johnson,* 151 F.3d 256, 259 n. 2 (5th Cir.1998), *cert. denied,* 526 U.S. 1100, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999); *Hallmark v. Johnson,* 118 F.3d 1073, 1076 (5th Cir.1997), *cert. denied sub nom. Monroe v. Johnson,* 523 U.S. 1041, 118 S.Ct. 1342, 140 L.Ed.2d 502 (1998).

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller–El v. Cockrell,* 537 U.S. 322, 335–36, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003); 28 U.S.C. § 2253(c)(2). Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell,* 301 F.3d 656, 658 n. 10 (5th Cir.2002) (holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain,* 227 F.3d 228, 230 n. 2 (5th Cir.2000) (holding the same); *Lackey v. Johnson,* 116 F.3d 149, 151 (5th Cir.1997) (holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted alone. *Crutcher v. Cockrell,* 301 F.3d at 658 n. 10; *Lackey v. Johnson,* 116 F.3d at 151; *Hill v. Johnson,* 114 F.3d at 80; *Muniz v. Johnson,* 114 F.3d at 45; *Murphy v. Johnson,* 110 F.3d 10, 11 n. 1 (5th Cir.1997); 28 U.S.C. § 2253(c) (3).

A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke,* 542 U.S. 274, 282, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004); *Miller–El v. Cockrell,* 537 U.S. at 336, 123 S.Ct. 1029; *Slack v. McDaniel,* 529 U.S. 473, 483, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000); *Barefoot v. Estelle,* 463 U.S. 880, 893, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983). To make such a showing, the petitioner need not show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke,* 542 U.S. at 282, 124

S.Ct. 2562; *Miller–El v. Cockrell,* 537 U.S. at 336;, 123 S.Ct. 1029 *Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. 1595; *Barefoot v. Estelle,* 463 U.S. at 893 n. 4, 103 S.Ct. 3383. This Court is authorized to address the propriety of granting a CoA *sua sponte.* *Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir.2000).

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller–El v. Cockrell,* 537 U.S. at 338, 123 S.Ct. 1029 (*quoting Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. 1595); *accord Tennard v. Dretke,* 542 U.S. at 282, 124 S.Ct. 2562. In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and whether this Court was correct in its procedural ruling. *See Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. 1595 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows reasonable jurists would find it debatable whether the claim is a valid assertion of the denial of a constitutional right, and the

district court's procedural ruling was correct).

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Foster v. Quarterman*, 466 F.3d 359, 364 (5th Cir. 2006), *cert. denied*, —— U.S. ——, 127 S.Ct. 2099, 167 L.Ed.2d 817 (2007); *Dickson v. Quarterman*, 462 F.3d 470, 476 (5th Cir.2006); *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir.2005), *cert. denied*, —— U.S. ——, 127 S.Ct. 351, 166 L.Ed.2d 49 (2006); *Bridgers v. Dretke*, 431 F.3d 853, 861 (5th Cir.2005), *cert. denied*, 548 U.S. 909, 126 S.Ct. 2961, 165 L.Ed.2d 959 (2006).

Nonetheless, a CoA is not automatically granted in every death penalty habeas case. *See, e.g., Scheanette v. Quarterman*, 482 F.3d at 828–29 (holding petitioner *not* entitled to a CoA on a *Ring/Apprendi* claim nearly identical to petitioner's twenty-fifth claim herein); *Turner v. Quarterman*, 481 F.3d 292, 301–02 (5th Cir.) (holding petitioner eligible for CoA on *neither* ineffective assistance, *Ring*, nor "failure to inform jury of the effect of a hung jury" claims), *cert. denied*, —— U.S. ——, 128 S.Ct. 34, 168 L.Ed.2d 810 (2007); *Sonnier v. Quarterman*, 476 F.3d 349, 364–69 (5th Cir.) (denying CoA on a wide variety of innovative challenges to the Texas capital sentencing scheme, including many similar to those raised by petitioner herein), *cert. denied*, —— U.S. ——, 128 S.Ct. 374, 169 L.Ed.2d 259 (2007).

██ None of petitioner's claims herein satisfy the standard for obtaining a CoA. The Texas Court of Criminal Appeals' rejections on the merits of petitioner's challenges to the trial court's rulings on challenges for cause and peremptory challenges were reasonable applications of clearly established federal law. The same is true for the Texas Court of Criminal Appeals' rejections on the merits of petitioner's actual innocence, constructive denial of counsel, and conflict of interest claims. Petitioner presented the state habeas court with no evidence showing Bexar County's capital attorneys fee schedule had any impact upon his legal representation. Likewise, petitioner's ineffective assistance claim failed because petitioner presented the state habeas court with no evidence showing his trial counsel ever acted in an objectively unreasonable manner. In fact, petitioner presented the state habeas court with almost no evidence inquiring into the subjective thought process of his trial counsel or establishing the existence of any additional exculpatory, mitigating, or otherwise beneficial evidence which his trial counsel, through more thorough investigation, could have developed and presented at trial.

Petitioner never presented the state habeas court with evidence showing there was any evidence available at the time of petitioner's trial showing prosecution witnesses Rick Wood and Joey Banks had reached an agreement with prosecutors at that time involving their trial testimony against petitioner; therefore, petitioner's *Brady* and *Giglio/Napue* claims are legally frivolous.

Petitioner's procedurally defaulted and *Teague*-barred challenges to the Texas capital sentencing scheme contained in his nineteenth, twentieth, twenty-second, and twenty-fourth through thirty-first claims are also foreclosed by well-settled Supreme Court and Fifth Circuit precedent.

None of petitioner's remaining claims present an arguable basis for federal habeas relief under the AEDPA. There is no room for disagreement among reasonable jurists as to any of the foregoing conclusions. Petitioner is not entitled to a CoA for the purpose of re-arguing claims which he failed to support with evidence during his state habeas proceeding. Therefore,

petitioner is not entitled to a Certificate of Appealability in this cause.

Accordingly, it is hereby **ORDERED** that:

1. All federal habeas corpus relief requested in petitioner's pleadings herein is **DENIED.**

2. Petitioner is **DENIED** a Certificate of Appealability on all claims presented in his pleadings herein.

3. All other pending motions are **DISMISSED** AS MOOT.

4. The Clerk shall prepare and enter a Judgment in conformity with this Memorandum Opinion and Order.

**It is so ORDERED.**